FEDERAL DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS


JESSICA CONNOLLY                          )
                                          )
      PLAINTIFF                    )
                                          )
v.                                        )          Case No.
                                          )
WOBURN PUBLIC SCHOOLS ,                   )
                                          )
CITY OF WOBURN,                           )
                                          )
MATTHEW CROWLEY,                          )
      Individually, and            )
                                          )
MICHAEL BALDASSARE,                       )
      Individually                 )
                                          )
      DEFENDANTS                   )

--------------------------------------------------------

## **COMPLAINT AND JURY DEMAND**

1.     Plaintiff is an individual who resides in Wilmington, Middlesex County, Massachusetts.


2.     Defendant the Woburn Public Schools ("District") is a school district in Woburn,

Massachusetts that receives federal financial assistance.


3.     Defendant City of Woburn (the "City") is a municipality that receives federal financial

assistance with regard to education of the students at the Woburn Public Schools.  Ms.

Connolly's teacher contracts were issued by the City of Woburn.


4.     Defendant Matthew Crowley is an individual who works at 55 Locust Street, Woburn,

Massachusetts and upon information and belief resides in Lexington, Massachusetts.

5.      Defendant Michael Baldassarre is an individual residing at 565 Elm Street, Concord, Massachusetts.

## INTRODUCTION

6.      This is a complaint for discrimination and retaliation against a special education teacher at the Woburn Public Schools. The Plaintiff, Jessica Connolly, requested accommodations to work remotely due to medical issues. The accommodations were given but in the process, she was harassed and intimidated by the principal of her school, Kenneth Kessaris, and the Special Education Director Maureen Ryan.

7.      In addition, the Plaintiff has been the subject of an ongoing campaign of bullying, harassment, intimidation and retaliation because she  advocated for disabled students with special education needs and because she spoke out about major deficiencies in the special education program.

8.      The actions of the Woburn Public Schools constitute violations of the Americans With Disabilities Act, Section 504 of the Rehabilitation Act, the First Amendment and have created a hostile work environment.

## JURISDICTION AND VENUE

9.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This Honorable Court is the appropriate venue because all parties live and work, and all of the actions have taken place, in the Commonwealth of Massachusetts.

## FACTS

10.      Jessica Connolly has been a dedicated special education teacher for 13 years. She is dedicated to her job and the students she serves. She was a finalist in the National Teacher of the year by the Southern Poverty Law Center in 2015.  Ms. Connolly receives multiple parent's

choice awards given each year.  She has almost never been absent and has accumulated nearly 130 sick days.  She secured many grants for her students on her own, and has appeared in the Woburn Chronicle for her efforts in securing Classroom Jeopardy and for Epilepsy Awareness.  Ms. Connolly also is disabled because she suffers from general anxiety disorder which affects her nervous system and has asthma which affects her ability to breathe.

11.     In August of 2020, Ms. Connolly requested to be a virtual teacher due to a personal health issue. Principal Kessaris approved the request. When Ms. Connolly tried to make arrangements Human Resources Director, she was met with anger and hostility and was sent away.

12.     Ms. Connolly received a phone call on September 3, 2020 from the Human Resources Director, Mrs. O'Neil saying that Assistant Superintendent Dr. Baldassarre had rejected her request.  Ms. Connolly politely protested and later, Mrs. O'Neil reluctantly said she was approved after talking to Baldassarre.

13.     Soon after, Dr. Baldassarre called Ms. Connolly on her personal cell phone and asked that she come back for "in-person learning" because parents were sad to see her go, thus reneging on the accommodation he had promised.

14.     Meanwhile, she had received an intense workload that far exceeded that of the job description and was disproportionate to her peers.' She requested training and resources and was denied and ignored.

15.     She was intimidated by the possibility of being viewed as "a bad teacher, so despite her fears about COVID, she reluctantly agreed to Dr. Baldassarre's request to return to in-person learning.  Ms. Connolly rescinded her request to work virtually on September 17, 2020.

16.     The school system contacted her about scheduling a meeting to engage in the collaborative process of "discussing accommodations" on September 21, 2020 for her health issues.  Ms. Connolly voluntarily read an emotional personal statement in good faith about her circumstances and health concerns and the lack of support she had received. Ms. Connolly was shamed at this meeting by both Superintendent Crowley and Special Education Director Mrs. Maureen Ryan.  Superintendent Crowley embarrassed her about returning to school, and Mrs. Ryan ridiculed her for "not caring about her family." They lied and said that Principal Kessaris had never approved the accommodations.  Dr. Crowley asked in front of her supervisors if she "put parents up to contacting Dr. Baldassarre." The withdrawal of the accommodations caused her emotional turmoil and confusion. She was in an impossible position either way.  She had only two options - work while unsafe for her health and her family's health, or being in an impossible virtual role for which she had no knowledge or training of how to effectively teach.

17.     Despite the request that she return to in-person learning, she was given another assignment as a virtual teacher. Ms. Connolly was confused, scared, and ashamed and felt that she was being manipulated.

18.     Throughout the 2020-2021 school year, Mrs. Ryan falsely accused Ms. Connolly of not being in compliance with student service times.

19.     In addition, Mrs. Ryan belittled, mistreated, harassed, put into situations that were beyond her authority, and bullied her all because she dared to speak up on behalf of her special education students.

20.     Ms. Connolly noted several deficiencies in the special education department. The Chairperson and the Director often abdicated their jobs as the leader of IEP meetings and have thrown Ms. Connolly into meetings to be the sacrificial lamb.

21.     For example, Ms. Connolly has been expected to act as the district's LEA Representative during IEP meetings this school year. The LEA legally must have the authority to allocate the district's resources for the services needed by the student. However, Ms. Connolly was never trained for this role and was never vested with the proper authority to serve in this role. This has made Ms. Connolly the "spokesperson" for the IEP Team, and parents are looking to her to answer legal questions and complaints– questions that she should not have to field by herself. She is the "fall guy" to defend the district's inadequacies while the Chairperson and Director make themselves unavailable for scrutiny.

