UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JESSICA CONNOLLY,                       )
                                        )
            Plaintiff,                  )
                                        )          Civil Action No.
      v.                                )          22-10695-FDS
                                        )
WOBURN PUBLIC SCHOOLS, et al.,          )
                                        )
            Defendants.                 )
_____)


MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

SAYLOR, C.J.

        This case arises from a series of disputes between a teacher and a public school system.

Plaintiff Jessica Connolly alleges that defendants Woburn Public Schools, the City of Woburn,

Matthew Crowley, and Michael Baldassarre engaged in discrimination, retaliation, and a

campaign of workplace bullying against her. Connolly contends that defendants treated her

adversely because she requested workplace accommodations for disabilities and because of her

advocacy on behalf of disabled children.

        The complaint asserts claims under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; under

the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; under Mass. Gen. Laws ch.

151B; and for intentional infliction of emotional distress. Baldassarre has moved to dismiss the

complaint for failure to state a claim against him. The other defendants have moved to dismiss

the complaint for failure to state a claim and on the ground that the claims are time-barred.

        In this case, assessing the allegations of the complaint to determine the validity of the

claims is an unusually difficult exercise. Among other things, the complaint asserts four

different forms of disability discrimination, arising out of two different sets of disabilities: (1) discrimination on the basis of plaintiff's *own* physical disability (asthma) and mental disability (general anxiety disorder); (2) retaliation for actions arising out of her own disabilities (such as requesting accommodations or filing a complaint); (3) discrimination in the form of retaliation for her advocacy for the rights of *other* disabled persons (her students); and (4) discrimination in the form of a hostile work environment (apparently arising out of both her own disabilities and her advocacy efforts).  Those four theories are intermingled across three different counts arising under both federal and state law.  Furthermore, some of those claims fall outside the limitations period, and some have been waived under state law.  Finally, it asserts common-law tort claims against two individuals.

For the following reasons, the motions to dismiss will be granted in part and denied in part.

## I.      Background

### A.      Factual Background

In light of the complexity of the claims asserted, a detailed review of the complaint is required.

#### 1.      The Parties

Jessica Connolly is a resident of Wilmington, Massachusetts.  She is a special-education teacher employed by the Woburn Public Schools.  (Compl. ¶ 10).  She has taught for thirteen years.  (*Id.*).  According to the complaint, she suffers from general anxiety disorder and asthma.  (*Id.*).

Woburn Public Schools ("the District") is a school district in Woburn, Massachusetts.  (*Id.* ¶ 2).

The City of Woburn ("the City") is a municipality in Massachusetts.  (*Id.* ¶ 3).

Matthew Crowley is a resident of Lexington, Massachusetts.  (*Id.* ¶ 4).  Crowley was the superintendent of the District during the events described in the complaint.

Michael Baldassarre is a resident of Concord, Massachusetts.  (*Id.* ¶ 5).  Baldassarre was the assistant superintendent of the District during the events described in the complaint.

### 2.  <u>The Dispute</u>

The complaint alleges a lengthy series of disputes between Connolly, defendants, and other school officials over a two-year period from August 2020 to May 2022.  Essentially, it alleges that Connolly has objected to the school's special-education policies, requested various teaching accommodations, and clashed with various school and District officials.  It alleges that as a result, she has been "continuously belittled, spied upon, intimidated, harassed and asked to do things she believes are illegal."  (*Id.* ¶ 82).

### a.  <u>Connolly's Request to Teach Remotely</u>

In August 2020, Connolly submitted a request to Kenneth Kessaris, the principal of her school, to teach remotely "due to a personal health issue."  (*Id.* ¶ 11).[1]  The complaint alleges that Kessaris approved the request, but when she tried to make arrangements with the school's human-resources director, "she was met with anger and hostility and was sent away."  (*Id.*).

On September 3, she received a call from the human-resources director telling her that Baldassarre had rejected her request.  (*Id.* ¶ 12).  She "politely protested," and later the human-resources director "reluctantly said" that after talking with Baldassarre, her request had been approved.  (*Id.*).

According to the complaint, shortly afterward, Baldassarre called Connolly and asked her to come back for in-person teaching because "parents were sad to see her go," thus "reneging on

---

[1] The complaint does not specify the school at which Connolly taught during the relevant events.

the accommodation he had promised."  (*Id.* ¶ 13).  It alleges that "[m]eanwhile," she had received "an intense workload that far exceeded her job description and was disproportionate to her peers."  (*Id.* ¶ 14).  She "requested training and resources and was denied and ignored."  (*Id.*).

Despite her "fears about COVID," Connolly "reluctantly agreed" to Baldassarre's request to return.  (*Id.* ¶ 15).  On September 17, 2020, she "rescinded" her request to teach virtually. (*Id.*).

On September 21, Connolly attended a meeting arranged by the District to "'discuss[ ] accommodations' . . . for her health issues."  (*Id.* ¶ 16).  She read "an emotional personal statement . . . about her circumstances and health concerns and the lack of support she had received."  (*Id.*).  According to the complaint, Crowley and Special Education Director Maureen Ryan "shamed," "embarrassed," and "ridiculed" her at the meeting.  (*Id.*).

### b.   The 2020-2021 School Year

The complaint alleges that Connolly was mistreated repeatedly throughout the rest of the 2020-2021 school year.  It alleges that she was given "another assignment as a virtual teacher" despite returning to teach in person.  (*Id.* ¶ 17).  It further alleges that Ryan falsely accused her of "not being in compliance with student service times."  (*Id.* ¶ 18).

According to the complaint, Connolly raised concerns about her school's deficient special-education services and was punished by the school in retaliation.  The District designated her as its local educational agency ("LEA") representative for individualized education program ("IEP") meetings, a position that she continues to hold.  (*Id.* ¶¶ 21, 23).  Connolly contends that her appointment was inappropriate because she does not have legal authority to commit resources on behalf of the District, which (she contends) federal law requires.  (*Id.* ¶¶ 21-22). The complaint alleges that after she "spoke out about this issue," she "was the subject of further retaliation and bullying" that took the form of "assigning her an uneven and impossible workload

and using pretexts to punish her and make her miserable and upset." (*Id.* ¶¶ 22-23). It further alleges that the District continues to assign her a disproportionate number of student evaluations without providing coverage for student services that she misses during the evaluations. (*Id.* ¶ 82).

According to the complaint, Connolly protested a lack of appropriate educational resources for disabled students. The complaint presents her efforts on behalf of L.W., a student at her school, as its principal example. She contends that the school "promise[d] . . . additional and comprehensive services" for L.W., but in reality provided L.W. with only an "inexperienced" teacher. (*Id.* ¶ 25). Connolly personally provided support to L.W. (*Id.*). The complaint alleges that Connolly "was blamed" for L.W.'s substandard care, and that the school "failed to defend" her from the "wrath" of L.W.'s parents. (*Id.* ¶¶ 25-26). The complaint alleges that Greitzer and Ryan "expected more and more" of Connolly and "gave her more and more work," "den[ying]" her the ability to make changes to her caseload. (*Id.* ¶ 27). The complaint further alleges that Ryan and Vice Principal Stephen Gallo "demanded" and "insisted" that Connolly provide them with her personal notes concerning L.W. (*Id.* ¶¶ 28-30).