22.     She protested to the administration on several occasions that she was illegally being thrown into a position for which she was not qualified. Not having a LEA Representative at IEP with the proper authority is a violation of IDEA. When she spoke out about this issue, she was the subject of further retaliation and bullying.

23.     The retaliation has taken the form of assigning her an uneven and impossible workload and using pretexts to punish her and make her miserable and upset.  She continues to be forced to run these illegal meetings.

24.     On December 14, 2020, the US Department of Education Office for Civil Rights found that the district retaliated against a student and his parents for advocating for the student's rights and that the district did not respond to  retaliation concerns consistent with Section 504 and Title II. As part of a resolution agreement, the district agreed to provide training to staff about how to respond to complaints under Section 504/Title II and about how retaliation should be recognized and prevented. Despite this agreement, retaliation continued to occur against Ms. Connolly.

25.     Ms. Connolly has often spoken up about the lack of services disabled students have been receiving. One such example was the promise the district made to a student "LW" about receiving additional and comprehensive services when in reality, the student was being used to help an inexperienced teacher complete her practicum for licensure.  At the same time, Ms. Connolly was giving LW the exact same service, but she was purposefully left out of communications about that staff member's contradictory efforts. When the parent and her lawyer began to catch on, Ms. Connolly was blamed.

26.     Ms. Connolly then became a target, and all of the district's failures toward LW were linked to her. For example, LW's parents mistakenly accused Ms. Connolly of overuse of the computer for her instruction. This was untrue, but the administration failed to defend Ms. Connolly and she had to bear the wrath of LW's parents.

27.     As Ms. Connolly continued to speak out, Special Education Director Maureen Ryan and special education team chairperson Jaimee Greitzer engaged in an effort to make her working conditions purposefully miserable. They expected more and more of her and gave her more and more work.  For example, a co-teacher was allowed to make changes to the caseload whereas Ms. Connolly was denied the same opportunity.

28.     Ms. Connolly's mental state further deteriorated as the hostile work environment progressed. On November 12, 2021, a Friday, Vice Principal Mr. Stephen Gallo approached Ms. Connolly and demanded that she "hand over" her protected personal notes to him to give to Mrs. Ryan.  She felt intimidated and caught off guard.

29.     Ms. Ryan, too, insisted that Ms. Connolly turn over data regarding LW immediately, even though it was not required. Ms. Connolly responded that she had personal notes that she was using to compile the data into a readable form and requested that she be given the weekend

to finish the report. Ms. Ryan became belligerent and insisted she turn over her data immediately.

30.     Personal notes of a special education teacher are her personal property and the procedure is that the administration is given copies of finalized IEP progress reports. The personal notes that Ms. Connolly was forced to produce were only quickly jotted thoughts and did not represent the final, thoughtfully prepared notes Ms. Connolly is known for preparing. The vice principal came to Ms. Connolly's classroom and continued to bully her about the data, which she did unwillingly.

31.     Things came to a head during a zoom Case Consult meeting on November 17, 2021. Special Education Director Maureen Ryan was particularly hostile towards Ms. Connolly. Throughout the meeting, she berated Ms. Connolly and set her up to be humiliated.  Mrs. Ryan had predetermined the services she wanted the student to receive and expected Ms. Connolly to pass them off as her own.  Predetermination is a procedural violation of the Individuals with Disabilities Act (IDEA) that deprives parents of the opportunity to meaningfully participate in their child's IEP.  Predetermination can also deny the child a free appropriate public education (FAPE).

32.     Ms. Connolly was humiliated in front of her peers at that meeting. Other participants stated that Ms. Ryan was abusive and relentless in her treatment of Ms. Connolly – one said that Ms. Ryan acted like she was "beating a dead horse." She was shaken and upset as there had been no cause for Ms. Ryan to treat her like that.

33.     The next day, Ms. Connolly sent an email to Ms. Ryan, her principal Mr. Kessaris and the assistant principal Mr. Gallo. She expressed how she felt devastated by the way she was treated at the meeting the day before. She explained that her workload was overly burdensome.

She said that she found herself "up late nights frantically planning and worrying while trying to learn the ins and outs of [her] added responsibilities formerly handled by the chairperson." She explained how she had been made to feel "completely inadequate and discouraged."

34.     She suggested that her duties be lightened, and that the chairperson play more of a hands-on role with the students. She asked if she could be relieved from oversight of LW's case since she had been placed in an untenable position by the administration. Ms. Ryan responded to Ms. Connolly's pleas with a curt message without offering any help. Ms. Ryan asked her to provide her caseload and student names, which Ms. Connolly immediately did.

35.     However, nothing was done, and her caseload remained the same. Ms. Ryan did nothing to address the inequities nor to provide assistance to Ms. Connolly.  Even though Ms. Connolly had pleaded to be relieved of the responsibility for LW's case, Ms. Ryan and her principals ignored this request.

36.     Ms. Connolly was uncomfortable and disturbed by LW's treatment. A parent meeting on LW's case was scheduled for December 2, 2021. Ms.Connolly made sure that the administration was prepared for that meeting. The day before, she left a hard copy of data and the most recent dictation packet in the principal's mailbox. She also sent several items to Jaimee Greitzer so that she could prepare for the meeting the next day. This included an entire IEP draft which included sample goals.  LW's parents also were in direct receipt of a table of data she compiled, even though it was not required.

37.     Meanwhile, Ms. Connolly entered a personal day for Dec 2. Since she had rarely taken a personal day, she mistakenly labeled her absence as "personal" rather than "sick." She was unaware that personal days required pre-approval and was made to feel stupid for not being familiar with a policy she had rarely, if ever, had to make use of.