### c.    <u>Events of November–December 2021</u>

On November 17, 2021, Connolly and Ryan attended a meeting over Zoom concerning a student. (*Id.* ¶ 31). According to the complaint, Ryan had "predetermined the services she wanted the student to receive," which (Connolly contends) violated the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. (*Id.*). It further alleges that Ryan expected Connolly to "pass [that decision] off as her own." (*Id.*). It alleges that Ryan "berated" her in a manner that other meeting participants found "abusive and relentless." (*Id.* ¶¶ 31-32). After the meeting, she was "shaken and upset." (*Id.* ¶ 32). She sent an email to Ryan, Kessaris, and Gallo "express[ing] how she felt devastated by the way she was treated at the meeting" and

"explain[ing] that her workload was overly burdensome."  (*Id.* ¶ 33).  She "suggested that her duties be lightened," that "the chairperson play more of a hands-on role with the students," and that she "be relieved from oversight of LW's case since she had been placed in an untenable position by the administration."  (*Id.* ¶ 34).  Ryan responded to her email "with a curt message without offering any help" and "asked her to provide her caseload and student names."  (*Id.*).  She did so.  (*Id.*).  The complaint alleges that "nothing was done, and her caseload remained the same."  (*Id.* ¶ 35).  Ryan and "her principals ignored [her] request" to be "relieved of the responsibility for LW's case."  (*Id.* ¶ 35).

On December 2, the school held a meeting with L.W.'s parents.  (*Id.* ¶ 36).  In advance of the meeting, Connolly provided the school administration with a copy of information from L.W.'s file; she also provided Jamie Greitzer, the chair of the school's special-education team, with a copy of an IEP draft.  (*Id.*).  Connolly took a personal day for December 2 and did not attend the meeting.  (*Id.* ¶ 37).  According to the complaint, she was "unaware that personal days required pre-approval and was made to feel stupid for not being familiar with a policy she had rarely, if ever, had to make use of."  (*Id.* ¶ 37).  Before the meeting with L.W.'s parents, she answered "voicemails and texts . . . from [Kessaris] with questions pertaining to the meeting."  (*Id.* ¶ 38).

According to the complaint, on the afternoon of December 2, Kessaris e-mailed Connolly, "indicating that her presence was needed at a disciplinary meeting" the next day with him and Marisa Boyajian, the school's human-resources director.  (*Id.* ¶ 39).  The complaint alleges that this scheduling violated a school policy requiring that employees be provided three days' notice before a disciplinary meeting.  (*Id.*).  That evening, Connolly sent an email to Boyajian "asking her about medical leave, but . . . did not receive a reply until 7 days later."  (*Id.*

6

¶ 40).

On December 3, Connolly attended the disciplinary meeting with the City's "Union President," Barbara Locke.  (*Id.* ¶ 41).  According to the complaint, Boyajian "reprimand[ed] her for mistakenly calling the sick day a personal day," for which she apologized.  (*Id.*).  The complaint alleges that Boyajian told her that she "ha[d] no professional courtesy" and that she "knew the real reason why [she] didn't go to work the day before."  (*Id.*).  It further alleges that Connolly asked Kessaris "why he hadn't told her about his concerns the day before when they were communicating about the meeting, but he refused to answer."  (*Id.* ¶ 42).  Locke "asked about progressive discipline since this was the only infraction ever committed by [Connolly]," but Kessaris "did not waiver [sic] or change his mind."  (*Id.* ¶ 42).

On December 7, Connolly received a disciplinary letter from Kessaris.  (*Id.* ¶ 43).  The letter "was placed in her personnel folder via email."  (*Id.*).  The complaint alleges that the letter contained "skewed accusations" and "reprimanded her for items not required by her contract." (*Id.*).  The complaint alleges, among other things, that the letter "violated the Woburn Policy handbook and Massachusetts laws about personnel records."  (*Id.*).

On December 8, Ryan asked Connolly for "(unrequired) data and notes with a parent." (*Id.* ¶ 44).  The complaint alleges that after she provided Ryan with the information, Ryan asked Locke about Connolly's work and "accused [Connolly] of fabricating the data."  (*Id.*).  Locke warned Connolly "to be cautious," and Connolly "lock[ed] access to her personal notes for fear they could be snatched and twisted by [Ryan]."  (*Id.* ¶ 45).

On December 9, Greitzer e-mailed Connolly "asking her to unlock the data." (*Id.*).  She did so.  (*Id.*).  The email was "copied to the parent involved."  (*Id.*).

According to the complaint, later on December 9, Gallo approached Connolly "alone in

her classroom and aggressively questioned [her] behind a closed door." (*Id.* ¶ 46). He asked her if she would "be present the next day for another meeting about LW." (*Id.*). Connolly told Gallo that she felt "unsafe" and "scared" because of "the treatment she had been receiving from [Ryan] and [Greitzer]." (*Id.*). The complaint alleges that Gallo "snapped and yelled," telling her, "You are combative and disrespectful!" (*Id.*). She "calmly responded and asked him to explain how her expressing concerns about the way she had been treated was combative." (*Id.*). Gallo "backed down and asked her again if she was planning to attend the meeting." (*Id.*). Connolly responded that "she would do whatever was in the best interests of the student." (*Id.*).

According to the complaint, Kessaris and Gallo came to Connolly's classroom two hours later. (*Id.* ¶ 47). The complaint alleges that Kessaris asked her "how they could get through the meeting tomorrow and how could they be assured that she would attend"; she responded that "she felt like she was being bullied and intimidated and was not intending to be insubordinate" and that "all she was trying to do was to make sure she would not get needlessly punished again." (*Id.*). "[A]n emergency occurred and [Gallo] left the room," and Connolly asked Kessaris why he had not raised concerns about her personal day before his December 7 letter. (*Id.* ¶ 48). The complaint alleges that Kessaris "vaguely alluded that he was not the author of the letter," but otherwise "refused to provide more details." (*Id.*). The complaint alleges that "this confirmed the retaliatory nature of the letter as he was pressured by someone else (presumably Mrs. Ryan) to find an excuse to discipline her." (*Id.*).

According to the complaint, later on December 9, Connolly "learned that [Ryan] had falsely reported her to [the] administration for lying." (*Id.* ¶ 49). The complaint alleges that she confronted Gallo, who "got angry and denied it happening." (*Id.*). According to the complaint, Connolly "felt like she was being intimidated and targeted for extra scrutiny in an attempt to

undermine her." (*Id.* ¶ 50).

Later on December 9, 2021, Connolly called in sick for December 10, the day of the school meeting about L.W. (*Id.*).

On the afternoon of December 10, 2021, Ryan "told [Connolly] that there was going to be another disciplinary meeting for her" on December 13. (*Id.* ¶ 51). The complaint alleges that she realized "that she was being set up and accused unjustly," and therefore "again called in sick on December 13." (*Id.*). The complaint alleges that "it was clear" that Ryan "was doing everything possible to retaliate against [her]." (*Id.*). It further alleges that at the December 10 meeting about L.W., Greitzer blamed Connolly for "things that she was not responsible for" and told L.W.'s parents that she disagreed with Connolly's MCAS recommendations. (*Id.* ¶ 52).

According to the complaint, over the next week Greitzer "continued berating" Connolly. (*Id.* ¶ 53). It further alleges that Boyajian "wrongly accused [her] of deleting important files to her supervisors"; she contends that she had only deleted her personal notes and memory aids, "which was standard procedure." (*Id.* ¶ 54).

### d.    The December 2021 Complaint

On December 14, 2021, Connolly filed a formal complaint with Crowley, Baldassarre, and the Woburn Teachers Association. (*Id.* ¶ 56). That complaint "outlined the bullying behavior against her," citing the November 17 Zoom meeting, the December 17 disciplinary letter, the "defamation of her name," and "the intimidating nature of the confiscation of her personal notes." (*Id.*). The complaint alleges that Baldassarre was assigned to investigate the complaint. (*Id.*). According to the complaint, Connolly participated in the investigation. (*Id.* ¶ 65).

The complaint alleges that on December 15, Baldassarre told Ryan about the December 14 complaint and said that "'interim measures' were to be implemented." (*Id.* ¶ 57). Ryan

allegedly indicated that "she was nevertheless going ahead with her own disciplinary action against [Connolly] because 'she needed to move forward regardless of the complaint.'"  (*Id.*).