38.     The meeting was held on December 2, 2021, as planned. Ms. Connolly did not come to school as she had indicated. However, she received voicemails and texts on her personal phone from the principal with questions pertaining to the meeting. Ms. Connolly immediately answered all of the questions. She reminded him that she had provided documents the day before and even forwarded some additional documents after the call. The principal acknowledged receipt of the documents and thanked Ms. Connolly for her helpfulness. He never made any mention of the fact that she had requested a personal rather than a sick day.

39.     Later that afternoon, Ms. Connolly received an email from the principal indicating that her presence was needed at a disciplinary meeting at 8:30 am the next day with him and the HR Director Marisa Boyajian. This was in violation of the policy that employees receive three days' notice before the scheduling of any disciplinary hearing. Ms. Connolly was confused because it came out of nowhere – her correspondence earlier in the day with the principal was cordial.

40.     That evening, Ms. Connolly sent an email to the HR director asking her about medical leave, but she did not receive a reply to this email until 7 days later.

41.     On December 3, 2021, Ms. Connolly sat down with the principal, the HR director and the City's Union President, Barbara Locke. Ms. Boyajian immediately began verbally attacking Ms. Connolly, reprimanding her for mistakenly calling the sick day a personal day. Ms. Connolly apologized and explained that she had been confused about the procedure. However, the berating continued, with Ms. Boyajian stating things like "you have no professional courtesy" and that she "knew the real reason why Ms. Connolly didn't go to work the day before".

42.     Ms. Connolly asked the principal why he hadn't told her about his concerns the day before when they were communicating about the meeting, but he refused to answer. Ms.Boyajian said that a disciplinary letter would be placed in Ms. Connolly's personnel file. The City's Union

President Barbara Locke was a witness and was very concerned about the tone of the meeting, especially given that a co-worker of theirs had tragically died of COVID the night before. The Union President asked about progressive discipline since this was the only infraction ever committed by Ms. Connolly and it was a very trivial, unintentional infraction. However, the principal did not waiver or change his mind.

43.     On December 7, 2021, Ms. Connolly was presented with the disciplinary letter which was placed in her personnel folder via email. The letter contained skewed accusations and reprimanded her for items not required by her contract. The tone was atypical of that used by the principal. The filing violated the Woburn Policy handbook and Massachusetts laws about personnel records.  It lacked rebuttal and Ms. Connolly's signature and she was not given an opportunity to respond. Ms. Connolly suspected that the principal was pressured into drafting the letter by Ms. Ryan in retaliation.

44.     The next day, December 8, 2021, Ms. Ryan asked to see Ms. Connolly's (unrequired) data and notes with a parent on a google doc, and Ms. Connolly obliged. She presented the data as she usually did – compiled into a comprehensive table of data. Ms. Ryan questioned Mrs. Locke about the data, in apparent disbelief that Ms. Connolly's work was so thorough. She wrongly and without any foundation accused Ms. Connolly of fabricating the data. This was a blatant attempt to wrongly discredit Ms. Connolly in the eyes of her peers in yet another retaliatory act.

45.     The union president told Ms. Connolly warned Ms. Connolly to be cautious. Fearing more unwarranted repercussions, Ms. Connolly decided to lock access to her personal notes for fear they could be snatched and twisted by Ms. Ryan.  Data was provided by Ms. Connolly in good faith directly to parents. The next day, Jamie Greitzer sent an email to Ms. Connolly asking

her to unlock the data, which she immediately did. However, that email was maliciously copied to the parent involved, in another blatant attempt to embarrass and disparage Ms. Connolly.

46.    The next day, the assistant principal Mr. Gallo approached Ms. Connolly (without union representation) alone in her classroom and aggressively questioned behind a closed door.  He repeatedly asked if she would be present the next day for another meeting about LW. Ms. Connolly told him that she felt "unsafe" and was scared. She explained that the treatment she had been receiving from Ms. Ryan and Jaimee Greitzer was meant to belittle and attack her and was making her feel unsafe. Instead of consoling her or backing off, Mr. Gallo snapped and yelled, "You are combative and disrespectful!" She calmly responded and asked him to explain how her expressing concerns about the way she had been treated was combative. He backed down and asked her again if she was planning to attend the meeting. Ms. Connolly responded by saying that she would do whatever was in the best interests of the student.

47.    A full two hours later, both the principal and the assistant principal came to Ms. Connolly's classroom. The principal said that Mr. Gallo had told him that Ms. Connolly wanted to speak with him, which was untrue. He then kept asking her how they could get through the meeting tomorrow and how could they be assured that she would attend. She responded by explaining that she felt like she was being bullied and intimidated and was not intending to be insubordinate. She tried to explain that she was being placed in an untenable situation and that all she was trying to do was to make sure she would not get needlessly punished again.

48.    Just then, an emergency occurred and Mr. Gallo left the room. Ms. Connolly asked the principal about the disciplinary letter and why he had not told her about his concerns earlier. He refused to look her in the eye, but vaguely alluded that he was not the author of the letter. He

refused to provide more details. However, this confirmed the retaliatory nature of the letter as he was pressured by someone else (presumably Mrs. Ryan) to find an excuse to discipline her.

49.     Later, Ms. Connolly learned that Ms. Ryan had falsely reported her to administration for lying. Ms. Connolly confronted Mr. Gallo to let him know about the inappropriate disparaging talk occurring behind her back. He got angry and denied it happening.

50.     Because the atmosphere was threatening and intense, with inaccurate accusations occurring behind her back and because she had been approached unrepresented by both her principal and assistant principal, Ms. Connolly's nerves were beyond frayed. She felt like she was being intimidated and targeted for extra scrutiny in an effort to undermine her. She called in sick the next day, December 10, 2021, which was the follow up meeting for LW. This time, Ms. Connolly followed the correct procedure for calling in a sick day.