On December 16, Connolly attended an IEP meeting for O.K., another student.  (*Id.* ¶ 58).  The complaint alleges that Connolly wanted Greitzer's support at the meeting because one of O.K.'s parents had "physically intimidated" her before.  (*Id.*).  The complaint alleges that Greitzer refused to attend, "because she was at a holiday party with [Ryan] at the time." (*Id.* ¶¶ 58-59).  Connolly canceled the meeting, feeling that "Greitzer was setting [her] up to fail by sending her to a meeting without the proper support or authority."  (*Id.*).

According to the complaint, on December 17, Greitzer sent a group email to Kessaris and Connolly's coworkers, "berat[ing] [her] for not having completed LW's IEP." (*Id.* ¶ 61).  The complaint alleges that Greitzer also wrote "misleading group e-mails" saying that Connolly "wasn't doing her job" and demanded that she incorporate recommendations of a psychologist, who the complaint alleges was Ryan's friend, into L.W.'s IEP.  (*Id.* ¶ 60).  She contends that incorporating the psychologist's recommendations "was against procedure" because she "was not present at the meeting when [the psychologist] made those recommendations."  (*Id.*).

By December 21, Connolly allegedly felt "extreme emotional distress," and perceived a "coordinated effort to belittle, demean and harass her, orchestrated by [Ryan] and assented to by her principal, vice principal, chairperson, HR director, and others, all because she had asked for accommodations and advocated for her disabled students."  (*Id.* ¶ 62).  On the same day, Connolly attended an investigatory meeting led by Baldassarre.  (*Id.* ¶ 65).  According to the complaint (and without further explanation), at the meeting she "was heavily encouraged" to remove Kessaris from "protective measures," and she did so.  (*Id.*).

On December 23, 2021, Greitzer allegedly sent an email to Connolly, copying

Baldassarre, "demand[ing]" her progress notes for an unidentified student.  (*Id.* ¶ 64).  According to the complaint, those notes were not due until January 6, 2022.  (*Id.*).

On January 3, 2022, Connolly allegedly sent an email to Kessaris "documenting that she was continuing to be put in an illegal role for which she was not qualified or trained."  (*Id.* ¶ 66).  "At the same time," Greitzer, Ryan, and Kessaris "failed to produce the IEP for LW as promised and left [her] to deal with the wrath of LW's parents and lawyer."  (*Id.*).

On January 20, 2022, Connolly and her union representatives attended an investigatory meeting with Baldassarre.  (*Id.* ¶ 67).  The complaint alleges that Baldassarre told Connolly that "she could end the investigation and mend relationships with him personally serving as mediator."  (*Id.*).  The complaint alleges that Baldassarre "implied that one case/event sparked repeated retaliatory/intimidating behaviors."  (*Id.*).

On January 28, Baldassarre distributed a "dismissive and irresponsible 5½ page" report about his investigation into Connolly's complaint.  (*Id.* ¶ 68).  According to the complaint, the report concluded that the District "needed to get legal advice about [Connolly] serving as the LEA representative at union meetings,"[2] that her "unequal caseload be the subject of a [Woburn Teachers Association] grievance," that the District "'would offer opportunities to explore further conversations' with a trained mediator," and that Kessaris "should remove the [December 7] disciplinary letter from [Connolly's] personnel file."  (*Id.*).  The complaint alleges that the report contained "lies" and "dismissed any acknowledgment of wrongdoing."  (*Id.*).  It further alleges that the report was "released to unauthorized parties," "directly resulting in further adverse actions and emotional damage."  (*Id.*).  Connolly filed an appeal "rebutt[ing] all of the items" in

_____

[2] Although plaintiff contends that Baldassarre's report referred to her serving as an LEA representative at "union meetings," the complaint alleges elsewhere that she objected to serving as an LEA representative at IEP meetings.

the report, although the complaint does not indicate where the appeal was filed.  (*Id.*).

**e.**     **Events of February–May 2022**

According to the complaint, none of the recommendations in Baldassarre's report "ever came to fruition."  (*Id.* ¶ 69).  The complaint alleges that she "voluntarily participated in efforts to 'repair relationships'" with Kessaris without a trained mediator.  (*Id.*).  Kessaris and Renee Morgan, the school's assistant special-education director, allegedly "scolded" Connolly for not working well with Greitzer.  (*Id.* ¶ 70).  It alleges that Kessaris and Gallo "'lurk[ed]' outside her classroom door," and that Kessaris asked "several colleagues . . . to spy on [her], by keeping track of her movements throughout the day."  (*Id.* ¶ 71).  And it alleges that Greitzer "drafted many emails that were sent to [her] supervisors, commanding [her] to do her job and insinuating she wasn't."  (*Id.* ¶ 72).  Connolly "asked [Greitzer] to stop sending correspondence, but she refused."  (*Id.*).

On February 10, Connolly met with Kessaris.  (*Id.* ¶ 73).  Kessaris allegedly failed to allocate a substitute teacher to help Connolly with her responsibilities, but did so for another teacher.  (*Id.*).

On February 17, Connolly attended an IEP meeting for O.K.  (*Id.* ¶ 74).  The complaint alleges that Greitzer, who led the meeting, "denied the child the accommodation [Connolly] recommended that the child needed . . . and misstated the law."  (*Id.* ¶ 74).  The complaint alleges that Greitzer did so "[l]ikely to spite [Connolly] in front of her colleagues."  (*Id.*).  The complaint alleges that "[t]he team disagreed adamantly with [Greitzer's] incorrect denial of this accommodation."  (*Id.*).  Connolly, who was the meeting's note-taker, wrote that the school had approved O.K.'s accommodations "due to the majority sentiment" and provided her notes to O.K.'s parents.  (*Id.*).  According to the complaint, several days later, O.K.'s mother called Connolly and told her that Greitzer had called her and "made disparaging remarks about

12

[Connolly]." (*Id.* ¶ 75). Several days after that phone call, Greitzer allegedly sent Connolly a revised copy of the meeting notes that did not contain her recommended accommodations and "commanded" Connolly to send the revised notes to O.K.'s mother. (*Id.* ¶ 76). She refused. (*Id.*).

On March 11, Connolly "was unexpectedly asked to report to [Crowley's] [o]ffice with the union leader." (*Id.* ¶ 77). The complaint alleges that after Connolly asked "about options for hiring an independent investigator for her appeal," Crowley yelled, "I don't have time for this. I have already hired someone. I am trying to run a school district here." (*Id.*). Crowley also "threw his glasses down." (*Id.* ¶ 124). Crowley then "stormed" out of the room. (*Id.* ¶ 77). Some time later, Crowley hired Regina Ryan to handle Connolly's appeal. (*Id.* ¶ 78).

On March 14, Kessaris removed his December 7 disciplinary letter from Connolly's file. (*Id.* ¶ 79). Kessaris's "failure to immediately act to remove the wrongful letter [on Baldassarre's recommendation] caused [her] even more stress." (*Id.*).

On March 17, Greitzer sent an email to Connolly and her supervisors. (*Id.* ¶ 80). The complaint alleges that the email "mistakenly stat[ed] that [Connolly] was out of compliance with a student's IEP in an attempt to embarrass her." (*Id.*).

On March 21, Kessaris created a new schedule for the school's special-education students. (*Id.* ¶ 81). The complaint alleges that the schedule was "poorly designed, not in legal compliance, would require re-structuring of six other schedules, and would have negatively impacted the child's whole education." (*Id.*). Connolly "spoke out again for her students, stating it would 'be detrimental' to put this into place." (*Id.*).