51.     That afternoon, Ms. Ryan told her that there was going to be another disciplinary hearing for her scheduled for Monday December 13, where the HR director would be present. Ms. Ryan did not tell her why she was facing more discipline.  Realizing that she was being set up and accused unjustly, Ms. Connolly again called in sick on December 13, 2021. It was clear that Ms. Ryan was doing everything possible to retaliate against Ms. Connolly and was looking for ways to punish her unjustly.

52.     Ms. Connolly found out later from witnesses that Jaimee Greitzer had blamed her at the meeting on 12/10/21 for things that she was not responsible for.  Jaimee Greitzer also changed MCAS recommendations that Ms. Connolly had made for LW, telling LW's parents that she disagreed with Ms. Connolly's prior assessment. Once again, Ms. Connolly was being undermined publicly.

53.     Jaimee Greitzer continued berating Ms. Connolly throughout that week, hounding her to write an IEP for LW based on the meeting that Ms. Connolly did not attend.

54.     Next, the HR Director, Mrs. Boyajian, wrongly accused Ms. Connolly of deleting important files to her supervisors.  However, this was false. Ms. Connolly had deleted her own personal notes and memory aides which was standard procedure. Ms. Connolly was set up to look like she hasn't been properly instructing the child.

55.     The intimidation against Ms. Connolly soon reached a crisis level. She received an email from Ms. Ryan telling her to be at her office at 11:30 on December 14, 2021. At 11:25 on the dot, Ms. Ryan called the secretary to ask where Ms. Connolly was, even though she knew Ms. Connolly reported for work at 11:30 and that she had specifically asked her to report at 11:30. Once again, she was trying to manufacture a reason to discipline Ms. Connolly.

56.     On December 14, 2021, Ms. Connolly filed a formal complaint with the Superintendent, Assistant Superintendent Dr. Baldassarre (the City's appointed Civil Rights Officer), and the WTA President. The complaint outlined the bullying behavior against her, including the berating of her in a zoom meeting in front of her peers, the defamation of her name, the disciplinary letter, and the intimidating nature of the confiscation of her personal notes. Assistant Superintendent Baldassarre was assigned to investigate the complaint.

57.     On December 15, 2021, Assistant Superintendent Baldassarre wrote to Ms. Ryan about the complaint and stated that "interim measures" were to be implemented. Ms. Ryan indicated that she was nevertheless going ahead with her own disciplinary action against Ms. Connolly because "she needed to move forward regardless of the complaint." This is a clear example of retaliation by Ms. Ryan in continuing to attack Ms. Connolly after she had filed a complaint.

58.     An IEP meeting for another student, "OK," had been scheduled for December 16, 2021. Jaimee Greitzer refused to come even though Ms. Connolly indicated that she needed her support (she had been physically intimidated by this parent before) and she was wary of her ability to allocate the district's resources. A topic to be discussed at the meeting was the lack of a psychologist and available compensatory services. Ms. Connolly was left holding the bag, trying to explain to a parent why the district was not providing the services it had promised.

59.     Ms. Connolly learned that the reason Jaimee Greitzer did not attend was because she was at a holiday party with Ms. Ryan at that time. Ms. Connolly was completely overwhelmed and confused since Jaimee Greitzer, Maureen Ryan, or another administrator should have been available to explain to the parent what had been going on. Afraid that she might say the wrong thing or unintentionally contradict what Jamie Greitzer had promised, Ms. Connolly canceled the parent meeting. The parent was visibly upset, and Ms. Connolly tried to assuage the parent by explaining that the district was short-staffed. However, the real reason Jaimee Greitzer was not present was because she was at the holiday party. Once again, Jamie Greitzer was setting Ms. Connolly up to fail by sending her to a meeting without the proper support or authority.

60.     Meanwhile, Jaimee Greitzer continued to unnecessarily hound Ms. Connolly about LW's IEP and to write misleading group e-mails saying that Ms. Connolly wasn't doing her job. Jaimeie Greitzer demanded that Ms. Connolly include recommendations made by a Dr, Mousseau (a psychologist friend of Mrs. Ryan's portrayed as an outside advisory entity) even though Ms. Connolly was not present at the meeting when Dr. Mousseau made those recommendations, which was against procedure.

61.     On December 17, 2021, Jaimee Greitzer sent a group email to Ms. Connolly's co-workers and principal. In the email, she berated Ms. Connolly for not having completed LW's IEP, even

though Jaimee knew that Ms. Connolly was never given all the information she needed and that Ms. Connolly had already provided a detailed draft plan.

62.     By December 21, 2021, Ms. Connolly was feeling extreme emotional distress. She was fully aware of a coordinated effort to belittle, demean and harass her, orchestrated by Mrs. Ryan and assented to by her principal, vice principal, chairperson, HR director, and others, all because she had asked for accommodations and had advocated for her disabled students.

63.     She reached out to Mrs. Locke and the Woburn Teachers' Association President and Grievance Officer, Mr. James Byington, to explain what she had been through and to explain that she has been placed in embarrassing and illegal situations.  However, the troubling behavior did not stop.

64.     On December 23, 2021, Jamie Greitzer demanded that Ms. Connolly provide "progress notes" in an email that was copied to the assistant superintendent in an attempt to further embarrass Ms. Connolly. Jaimee Greitzer knew the notes were not due until January 6, but wanted it to appear that Ms. Connolly was behind.

65.     The district began an investigation of Ms. Connolly's complaint, and she readily participated willingly in all of the district's interviews and provided them with all documents that could even be remotely related.  At an investigatory meeting led by Dr. Baldassarre on 12/21/22, Ms. Connolly was heavily encouraged to remove Principal Kessaris from "protective measures".  She obliged, trying to be cordial, even though she knew that the protective measures were meant to protect her from further abuse.

66.     On January 3, 2022, Ms. Connolly sent another email to Mr. Kessaris documenting that she was continuing to be put in an illegal role for which she was not qualified or trained. At the same time, Jaimee Greitzer (along with Ms. Ryan and Principal Kessaris) failed to produce the

IEP for LW as promised and left Ms. Connolly to deal with the wrath of LW's parents and lawyer.