On April 7, Connolly allegedly "politely requested guiding documents" from her supervisors on how to "run[ ] meetings where she was to commit resources or defend the district

to an advocate." (*Id.* ¶ 83). The complaint alleges that her supervisors "evaded her questions all three times she asked that day." (*Id.*). Later, in "direct retaliation," Kessaris approached Connolly "alone in her classroom" and asked her to run a meeting "to be attended by an advocate" starting in "about 15-20 minutes." (*Id.*). The complaint alleges that Kessaris "demanded that she run the meeting, and that he and [Greitzer] would be there 'for support'"; that Connolly was "intimidated, scared, and completely unequipped without proper preparation and without the documentation that she requested"; that "[t]his was not pertaining to her job description"; that Ryan, Kessaris, and Greitzer "habitually run similar meetings for her colleagues"; and that this request was "in direct contrast of what the Woburn Teacher's Union has stated is the policy and on an internal document signed by [Ryan]." (*Id.*). According to the complaint, she experienced a "medical episode as a direct result of this retaliation," and the school nurse sent her home and advised her not to drive. (*Id.* ¶ 84). The complaint alleges that Connolly's departure "was documented as [her] 'refusing' to lead the meeting in violation of her principal's instructions." (*Id.*).

On April 8, Connolly returned to the school. (*Id.* ¶ 85). The complaint alleges that Greitzer sent an email to Connolly and her supervisors "commanding [her] to reschedule the meeting with the advocate because of her medical episode - even though [she] was taking time off for her own wedding." (*Id.*).

Around this time, Connolly spoke to O.K.'s mother. (*Id.* ¶ 86). The complaint alleges that O.K.'s mother was "extremely upset" that Greitzer had denied "her child's proper MCAS accommodations." (*Id.*). The complaint alleges that O.K's mother could not reach Baldassarre by phone and instead spoke to Morgan, who "asserted that OK did not meet the qualifications." (*Id.*). The complaint further alleges that O.K. "is in the <1st percentile for her reading

disability," and "should have never been the victim[ ] of [Greitzer] and [Morgan's] coordinated retaliatory pursuits against [Connolly]."  (*Id.*).  Connolly was "sickened."  (*Id.*).

On April 20, Connolly filed a complaint "outlining the above series of events" with the Massachusetts Commission Against Discrimination.  (*Id.* ¶ 87).

On May 5, the school's assistant special-education director requested a meeting on May 9 with Connolly.  (*Id.* ¶ 88).  According to the complaint, the subject of the meeting was "an IEP that [Connolly] recently worked on," and the email warned that "you have the right to representation as [the meeting] may result in disciplinary action."  (*Id.*).  The complaint alleges that this request "was unjustified" and that the assistant special-education director sent the email after work hours "in an effort to upset [Connolly] during her time with her family."  (*Id.* ¶ 89).  The complaint further alleges that Connolly's counsel wrote to defendants' counsel and requested "a postponement of the meeting."  (*Id.* ¶ 90).  However, "Defendant;s [sic] attorney refused to cancel or postpone the disciplinary meeting."  (*Id.*).

The complaint alleges that Connolly "reports to work in a state of abject fear" and that "[h]er physical and mental health are declining."  (*Id.* ¶ 92).  "She does not know who she can trust to help and protect her from the abuse."  (*Id.*).

### B.    Procedural Background

As noted, on April 10, 2022, Connolly filed a complaint with the Massachusetts Commission Against Discrimination.  She withdrew that complaint on May 6, 2022.

On May 8, 2022, Connolly filed the present complaint in this court.  The complaint asserts six counts:  discrimination and retaliation under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (Count One); discrimination and retaliation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Count Two); violation of Mass. Gen. Laws ch. 151B (Count Three); violation of the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185 (Count

Four); intentional infliction of emotional distress (Count Five); and violation of civil and constitutional rights under 42 U.S.C. § 1983 (Count Six).  Counts One, Two, and Four are against the City and the District.  Count Five is against Crowley and Baldassarre.  Counts Three and Six are against all defendants.  The complaint seeks both compensatory and punitive damages.[3]

Baldassarre filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  The City, the District, and Crowley separately filed a motion to dismiss for failure to state a claim.

On July 2, Connolly voluntarily dismissed Count Four and Count Six.

## II.   Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or

---

[3] The complaint also sought "treble damages and attorneys' fees pursuant to Mass. Gen. Laws ch. 149, § 185." (*Id.* ¶ 132).  Connolly has since dismissed her § 185 claim.

inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Counts One, Two and Three:  Disability Discrimination and Retaliation

As noted, Counts One, Two, and Three allege four different forms of disability discrimination and retaliation:   (1) discrimination on the basis of plaintiff's own physical and mental disabilities; (2) retaliation in response to actions arising out of her own disabilities; (3) retaliation in response to her advocacy for disabled students; and (4) discrimination in the form of a hostile work environment arising out of both her physical and mental disabilities and her advocacy for disabled students.

All three counts contain the following summary paragraph:

Defendants have taken adverse actions against the Plaintiff which include, but are not limited to:  1) improperly and without foundation imposed discipline on the Plaintiff; 2) engaged in continuous harassment of Plaintiff and permitted employees to harass the Plaintiff; 3) contributed to and condoned a hostile and/or abusive workplace; 4) purposefully given her an overly burdensome and unequal case load; 5) taken away requested accommodations without justification; and 6) scheduled an unfounded disciplinary hearing knowing that it will negatively affect her chances of receiving the district transfer she applied for.

(Compl. ¶¶ 96, 102, 110).

#### 1.   Discrimination Based on Health Conditions

Counts One, Two, and Three allege, in part, claims against all defendants for disability discrimination based on plaintiff's asthma and general anxiety disorder.

Under the ADA, the Rehabilitation Act, and Chapter 151B, a plaintiff can establish a *prima facie* claim of disability discrimination by showing that (1) "[s]he suffers from a disability or handicap"; (2) that "[s]he was nevertheless able to perform the essential functions of [her] job,

either with or without reasonable accommodation"; and that (3) "[the employer] took an adverse

employment action against [her] because of, in whole or in part, [her] protected disability."

*Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005); 29 U.S.C. § 794(d) (requiring

that Title I of the ADA be used to determine whether a Rehabilitation Act violation has

occurred).

To be considered disabled or handicapped under those statutes, a plaintiff must

"demonstrate a physical or mental impairment that substantially limit[s] one or more of [her]

major life activities." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003). The

ADA requires that courts construe its definition of "disability" "in favor of broad coverage of

individuals under this chapter, to the maximum extent permitted by the terms of this

chapter . . . [and] consistently with the findings and purposes of the ADA Amendments Act of

2008." 42 U.S.C. § 12102(4)(A)-(B). The findings and purposes section of the statute explicitly

rejects several Supreme Court cases limiting the definition of "disability" and declares that

determining whether an individual has a qualifying disability "should not demand extensive

analysis." Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Massachusetts courts have

approvingly cited this amendment, suggesting that the same standard should apply to Chapter

151B claims. *See Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination*, 91

Mass. App. Ct. 208, 212-13, 213 n.6 (2017).

Plaintiff contends that her asthma and general anxiety disorder are impairments that

substantially limit her ability to breathe, work, and interact with other people. Asthma may

qualify as a substantially limiting impairment, particularly because plaintiff's claim of disability

discrimination centers on her ability to teach during the first year of the COVID-19 pandemic.

*See, e.g.*, *Peeples v. Clinical Support Options, Inc.*, 487 F. Supp. 3d 56, 62-63 (D. Mass. 2020).

The complaint further alleges that plaintiff has a general anxiety disorder that "causes shaking, increased heart rate, chest pains and hyperventilation which affects her nervous and circulatory systems." (*Id.* ¶ 106).[4]  She contends that her disorder "affects her ability to work and interact with people." (Pl. Opp. Defs. at 10).[5]  "[W]orking" and "interacting with others" are major life activities within the meaning of the ADA.  29 C.F.R. § 1630.2(i)(1)(i).

Under the circumstances, the complaint sufficiently alleges that plaintiff has one or more qualifying disabilities.