67.     On January 20, 2022, Ms. Connolly and her Union President and officer willingly participated in another investigatory meeting with Dr. Baldassarre.  It seemed anything but collaborative.  Dr. Baldassarre told her she could end the investigation and mend relationships with him personally serving as mediator. Dr. Baldassarre tried to turn the tables and implied that one case/event sparked repeated retaliatory/intimidating behaviors which was a form of blaming the victim. Mr. Byington protested when this was said. Ms. Connolly felt as if her situation was being down-played and she was being encouraged to drop her complaint.

68.     On January 28, 2022, Assistant Superintendent Baldassarre distributed a dismissive and irresponsible 5½ page "Confidential Investigative Report" about his investigation into Ms. Connolly's complaint. The report contained lies about "pertinent facts" and "findings." The report concluded that the district needed to get legal advice about Ms. Connolly's serving as the LEA representative at union meetings, that the unequal caseload be the subject of a grievance by the WTA, the district would "offer opportunities to explore further conversations" with a trained mediator, and that Principal Kessaris should  remove the disciplinary letter from Ms. Connolly's personnel file.  The report completely dismissed any acknowledgement of wrongdoing or retaliation under 504 - a violation of 504 itself.  This report was also released to unauthorized parties directly resulting in further adverse actions and emotional damage. Ms. Connolly filed an appeal which rebutted all of the items in the report.

69.     None of these "recommendations" ever came to fruition, although Ms. Connolly voluntarily participated in efforts to "repair relationships" with Principal Ken Kessaris. These

efforts were not that of a trained mediator as promised, but Ms. Connolly still showed an unrelenting willingness to improve conditions for her students.

70.    Nevertheless, the abuse continued. Ms. Morgan scolded Ms. Connolly at a "training" meeting for not "working well" with Jaimee, and the principal sent her an identical email. They both told her to answer to Jaimee even though Ms. Connolly stated she felt uncomfortable with the hostile way Jaimee had been treating her.

71.    One day, she found the principal and assistant principal "lurking" outside her classroom door.  She also learned that several colleagues had been asked by the principal to spy on Ms. Connolly, by keeping track of her movements throughout the day.

72.    Meanwhile, Jaimee drafted many e-mails that were sent to Ms. Connolly's supervisors, commanding Ms. Connolly to do her job and insinuating she wasn't.  Ms. Connolly asked Jaimee to stop sending correspondence, but she refused.

73.    On February 10, 2022, Ms. Connolly met with Principal Kessaris and Special Education Teacher Leader, Gregory Woodland.  The principal attempted to "balance" the workload among the special education teachers, but it was woefully inadequate. Ms. Connolly's co-worker was assigned a substitute teacher to help with her duties, but Ms. Connolly was not.

74.    On February 17, 2022, Ms. Connolly had the rescheduled OK IEP meeting (the contentious  one Jaimee refused to come to in order to attend Mrs. Ryan's Christmas party).  Jaimee lead the meeting.  Likely to spite Ms. Connolly in front of her colleagues, Jaimee denied the child the accommodation Ms. Connolly recommended that the child needed, including denying the accommodation that the MCAS be read aloud to her, and misstated the law. The team disagreed adamantly with Jaimee's incorrect denial of this accommodation.  Ms. Connolly

was the note-taker for the meeting, and due to the majority sentiment, she noted the team approved OK's MCAS accommodation and sent the notes to parents.

75.     Several days later, OK's mother called Ms. Connolly very upset.  She reported that Jaimee had called her and made disparaging remarks about Ms. Connolly. The mother also was shaken, because Jaimee falsely told her that her daughter wouldn't graduate from high school due to this MCAS accommodation.  The parent forwarded an e-mail to Ms. Connolly from Jaimee that verified that this phone conversation had taken place.

76.     Several days later, Jaimee sent Ms. Connolly a "revised" copy of OK's meeting notes, minus the MCAS accommodation, and commanded she send it to the mother.  Ms. Connolly refused.

77.     On March 11, Ms. Connolly was unexpectedly asked to report to the Superintendent's Office with the union leader. Ms. Connolly asked about options for hiring an independent investigator for her appeal. The Superintendent then yelled, stormed out, and said, "I don't have time for this.  I have already hired someone.  I am trying to run a school district here."  Ms. Connolly was disturbed by his anger and explosive behavior.

78.     Despite this request for an independent party, the superintendent went ahead and hired a woman named Regina Ryan to handle the appeal.

79.     Principal Kessaris removed the disciplinary letter in Ms. Connolly's file on March 14, 2022 – 3 months from when he was advised by Mr. Baldassarre to do so. His failure to immediately act to remove the wrongful letter caused Ms. Connolly even more distress.

80.     On March 17, 2022, Jaimee Greitzer sent an email to Ms. Connolly, and her supervisors, mistakenly stating that she was out of compliance with a student's IEP in an attempt to embarrass her.

81.     On March 21, 2022, Principal Kessaris created a new "schedule" for the special

education students. However, the schedule was poorly designed, not in legal compliance, would

require re-structuring of six other schedules, and would have negatively impacted the child's

whole education. Ms. Connolly spoke out again for her students, stating it would "be

detrimental" to put this into place.

82.     The district continues to purposefully give Ms. Connolly a disproportionate amount of

student evaluations, while not providing any coverage for the services she will have to miss

during the evaluations. Ms. Connolly asked for help and guidance three times.  She is being

continuously belittled, spied upon, intimidated, harassed and asked to do things she believes are

illegal, like serving as the LEA representative.