The complaint likewise sufficiently alleges the two remaining requirements.  It alleges that plaintiff was capable of performing the essential functions of her job, having taught for thirteen years. (Compl. ¶ 10).  It describes at least one instance in which plaintiff could not continue working because of an anxiety-induced medical episode. (Compl. ¶ 84).  It obliquely refers to plaintiff's anxiety by alleging that she took sick days because of her "mental state" and "nerves." (Compl. ¶¶ 37, 40, 50, 51).  According to the complaint, school officials responded to plaintiff's absences with formal discipline that (according to the complaint) did not comply with school policy (Compl. ¶¶ 39, 42, 43), as well as informal discipline, such as Assistant Principal Gallo's confrontation with plaintiff. (Compl. ¶ 46).  Taken together, the allegations are sufficient at this stage to establish that plaintiff's employer took an adverse action against her at least in part because of her disability.

In summary—and before consideration of the statute of limitations issue—the complaint

---

[4] The complaint mentions one instance in which a tense conversation with Kessaris caused plaintiff to experience a "medical episode," requiring the intervention of a school nurse. (Compl. ¶ 84).

[5] Defendants contend that plaintiff is not disabled, but their argument is based on cases predating—and relying on Supreme Court precedent rejected by—the ADA Amendments Act of 2008 and a 2012 First Circuit case that does not apply the Act. (*See* Defs. Mem. at 7-8 (first citing *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184 (2002); and then citing *McDonough v. Donahoe*, 673 F.3d 41 (1st Cir. 2012)).

plausibly alleges claims of disability discrimination under the ADA, Rehabilitation Act, and Chapter 151B.

### 2.      **Unlawful Retaliation under Federal Law**

Counts One and Two allege, in part, claims against the District and the City for unlawfully retaliating against plaintiff in response to (1) actions she took arising out of her own disabilities (such as requesting accommodations and filing an MCAD complaint) and (2) her advocacy on behalf of disabled students, all in violation of the ADA and Rehabilitation Act.

To prove a claim of unlawful retaliation under the ADA and the Rehabilitation Act, a plaintiff must prove that "(1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action."  *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012).

### a.      **Plaintiff's Own Disabilities**

As to plaintiff's asthma, the complaint alleges that she requested that the school allow her to teach remotely "due to a personal health issue" and her "fears about COVID," but that she was later pressured to rescind her request, and "shamed" and "embarrassed" for having made it. (Compl. ¶¶ 11-16).  Those allegations are sufficient to state a claim for retaliation for requesting an accommodation for a physical disability.

As to plaintiff's anxiety disorder, the complaint alleges that she experienced an unidentified "medical episode," apparently on April 7, 2022, in response to a conversation with Kessaris about leading a meeting; that she left school; and that "[t]his was documented" as her "'refusing' to lead the meeting."  (*Id.* ¶ 84).  It further alleges that plaintiff filed a complaint on April 10, 2022, with the Massachusetts Commission Against Discrimination "outlining the above series of events."  (*Id.* ¶ 87).  And it alleges that on May 5, 2022, the school's assistant special-

education director emailed plaintiff:

> Good Evening Jessica, I am writing to request a meeting with you to discuss details related to an IEP you recently worked on. We have scheduled the meeting for 11 am on Monday, May 9th. Please be advised that you have the right to representation as it may result in disciplinary action.

(*Id.* ¶ 88).  It alleges that this email was "a blatant act of retaliation" for her MCAD complaint.

(*Id.* ¶ 89).  The actual MCAD complaint is not part of the record.

Filing a formal complaint about discriminatory behavior is protected conduct.  *Cf. Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003).   An email about possible disciplinary action "may constitute adverse employment action, subject to the facts of a particular case." *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 37 (1st Cir. 2011).  A relatively short period between the protected activity and the adverse action may suggest causation.  *Noviello v. City of Boston*, 398 F.3d 76, 86-87 (1st Cir. 2005).

Read very generously, the complaint can be construed to allege that plaintiff had a medical episode due to her anxiety disorder, that she had to leave school as a result, that the school mischaracterized what happened, that she then filed an MCAD complaint, and that she was then threatened with disciplinary action.  Although threadbare and vague, at this stage the allegation that she suffered retaliation arising out of her anxiety disorder is sufficient to survive a motion to dismiss.

### b.    Plaintiff's Advocacy on Behalf of Disabled Students

The complaint also alleges that plaintiff reported multiple issues with the District's treatment of disabled students to school officials, causing them to demean her and assign her large workloads.  The complaint alleges several instances in which she complained that the District was not providing adequate resources for disabled students.  (*E.g.*, Compl. ¶¶ 23, 33-34, 81).  Advocacy on behalf of disabled students to protect their rights "plainly constitutes protected

conduct under these statutes." *D.B.*, 675 F.3d at 41.  According to the complaint, the school administration, in response to plaintiff's actions, assigned her an "uneven and impossible workload," took disciplinary action not permitted by school policy, and sanctioned a bullying campaign against plaintiff.  (Compl. ¶¶ 23, 39, 43, 82).  Those actions, if proved, "might well dissuade a reasonable person from making or supporting a charge of discrimination."  *D.B.*, 675 F.3d at 41-42.  To be sure, the complaint is somewhat cryptic and vague about the identity of the individuals to whom plaintiff reported her complaints and those who took action against her. However, at this stage, the allegations that at least some of the disciplinary actions were causally connected to her reporting are sufficient to survive a motion to dismiss.

In summary, the complaint plausibly alleges claims of unlawful retaliation under the ADA and the Rehabilitation Act.

### 3.  Unlawful Retaliation under State Law

Count Three alleges, in part, a claim against all defendants for unlawful retaliation under state law in violation of Chapter 151B.

Under Chapter 151B, an employer may not "discharge, expel, or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter."  Mass. Gen. Laws ch. 151B, § 4; *see also Abramian v. President and Fellows of Harvard College*, 432 Mass. 107, 121 (2000).  A *prima facie* case of retaliation under 151B parallels the ADA and Rehabilitation Act requirements:  protected conduct, adverse action, and causation.  *Chi-Sang Poon v. Massachusetts Inst. of Tech.*, 74 Mass. App. Ct. 185, 199-200 (2009).  Here, there are two issues concerning the state-law retaliation claim that do not apply to the parallel federal claims:  (1) whether that claim has been waived as to defendants the City, the District, and Crowley and (2) whether the factual allegations are sufficient to state a claim as to defendant Baldassarre.

22

### a.   <u>Waiver under Section 185(f)</u>

The Massachusetts Whistleblower Statute prohibits employers from retaliating against employees who report or refuse to participate in activities, policies, and practices of their employer that they reasonably believe are unlawful or pose a risk to public health, safety, or the environment.  Mass. Gen. Laws ch. 149, §§ 185(b)(1)–(3).  Employees may bring a civil action under § 185 and seek "[a]ll remedies available in common law tort actions."  *Id.* § 185(d).

However, a plaintiff who brings a § 185 claim must waive certain other claims.  "[T]he institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to [the plaintiff], for the actions of the employer . . . under any . . . state law, rule or regulation, or under the common law."  *Id.* § 185(f).  Massachusetts courts have held that a waiver under § 185(f) extends to "statutory and common law damage claims that in substance derive from the same conduct forming the basis for a [§ 185] retaliation claim."  *Fitzgerald v. Commonwealth*, 2015 WL 924984, at *2 (Mass. Super. Ct. 2015) (collecting cases).  That waiver applies to all of an employer's retaliatory conduct—although not, as defendants contend, to "other claims, such as intentional infliction of emotional distress, that are distinct from the claim to recover for the retaliatory action."  *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 220 (D. Mass. 2002), *aff'd*, 362 F.3d 1 (1st Cir. 2004).

Count Four, the § 185 claim, alleged that the District and City retaliated against plaintiff because she reported that school policies were "in violation of the law and/or which she believed posed a risk to public safety."  (Compl. ¶ 114).  In substance, it alleged that plaintiff reported issues with the school's IEP meetings and her treatment by her colleagues to her supervisors. (*See, e.g.*, *id.* ¶ 22 ("[W]hen she spoke out about [an alleged IDEA violation], she was the subject of further retaliation and bullying.")).