83.     On April 7, 2022, Ms. Connolly politely requested guiding documents for running

meetings where she was to commit resources or defend the district to an advocate.  Her

supervisors evaded her questions all three times she asked that day.  In direct retaliation, about

15-20 minutes before a meeting to be attended by an advocate was set to begin (at 1:30 p.m.),

Principal Kessaris approached Ms. Connolly alone in her classroom.  He demanded that she run

the meeting, and that he and Mrs. Greitzer would be there "for support".  Ms. Connolly said she

felt intimidated, scared, and completely unequipped without proper preparation and without the

documentation she requested.  This was not pertaining to her job description.  It is unclear why

Mrs. Ryan, Mr. Kessaris, and Mrs. Greitzer habitually run similar meetings for her colleagues,

but Ms. Connolly treatment has been different.  It also has been in direct contrast of what the

Woburn Teacher's Union has stated is the policy and on an internal document signed by Mrs.

Ryan. See Exhibit A attached hereto.

84.     Ms. Connolly experienced a medical episode as a direct result of this retaliation.  She had the school nurse intervene at 1:20 p.m. as a result of her distress and was sent home, and advised not to drive.  This was documented as Ms. Connolly "refusing" to lead the meeting in violation of her principal's instructions.

85.     The next day, Ms. Connolly returned to work and was determined not to let her students be victimized.  She arrived to find a group e-mail sent by Jaimee Greitzer (including parent and supervisors) commanding Ms. Connolly to reschedule the meeting with the advocate because of her medical episode - even though Ms. Connolly was taking time off for her own wedding.

86.     Ms. Connolly was devastated when she returned a phone call to OK's mother, who was extremely upset.  She had reported that she called the Assistant Superintendent, Mike Baldassarre, about Jaimee's denial of her child's proper MCAS accommodations.  The Assistant Superintendent was not available, so she was re-directed to Assistant Special Education Director, Renee Morgan.  Renee covered for Jaimee and asserted that OK did not meet the qualifications. The child is in the <1st percentile for her reading disability and meets all 3 of the state's requirements.  The parent and student should have never been the victims of Jaimee and Renee's coordinated retaliatory pursuits against Ms. Connolly.  Ms. Connolly was sickened that they were.

87.     On April 10, 2022, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination outlining the above series of events. Plaintiff was in the process of amending her complaint to include counts against both the Superintendent and Assistant Superintendent when a disturbing event occurred.

88.     On May 5, 2022, at 10:33 p.m., Assistant Special Education Director Renee Brisette sent an email to the Plaintiff stating the following:

"Good Evening Jessica,  I am writing to request a meeting with you to discuss details
related to an IEP you recently worked on.   We have scheduled the meeting for 11 am on
Monday, May 9th.  Please be advised that you have the right to representation as it may
result in disciplinary action." See Exhibit B attached hereto.

89.     The email did not state anything that Plaintiff has done wrong nor any policies she has

violated. It was also sent well after school hours. It is a blatant act of retaliation for Plaintiff

having filed the MCAD complaint as it was unjustified and sent personally to Plaintiff during the

evening hours in an effort to upset her during her time with her family.

90.     Plaintiff's lawyer contacted Defendant's lawyer asking for a postponement of the

meeting. Defendant's lawyer responded by saying that she would discuss the matter on Monday

between   or and said "Have a good weekend." However, Defendant;s attorney refused to cancel

or postpone the disciplinary meeting.

91.     Because Defendant has continued to take retaliatory action against the Plaintiff and

intends to harm her employment status as early as Monday, Plaintiff requested permission from

the MCAD to remove her complaint from the Commission and file with the federal court. That

permission was given on May 6, 2022. See letter authorizing dismissal attached as Exhibit C.

92.     Ms. Connolly reports to work in a state of abject fear, as well as being worried sick about

herself and her students.  The emotional toll this has taken has been traumatic and

agonizing.  Her physical and mental health are declining. She does not know who she can trust to

help and protect her from the abuse. These actions, unfortunately, comprise a disturbing pattern

of bullying and hazing within the Woburn school system that has come to light in reports by the

Boston Globe.  Ms. Connolly's ultimate goal has always remained the well-being of the

district's most vulnerable students, and for that, she is being unduly punished.

**COUNT ONE**
**DISCRIMINATION AND RETALIATION UNDER THE  REHABILITATION ACT**
**AGAINST WOBURN PUBLIC SCHOOLS AND CITY OF WOBURN**

93.     Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

94.     Plaintiff engaged in protected conduct under the Rehabilitation Act, by, among other things, attempting to protect the rights of disabled students and advocating for their rights, all as discussed in greater detail above.

95.     Defendants retaliated against Plaintiff after she attempted to protect the rights of her students, by, among other things, being overly critical of Plaintiff's work, being condescending to her, singling her out to other faculty, failing to provide her with adequate time to prepare for her students' needs, bullying her into silence, and creating a hostile work environment.

96.     Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) improperly and without foundation imposed discipline on the Plaintiff; 2) engaged in continuous harassment of Plaintiff and permitted employees to harass the Plaintiff; 3) contributed to and condoned a hostile and/or abusive workplace; 4) purposefully given her an overly burdensome and unequal case load; 5) taken away requested accommodations without justification; and 6) scheduled an unfounded disciplinary hearing knowing that it will negatively affect her chances of receiving the district transfer she applied for.

97.     Plaintiff also requested reasonable accommodations in the form of remote work which accommodations were revoked without justification.

98.     Plaintiff has suffered damages due to Defendants' actions.

**COUNT TWO**
**DISCRIMINATION AND RETALIATION UNDER THE ADA 42 U.S.C. §12131, et seq.**
**AGAINST WOBURN PUBLIC SCHOOLS AND CITY OF WOBURN**

99.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

100.    Plaintiff engaged in protected conduct under the ADA, by, among other things, attempting to protect the rights of disabled students and advocating for their rights, all as discussed in greater detail above.

101.    Defendants retaliated against Plaintiff after she attempted to protect the rights of her students, by, among other things, being overly critical of her work, being condescending to Ms. Rae, singling her out to other faculty, failing to provide her with adequate time to prepare for her students' needs, bullying her into silence, and creating a hostile work environment.