By filing a complaint with a § 185 claim, plaintiff waived all other statutory and

common-law claims related to her retaliation claim.  That includes her claims of unlawful retaliation and hostile work environment arising out of her advocacy for disabled students under Chapter 151B, as set forth in Count Three.

The fact that plaintiff has since dismissed her § 185 claim does not affect that waiver. The text of the statute provides that "institution" of a private action waives state and common-law claims.  Mass. Gen. Laws ch. 149, § 185(f).  Under Massachusetts law, a plaintiff institutes a private action by filing a complaint.  *Brickett v. Davis*, 38 Mass. 404, 410-11 (1838) (using "institution of a suit" and "file a plea" synonymously); *Connihan v. Thompson*, 111 Mass. 270, 271-272 (1873) (using "institution of a suit" and "commencing an action at law" synonymously). A plaintiff therefore waives her statutory and common-law claims under § 185 when she files a complaint.  *See Fitzgerald*, 2015 WL 924984, at *2 (collecting cases).

Plaintiff's state-law discrimination claim is not, however, affected by that waiver to the extent that it does not derive from the same conduct (that is, retaliation in response to her advocacy for disabled students) as her § 185 whistleblower claim.  To the extent, therefore, that the claim is based on discriminatory or retaliatory conduct directed to her own physical and mental disabilities, the claim is not waived.[6]

### b.  Discrimination Claim against Baldassarre

Count Three alleges, in part, a claim under Chapter 151B against Baldassarre for unlawful discrimination.

---

[6] Count Five asserts a claim for intentional infliction of emotional distress against Crowley and Baldassarre.  Because § 185 only bars claims against "employer[s]," Mass. Gen. Laws ch. 149, § 185(b), those claims are "legitimate[ly] independent" from the § 185 claim.  *Bennett*, 230 F. Supp. 2d at 221; *see also Jones v. Maloney*, 74 Mass. App. Ct. 745, 750-51 (2009) (analyzing a claim for intentional infliction of emotional distress against an assistant principal separately from a claim against the school district).  Her claim for intentional infliction of emotional distress is therefore unaffected by the waiver.

The complaint describes Baldassarre's conduct in only five paragraphs.[7]  It alleges that he was assigned to investigate plaintiff's December 2021 complaint, (*id.* ¶ 56); that he told Ryan that (unidentified) "interim measures" (apparently favorable to plaintiff) should be implemented in response to that complaint (*id.* ¶ 57); that he led an investigatory meeting during which plaintiff was "heavily encouraged" to remove Kessaris from (unexplained) "protective measures," (*id.* ¶ 65); that, at a later meeting, he told plaintiff that "she could end the investigation and mend relationships" by letting him mediate the dispute; that during the same meeting, he "tried to turn the tables and implied that one case/event sparked repeated retaliatory/intimidating measures which was a form of blaming the victim" (*id.* ¶ 67); and that he issued a report that "contained lies about 'pertinent facts' and 'findings,'" "dismissed any acknowledgement of wrongdoing," and was "released to unauthorized parties directly resulting in further adverse actions," (*id.* ¶ 68).

Baldassarre has moved to dismiss the claims against him in Count Three on the ground that the complaint does not allege that he committed any specific acts of discrimination.  In her opposition to that motion, plaintiff contends—for the first time—that he should be held liable as an aider and abettor of retaliation in violation of Chapter 151B and for his failure to investigate her claims of harassment (Pl. Opp. Baldassarre at 7-8).

It is true that Chapter 151B provides for an action for aiding and abetting discrimination. Mass. Gen. Laws ch. 151B, § 4(5).  The complaint, however, makes no such allegation.  In any event, the complaint does not allege sufficient facts to establish aiding and abetting liability.

---

[7] The complaint's use of the passive voice makes it difficult in many instances to attribute specific instances of conduct to specific individuals. (*See, e.g.*, Compl. ¶ 65 ("At an investigatory meeting led by Dr. Baldassarre on 12/21/22, Ms. Connolly was heavily encouraged to remove Principal Kessaris from 'protective measures.'").)

To prove an aiding and abetting claim under Massachusetts law, a plaintiff must establish

(1) that the defendant committed a wholly individual and distinct wrong separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under G.L. c. 151B.

*Lopez v. Commonwealth*, 463 Mass. 696, 713 (2012) (internal quotation marks and punctuation removed) (quoting *Harmon v. Malden Hosp.*, 19 Mass. Discrimination L. Rep. 157, 158 (1997)). The complaint here does not contain allegations that fit neatly within that framework.

First, the complaint does not allege that Baldassarre "committed a wholly individual and distinct wrong separate and distinct from the claim in main." The "claim in main" is presumably the claim under Ch. 151B for retaliatory discrimination and for a hostile work environment. And Baldassarre's "distinct wrong" presumably arises from the creation and release of his report, as the remaining allegations as to him do not even suggest wrongful conduct. The complaint, however, contains no specifics about the alleged "lies" in that report (such as what the lies were, and who told them), who released it, the unauthorized parties to whom it was released, and the adverse actions that resulted. At a minimum, those omissions make it difficult to evaluate the claim for aiding and abetting—in particular, how the alleged "distinct wrong" committed by Baldassarre intersects with the "claim in main."

Furthermore, the complaint does not allege that Baldassarre had the intent to discriminate, or that he shared that intent with the alleged principal offender (presumably, the District and/or City).[8] Nor does it allege that he knew of his "supporting role" in "an enterprise designed to deprive [plaintiff] of a right guaranteed [to her]" under Chapter 151B. It seems to

_____

[8] Furthermore, the complaint alleges that the report included recommendations favorable to plaintiff—for example, suggesting that the District obtain legal advice as to whether plaintiff could serve as an LEA representative; that plaintiff's unequal caseload be adjudicated as part of the union grievance process; and that Kessaris's earlier disciplinary letter be removed from her file.

suggest that Baldassarre's report led to "further adverse actions and emotional damage," but does not specifically allege that he knew or intended that his report would have that effect.  (Compl. ¶ 68).

Finally, the Chapter 151B claim is waived to the extent that it relies on claims for retaliatory conduct arising out of plaintiff's advocacy efforts.  If the "claim in main" has been waived—that is, the claim against the principal offender—it must follow that the aiding and abetting claims have been waived as well.  It would certainly be odd and illogical for a claim of aiding and abetting to proceed if the claim against the principal offender were barred.

In sum, the complaint does not state a Chapter 151B claim against Baldassarre, and will be dismissed as to him.[9]

### 4.       Hostile Work Environment

Counts One, Two, and Three appear to allege, in part, that defendants discriminated against plaintiff by creating a hostile work environment in violation of federal and state law.

A plaintiff making a claim of hostile work environment must show that "the complained-of conduct was so severe or pervasive that it altered the terms or conditions of her employment." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006); *see also Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006).  Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work

---

[9] Plaintiff also contends that a supervisor's failure to investigate credible allegations can itself create a hostile work environment.  It is certainly true that a failure to investigate can be a component of such a claim.  However, in the cases that plaintiff cites, the defendants did not investigate the complaints at all.  *See Chapin v. University of Mass. at Lowell*, 977 F. Supp. 72, 79-80 (D. Mass. 1997); *Munford v. James T. Barnes & Co.*, 441 F. Supp. 459, 466 (E.D. Mich. 1977).  Here, Baldassarre did investigate plaintiff's complaint, and in any event plaintiff's allegations about the inadequacies of that report are part of her claim of a hostile work environment.  But that does not provide a basis for concluding that Baldassarre can be found to have aided and abetted discrimination.

performance." *Pomales*, 447 F.3d at 83.