102.    Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) improperly and without foundation imposed discipline on the Plaintiff; 2) engaged in continuous harassment of Plaintiff and permitted employees to harass the Plaintiff; 3) contributed to and condoned a hostile and/or abusive workplace; 4) purposefully given her an overly burdensome and unequal case load; 5) taken away requested accommodations without justification; and 6) scheduled an unfounded disciplinary hearing knowing that it will negatively affect her chances of receiving the district transfer she applied for.

103.    Plaintiff also requested reasonable accommodations in the form of remote work which accommodations were revoked without justification.

104.    Plaintiff has suffered damages as a direct and proximate result of Defendants' actions.

**COUNT THREE**
**VIOLATION OF M.G.L. c. 151B AGAINST ALL DEFENDANTS**

105.   Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

106.   Plaintiff has general anxiety disorder which causes shaking, increased heart rate, chest pains and hyperventilation which affects her nervous and circulatory systems and is considered a disability. She also has asthma which affects her ability to breathe.

107.   Plaintiff has also advocated on behalf of students with disabilities.

108.   The unlawful employment practices complained of above were intentional.

109.   The unlawful employment practices complained of above were done with malice or with reckless indifference to the protected rights of Ms. Connolly.

110.   Defendants have taken adverse actions against the Plaintiff which include, but are not limited to: 1) improperly and without foundation imposed discipline on the Plaintiff; 2) engaged in continuous harassment of Plaintiff and permitted employees to harass the Plaintiff; 3) contributed to and condoned a hostile and/or abusive workplace; 4) purposefully given her an overly burdensome and unequal case load; 5) taken away requested accommodations without justification; and 6) scheduled an unfounded disciplinary hearing knowing that it will negatively affect her chances of receiving the district transfer she applied for.

111.   As a direct and proximate result of Defendants' unlawful discrimination, Ms. Connolly has suffered damages.

**COUNT FOUR**
**VIOLATION OF M.G.L. c. 149 §185 WHISTLEBLOWER ACT AGAINST WOBURN**
**PUBLIC SCHOOLS AND CITY OF WOBURN**

112.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

113.    Plaintiff works for the Woburn Public Schools and has a contract with the City of Woburn and is a public employee

114.    Plaintiff disclosed to a supervisor activities and practices that she reasonably believed were in violation of the law and/or which she believed posed a risk to public safety.

115.    Defendants retaliated against Plaintiff for her disclosures as outline in the preceding paragraphs.

116.    Plaintiff gave her supervisors written notice and afforded the employer a reasonable opportunity to correct the activities and practices.

117.    Plaintiff has suffered damages as a direct and proximate result of Defendants' actions.

**COUNT FIVE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST MATTHEW CROWLEY AND MICHAEL BALDASSARRE**

118.     Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

119.     Defendants' conduct was extreme and outrageous.

120.    Defendants had no right or excuse to engage in such conduct.

121.    Plaintiff did not consent to Defendants' conduct.

122.    Defendants knew or should have known that its conduct was likely to cause Plaintiff severe emotional distress, did cause such severe emotional distress and continues to cause emotional distress.

## COUNT SIX
## COLOR OF STATE LAW VIOLATION OF 42 U.S.C. §1983

123.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs and incorporates the same by reference.

124.    The actions of all Defendants were done under the color of state law.

 Defendant Crowley knowingly allowed five different administrators to relentlessly harass the Complainant. When the Complainant rightly requested an independent investigation and questioned the fairness of the selection process, Dr. Crowley lost his temper, threw his glasses down, and yelled at the Complainant.  He stated he didn't have time for this, as he is running a school district, and abruptly left the room.  He also arranged for the Complainant to be independently investigated by an attorney closely aligned with the district's own lawyers, making a complete mockery of an "unbiased" investigative process.  He embarrassed her and ridiculed her in front of a panel of colleagues when she asked for medical accommodations.

125.    Woburn Public Schools and/or the City of Woburn ratified Defendant Crowley's behavior.

126.    Defendant Assistant Superintendent Baldassarre is the designated Civil Rights officer for the district. He failed in his duty by conducting a woefully inadequate and biased investigation of Plaintiff's internal complaints, violating Plaintiff's right to privacy by sharing her Plaintiff's personal information with her peers, and failed to carry out the recommendations he promised in his report. His actions encouraged other staff members to become hostile toward Plaintiff, which he did nothing to curtail.

127.    Woburn Public Schools and/or the City of Woburn ratified Defendant Baldassarre's behavior.

128.    Woburn Public Schools has a history of failing to provide a free and appropriate public education to students with disabilities and special needs, and has a custom, practice, or pattern of attempting to coerce and discourage employees from speaking about and disclosing information thereof.

129.    Defendants tried to restrain Plaintiff's speech and retaliated against her for raising her concerns and filing an internal complaint.

130.    Defendants also retaliated against the Plaintiff by scheduling a disciplinary meeting without disclosing the reasons and by sending the email to Plaintiff late at night, disturbing her time with her family.

131.    As a proximate result of the Defendants' actions, Plaintiff has suffered physical, emotional and reputational damages.

132.    The conduct of the Defendants was intentional, illegal and violated societal norms and should be punished with punitive damages.

WHEREFORE, Plaintiff requests the following relief:

1) That the Defendants be enjoined from any acts of retaliation;

2) For compensatory damages;

3) For punitive damages;

4) For treble damages and attorneys' fees pursuant to M.G.L. c. 149 §185; and

5) For any other relief this Honorable Court deems just and meet.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable.