Some of the allegations in the complaint clearly reflect mere disagreements about plaintiff's work performance, or the content of student IEPs. *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87 (1st Cir. 2016) (noting that "minor instances of employment skirmishes" are not sufficient to form a hostile work environment). Others appear to reflect rude, contentious, and discourteous behavior by some school officials. But rudeness and insults, without more, cannot support a hostile work environment claim. *See Smith v. The Public Schools of Northborough-Southborough Massachusetts*, 133 F. Supp. 3d 289, 293, 296 (D. Mass. 2015) (finding that a principal's interrupting and contradicting plaintiff teacher during a meeting, using a schoolwide paging system to locate plaintiff, scheduling meetings during holiday season, and issuing critical instructions did not create a hostile work environment). *Noviello*, 398 F.3d at 92 ("[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim."). Nonetheless, taken as a whole, the complaint appears to allege sufficient facts to support a claim of a hostile work environment under federal law.

As discussed, plaintiff has waived her Chapter 151B claim to the extent that it is based on retaliation in response to her advocacy on behalf of disabled students. Accordingly, to the extent that the claim of hostile work environment arises out such retaliatory conduct, it cannot form the basis of her Chapter 151B claim.

### B.     Count Five:  Intentional Infliction of Emotional Distress

Count Five alleges a claim for intentional infliction of emotional distress against Crowley and Baldassarre. Under Massachusetts law, a claim for intentional infliction of emotional distress requires proof

> (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's

distress; and (4) that the plaintiff suffered severe distress.

*Sena v. Commonwealth*, 417 Mass. 250, 263-34 (1994).

The standard of proof for extreme and outrageous behavior is very high. "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1986) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (Am. L. Inst. 1965)). Mere embarrassment, or sharp questioning by a supervisor, does not qualify as extreme and outrageous conduct that is beyond all possible bounds of decency. *See Anderson v. Boston Sch. Comm.*, 105 F.3d 762, 766-67 (1st Cir. 1997) (holding that a principal's accusing a teacher of breaking a lock did not support the teacher's intentional infliction of emotional distress claim). Similarly, mere expressions of anger or frustration by supervisors, without more, do not qualify. *See Gindi v. Norton*, 216 F. Supp. 3d 199, 206 (D. Mass. 2016). And even insults and threats are normally insufficient. *Foley*, 400 Mass. at 82.

### 1.  Crowley

In her opposition memorandum, plaintiff contends that Crowley should be found liable for intentional infliction of emotional distress based on his conduct on five occasions. (Pl. Opp. Defs. at 19-20).

First, plaintiff contends that Crowley denied her August 2020 request for virtual teaching and then pressured her to rescind her request. However, the complaint alleges that Baldassarre, not Crowley, was the school official who denied her request and later called her to discuss returning to in-person teaching. (Compl. ¶¶ 13-15).

Second, the complaint alleges that a meeting on September 21, 2020, Crowley "shamed" her after she read "an emotional personal statement in good faith about her circumstances and

health concerns and the lack of support she had received." (*Id.* ¶ 16).   It further alleges that he "embarrassed her about returning to school," and asked whether she had put parents up to contacting Baldassarre in support of her virtual teaching request.  (*Id.*).[10]

Third, Count Six—which alleged a violation of 42 U.S.C. § 1983, and which has been voluntarily dismissed—alleges that Crowley "knowingly allowed five different administrators to relentlessly harass [her]."  (*Id.* ¶ 124).[11]  Aside from that conclusory allegation, the complaint does not allege that Crowley knew anything about school officials' conduct toward plaintiff before her December 2021 complaint, other than the meeting on September 21, 2020.  And after December 2021, it appears that Crowley delegated the investigation of her complaint to Baldassarre.  The complaint alleges no specific details concerning Crowley's knowledge, actions, or intent with respect to school officials' conduct toward plaintiff.

Fourth, Count Six alleges that "when [plaintiff] rightly requested an independent investigation and questioned the fairness of the selection process, Dr. Crowley lost his temper, threw his glasses down, and yelled at [plaintiff]."  (*Id.* ¶ 124).  It further alleges that Crowley "stated [that] he didn't have time for this, as he is running a school district, and abruptly left the room."  (*Id.*).

Fifth, Count Six alleges that Crowley "arranged for [plaintiff] to be independently investigated by an attorney closely aligned with the district's own lawyers, making a complete mockery of an 'unbiased' investigative process."  (*Id.*).  The complaint does not describe the basis for the claim of a close alignment, the outcome of the lawyer's investigation, or the

_____

[10] In her opposition memorandum, plaintiff alleges that at the September 2020 meeting Crowley also "made fun of her disability."  (Pl. Opp. Defs. at 20).  That allegation, however, is nowhere in the complaint, and accordingly cannot be considered by the Court.

[11] Count Five did not incorporate by reference the allegations in Count Six (which, again, has been dismissed).

lawyer's conduct during the investigation.  Nor does it allege that Crowley intended to cause plaintiff emotional distress by making the hire, or whether the hiring caused her emotional distress.

Those allegations, taken together—and even taking into account the allegations in Count Six—are insufficient to make out a plausible claim for intentional infliction of emotional distress.  Whatever the merits of plaintiff's factual claims, they do not amount to extreme and atrocious conduct that is beyond all possible bounds of decency.   Accordingly, the claim against Crowley for intentional infliction of emotional distress will be dismissed.

### 2.   **Baldassarre**

In her opposition memorandum, plaintiff asserts that her claim of intentional infliction of emotional distress against Baldassarre is based on five grounds:  that he pressured her to rescind her virtual teaching accommodations; that, during his investigation, he pressured her into rescinding "protective measures"; that his investigation was inadequate and biased; that he released his report to her peers; and that he failed to carry out his report's recommendations.

First, according to the complaint, Baldassarre called plaintiff and "asked" her to return to the classroom "because parents were sad to see her go." (*Id.* ¶ 13).  Days later, she rescinded her request to teach virtually.

Second, plaintiff now contends (in her opposition to Baldassarre's motion to dismiss, but not in her complaint) that Baldassarre "threaten[ed] her in an attempt to get her to drop the protections in place against her abusers."  (Pl. Opp. Baldassarre at 11).  The complaint refers to "interim measures" and "protective measures" that Baldassarre implemented during his investigation, but provides no detail as to what those measures were, and how they affected plaintiff.  It alleges that at a meeting led by Baldassarre, plaintiff was "heavily encouraged" to remove Kessaris from the "protective measures."  (Compl. ¶ 65).  Because of the complaint's

use of the passive voice, it is unclear whether Baldassarre himself was the one doing the encouraging.  In any event, there is no allegation in the complaint that he threatened her in any way.[12]

Third, plaintiff now contends that Baldassarre's investigation was "a sham."  According to the complaint, Baldassarre's investigation took one month.  During the investigation, Baldassarre apparently implemented (unspecified) measures to protect plaintiff, conducted interviews, reviewed documents, and held meetings with plaintiff.  His report, as described in the complaint, contained "lies about 'pertinent' facts and 'findings.'"  (Compl. ¶ 68).  But the complaint also alleges that the report suggested that the parties should meet with a trained mediator, and also directly addressed several of plaintiff's greatest concerns:  her serving as an LEA representative illegally, her unequal caseload, and Kessaris's disciplinary letter.  It is possible that Baldassarre's investigation was not as sweeping or favorable as plaintiff may have wanted, but the complaint describes an investigation that was, at worst, inaccurate and inadequate—not extreme or outrageous.  *See Jones v. Maloney*, 74 Mass. App. Ct. 745, 751 (2009).

Fourth, plaintiff now contends that Baldassarre released his report to her peers, causing her emotional distress.  However, the complaint itself does not actually allege that Baldassarre released the report; it simply alleges that the report "was . . . released."  (Compl. ¶ 68).  Nor does the complaint identify which "unauthorized parties" received the report, or what "adverse actions" those parties took in response to the report.  At worst, Baldassarre committed "procedural missteps" in his distribution of the report, but such missteps do not suggest intent—

---

[12] Plaintiff's further contention in her opposition that Baldassarre "exploited" her anxiety disorder "as leverage" to threaten her into withdrawing the measures is likewise not set forth in the complaint.  (Pl. Opp. Baldassarre at 11).

nor are they extreme or outrageous.  *Chakrabarti v. Cohen*, 31 F.3d 1, 6 (1st Cir. 1994).