Date:   5/6/2022                                        Respectfully submitted,
                                                       Jessica Connolly,

By her attorney,


Laurel J. Francoeur
BBO 633085
Francoeur Law Office
63 Shore Road, Suite 24
Winchester, MA 01890
781-222-0557
laurel@francoeurlaw.com

# EXHIBIT A



**Woburn Public Schools**
*Special Education Office*
*55 Locust Street, Woburn, MA 01801*
Tel: (781) 937-8233
Fax: (781) 939-5859

May 19, 2021

Dear Special Education staff,

As many of you are aware, the Department of Elementary and Secondary Education has recently released detailed guidance for school districts on Dyslexia.  This guidance has a strong focus on early identification and appropriate instruction across Tier 1, Tier 2, and Tier 3 (Special Education).  School based special education teams *will now identify and label students with Dyslexia* under the category of Specific Learning Disability, and will determine the need for specialized and data-driven instruction for our students. As we prepare for the 2021-2022 school year, we have been providing staff with the very best professional development and corresponding instructional materials, such as current kits and online access to Wilson Reading, RAVE-O, Lindamood Bell as well as a variety of online applications. Additionally, we have engaged an expert in the field, Melissa Orkin, to assist us with assessment and identification as well as specialized instructional practices and data analysis over the next school year.

As we plan for the start of school in the fall, we are implementing changes in an effort to align our programs in accordance with the newly released guidelines.  The "LEAP" program that for many years has been located at the Altavesta School, is being restructured to better meet the needs of our elementary students across the district.  For the 2021-2022 school year, *our language based specialized instruction will operate out of each of our elementary schools*.  A dedicated resource room teacher will be trained to support our high needs language based students within the home school environment.  This decision was made thoughtfully as we considered the guidance and the best way to ensure that across all seven elementary schools our students have access to an equitable education within the least restrictive setting.  While we recognize that this is a significant shift, we are confident that our educators are well prepared for this change and will have the support in place to ensure success within this new model.

Additionally, as a result of the addition of a special education teacher at each building, the elementary caseloads will be decreased significantly.  Moving forward, similar to the practice at the middle and high school, our special education elementary and early childhood teachers will be responsible for holding the annual meetings and progress meetings for students on their caseloads.  This will allow for flexibility in scheduling and increased parent/liaison relationships.  During the June professional development days, Allan Blume will be presenting tips and strategies to ensure that all special education teachers are adequately prepared to run the annual meetings, as well as a refresher to be held at the start of the school year in the fall.  The Special Education team chairs will continue to chair all initial meetings, re-evaluation meetings, extended evaluations, manifestation determinations, *as well as any meetings that are contentious or involve an advocate or attorne*y.

I am hopeful that these changes will positively impact both students and staff as we look forward to the post-pandemic educational setting.  Please feel free to contact me with any questions or concerns.

Sincerely,

Maureen E. Ryan, M.Ed.
Director of Special Education

# EXHIBIT B

---------- Forwarded message ---------
From: **Morgan, Renee** <rmmorgan@woburnps.com>
Date: Thu, May 5, 2022 at 8:45 PM
Subject: Meeting
To: Connolly, Jessica <jconnolly@woburnps.com>
Cc: Ken Kessaris <kkessaris@woburnps.com>

Good Evening Jessica,

I am writing to request a meeting with you to discuss details related to an IEP you recently worked on.  We have scheduled the meeting for 11 am on Monday, May 9th.  Please be advised that you have the right to representation as it may result in disciplinary action.

*Renee Brissette, M.Ed*
*Assistant Director of Special Education*
*Woburn Public Schools*
*Special Education Office*
*55 Locust Street*
*Woburn, MA 01801*
*781-937-8233, Ext 11256*
Parents Notice of Procedural Safeguards

GZJ  KDKV'E

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

## - DISMISSAL -

| | |
|---|---|
| **To:**  Laurel J Francoeur, Esq.<br>Francoeur Law Office<br>63 Shore Rd. Ste 24<br>Winchester, MA 01890 | **Case:** Jessica Connolly v. Woburn Public Schools, City of Woburn<br>**MCAD Docket Number:** 22BEM00854<br>**EEOC/HUD Number:** 16C-2022-01226<br>**Investigator:** Lila Roberts |

Your complaint has been dismissed as follows:

[ ]    Pursuant to 804 CMR 1.08(1)(a) (2020), the Commission accords substantial weight to the findings or resolution of the complaint by another forum and has decided to close the investigation accordingly.

[X]    Pursuant to 804 CMR 1.08(1)(b) (2020), the complaint is dismissed after being withdrawn pursuant to 804 CMR 1.04(12) (2020). You are required to file a copy of a complaint filed in court after withdrawal from the Commission with the Commission's Office of the General Counsel pursuant to 804 CMR 1.04(13) (2020).

[ ]    Pursuant to 804 CMR 1.08(1)(d) (2020), the complaint is administratively dismissed due to:

> [ ] bankruptcy of a party
> [ ] death of a party
> [ ] inability to locate a party after providing the party 30 days in which to respond to a notice sent to the party's last known address
> [ ] adjudication by another forum
> [ ] unreasonable refusal by complainant to cooperate with processing the case
> [ ] failure to participate
> [ ] refusal to accept a reasonable settlement offer
> [ ] other:

[ ]    Pursuant to 804 CMR 1.08(1)(e) (2020), the parties have settled the case.

[ ]    Pursuant to 804 CMR 1.08(4)(a)(5) (2020), the Commission has entered an order reversing a probable cause determination.

**Please note that further administrative or judicial review of the dismissal of your complaint is unavailable.**

*Neldy Jean-Francois*                                        May 6, 2022
_____        _____
Neldy Jean-Francois                                          Date
Investigating Commissioner

MCAD Docket Number 22BEM00854, Dismissal without Right to Appeal

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

Cc:
City of Woburn
Attn: Director of Human Resources
10 Common ST.
Woburn, MA 01801

Douglas I. Louison, Esq., Elizabeth F. Scian, Esq.  & Alexandria M. Gill, Esq.
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA 02109

Jessica Connolly
15 Crystal Rd.
Wilmington, MA 01887

Woburn Public Schools
Attn: Director of Human Resources
55 Locus St.
Woburn, MA 01801

MCAD Docket Number 22BEM00854, Dismissal without Right to Appeal