Finally, plaintiff now contends that Baldassarre failed to carry out any of his report's recommendations.  The complaint, however, alleges that Kessaris removed his disciplinary letter from plaintiff's file, which was one of the report's recommendations (albeit several months after the report's release).  It is not clear whether Baldassarre's report required him personally to follow through on his own recommendations; it would be odd, for example, for an assistant superintendent to file a union grievance over a teacher's caseload.

Again, those allegations suggest possible mistakes, neglect, and insensitivity.  They do not, however, amount to a plausible claim of extreme or outrageous misconduct sufficient to establish a claim for intentional infliction of emotional distress.  Accordingly, the claim against Baldassarre for intentional infliction of emotional distress will be dismissed.

### C.    Statute of Limitations

Finally, defendants contend that all claims alleging discrimination or retaliation based on events occurring before June 24, 2021, are time-barred.  Plaintiff contends that defendants' actions constituted a single unlawful employment practice and that the "continuing violation" doctrine applies.

Counts One, Two, and Three assert claims under the ADA, Mass. Gen. Laws ch. 151B, and Section 504 of the Rehabilitation Act.[13]  Under the ADA, a claimant "must [first] exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits."  *Bonilla v. Muebles J.J. Alvarez, Inc.*,

---

[13] Count Five, the claim for IIED, will be dismissed for other reasons, but it is clearly not time-barred.  The relevant statutes—the ADA, the Rehabilitation Act, and Chapter 151B—require a plaintiff to exhaust her discrimination and retaliation claims, not her tort claims.  Furthermore, Massachusetts law provides a three-year limitations period for claims of intentional infliction of emotional distress.  *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 823 (1994).  The earliest event described in the complaint is from August 2020.  Count Five was therefore filed within the applicable limitations period.

194 F.3d 275, 278 (1st Cir. 1999).  The claimant must file a charge "within either 180 or 300 days of the offending conduct," depending on the jurisdiction in which the charged conduct occurred.  *Rivera-Díaz v. Humana Ins. of P.R.*, 748 F.3d 387, 390 (1st Cir. 2014).  A claimant who alleges a violation of Section 504 of the Rehabilitation Act, which incorporates "the standards applied under title I [of the ADA]," must likewise exhaust her administrative remedies within the prescribed time limit.  29 U.S.C. 794(d); *Bonilla*, 194 F.3d at 277-78 (holding that a plaintiff who brings a claim under Title I of the ADA must first exhaust her administrative remedies).  In Massachusetts, a claimant alleging discrimination under Chapter 151B "may maintain a civil action only if she has previously filed a timely complaint with the [MCAD]." *Christo v. Edward G. Boyle Ins. Agency*, 402 Mass. 815, 816 (1988).  Massachusetts law requires that a Chapter 151B complainant file a complaint with the MCAD "within 300 days after the alleged unlawful conduct."  804 Mass. Code Regs. 1.04(3).

Plaintiff filed a complaint with the MCAD on April 10, 2022.  There is no question that any claim that she may have arising out of events occurring on or after June 24, 2021—300 days before the filing of her MCAD complaint—is timely.  Claims arising out of events before that date may also be actionable under the "continuing violation" doctrine.

> The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims. This ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory.

*O'Rourke v. City of Providence*, 235 F.3d 713, 732 (1st Cir. 2001) (internal quotations and citations omitted).

Under federal law, a claim of a "continuing violation" is evaluated according to the

following criteria: (1) whether the subject matter of the discriminatory acts was sufficiently similar such that there was a substantial relationship between the otherwise untimely acts and the timely acts; (2) whether the acts were isolated and discrete or occurred with frequency or repetitively or continuously; and (3) whether the acts were of sufficient permanence that they should have triggered an awareness of the need to assert one's rights. *See O'Rourke*, 235 F.3d at 731. The "continuing violation" doctrine does not apply if, at the relevant time, plaintiff was or should have been aware of the discriminatory practice. *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 401-02 (1st Cir. 1990).

Under Massachusetts law, a plaintiff can establish a continuing violation by showing that (1) at least one discriminatory act occurred within the limitation period, (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts, and (3) earlier violations outside the limitations period did not trigger the plaintiff's "awareness and duty" to assert her rights. *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 642-43 (2004). When a plaintiff brings a claim based on an alleged hostile work environment, the limitation period begins to run when "the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 539 (2001).

The "continuing violation" doctrine may have particular force in the context of a claim of hostile work environment.

> [O]ften a sexual harassment claim will not accrue until after a period of recurring acts of harassment. A plaintiff usually will not have a viable claim of hostile work environment from single acts that are isolated or sporadic or not themselves severe enough to alter the work environment and create an abusive work environment—both from an objective and subjective viewpoint. Or they may not of themselves appear to be discriminatory. But the recurrence of events that do not of themselves appear to be discriminatory may, over time, come to demonstrate both an increasingly difficult environment and that the events lack an

innocent explanation.  A plaintiff may be unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.

*O'Rourke*, 235 F.3d at 732 (internal quotations and citations omitted).

To the extent that plaintiff is asserting claims for disability discrimination arising out of defendants' conduct with respect to her asthma—in particular, her request to teach remotely for health reasons—they are time-barred.[14]  Assuming the truth of the allegations in the complaint, plaintiff was aware of the alleged discriminatory practice no later than September 21, 2020, when she was "shamed," "embarrassed," and "ridiculed" for her health concerns.  (Compl. ¶ 16). And the complaint does not allege that any of the acts by school officials occurring after June 24, 2021, arose from her physical condition or her request to teach remotely.

To the extent plaintiff is asserting claims for disability discrimination arising out of her advocacy for disabled students, her general anxiety disorder, or based on a hostile work environment, the facts are less clear.  Some of the events of which she complains occurred during the 2020-21 academic year, which likely concluded around June 24, 2021, but many of them occurred during the 2021-22 academic year.  In light of the fact-intensive nature of the continuing violation inquiry, the Court is not prepared to say at this stage that any or all of those claims are time-barred.  The resolution of those issues must, at a minimum, await the development of a more complete factual record.

**D.    Summary**

To summarize:

1.      To the extent Counts One, Two, and Three allege claims under federal and state

---

[14] The complaint does not specifically describe the "personal health issue" that led plaintiff to request a virtual teaching assignment.  (Compl. ¶ 11).  While the Court infers that the "personal health issue" was plaintiff's asthma, to the extent that plaintiff asserts claims for any other physical disability that led her request a virtual teaching assignment, those claims are also time-barred.

law based on plaintiff's asthma, they will be dismissed as time-barred.

2.      To the extent Counts One and Two allege claims under federal law based on plaintiff's anxiety disorder, or her advocacy for disabled students, the motion to dismiss will be denied.

3.      To the extent Count Three alleges claims under state law based on plaintiff's anxiety disorder, the motion to dismiss will be denied.

4.      To the extent Count Three alleges claims under state law based on plaintiff's advocacy for disabled students, it will be dismissed pursuant to Mass. Gen. Laws ch. 149, § 185(f).

5.      Count Three will be dismissed as to defendant Baldassarre.

6.      Count Five, which alleges intentional infliction of emotional distress against Crowley and Baldassarre, will be dismissed for failure to state a claim.

## IV.   <u>Conclusion</u>

For the foregoing reasons,

The motion to dismiss of defendants the City, the District, and Crowley is GRANTED as to Counts One and Two to the extent that the claims are based on plaintiff's physical disability (asthma); GRANTED as to Count Three to the extent that the claims are based on plaintiff's physical disability (asthma) or advocacy for disabled students, and as to the claim against defendant Baldassarre; GRANTED as to Count Five; and otherwise DENIED.

The motion to dismiss of defendant Baldassarre is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 2, 2023                    Chief Judge, United States District Court