**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| JESSICA CONNOLLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-10695-JEK |
| | ) | |
| WOBURN PUBLIC SCHOOLS, CITY OF | ) | |
| WOBURN, MATTHEW CROWLEY, | ) | |
| and MICHAEL BALDASSARRE, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION TO EXCLUDE AN EXPERT WITNESS, AND DEFENDANTS' MOTION TO STRIKE**

**KOBICK, J.**

Plaintiff Jessica Connolly, a special education teacher for the Woburn Public Schools, contends that, between 2020 and 2023, she was subject to workplace discrimination and retaliation because of her anxiety, her advocacy for students with disabilities, and her complaints of harassment. She has asserted claims against the defendants—Woburn Public Schools, the City of Woburn, and Matthew Crowley, the Superintendent of the Woburn Public Schools—under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and M.G.L. c. 151B. After a period of discovery, the defendants have moved for summary judgment and to strike certain deposition testimony, and Connolly has moved to exclude the opinions of the defendants' expert witness.

For the reasons that follow, the defendants' motion to strike will be granted in part and denied in part, and their motion for summary judgment will be granted. Connolly did not disclose her anxiety to the defendants until well after the challenged conduct in this case, and the evidence,

viewed in the light most favorable to Connolly, does not show that Connolly's coworkers and supervisors regarded her as disabled. While Connolly did engage in protected conduct by filing a series of harassment complaints, no reasonable jury could conclude that she was subject to a hostile work environment or other adverse employment action because of her protected conduct. Connolly's motion to strike the opinions of the defendants' expert will be denied as moot, because summary judgment is warranted even absent consideration of the expert's opinions.

## BACKGROUND

### I.  Statutory and Regulatory Framework.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, provides states with federal funding to assist in the education of children with disabilities. *Roe v. Healey*, 78 F.4th 11, 15 (1st Cir. 2023). This funding is conditioned on compliance with certain statutory conditions, including the obligation to provide all eligible children with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"). *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017); *C.D. by & through M.D. v. Natick Pub. Sch. Dist.*, 924 F.3d 621, 624-25 (1st Cir. 2019). A FAPE consists of "special education and related services" that, among other requirements, "are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)]." 20 U.S.C. § 1401(9). The LRE mandate requires that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* § 1412(a)(5)(A).

An individualized education program ("IEP") is "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 580 U.S. at 391 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IEP consists of a "'written statement for each child with a disability that is developed, reviewed, and revised in accordance with' federal law and regulations." *G.D. by & through Jeffrey D. v. Swampscott Pub. Sch.*, 27 F.4th 1, 5 (1st Cir. 2022) (quoting 20 U.S.C. § 1414(d)(1)(A)(i) and citing 34 C.F.R. § 300.324; 603 Code Mass. Regs. 28.05). The statement must contain "'the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." *Id.* (quoting *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) and citing 603 Code Mass. Regs. 28.05(4)). IEPs must be drafted based on student need, not available district resources. Under no circumstances should an IEP "be written 'to fit' a particular placement." ECF 97-3, Ex. D, at 61.

IEPs are prepared at meetings by the IEP Team, which comprises the parents of the student, at least one regular education teacher (if the child is participating in the regular education environment), at least one special education teacher (or special education provider, where appropriate), a representative of the local educational agency, "an individual who can interpret the instructional implications of evaluation results," other individuals with "knowledge or special expertise regarding the child" (at the discretion of the parent or agency), and the child (where appropriate). 20 U.S.C. § 1414(d)(1)(B); *see also* 34 C.F.R. § 300.321. The local educational agency representative on the IEP Team must be "qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities"; "knowledgeable about the general education curriculum"; and "knowledgeable about the

availability of resources of the local educational agency." 20 U.S.C. § 1414(d)(1)(B)(iv); *accord* 34 C.F.R. § 300.321(a)(4). In Massachusetts, school districts are the local educational agencies directly responsible for developing and administering IEPs, and they are overseen by the Department of Elementary and Secondary Education to ensure IDEA compliance. *See Roe*, 78 F.4th at 16; *G.D.*, 27 F.4th at 5; 20 U.S.C. § 1401(19)(A) (defining "local educational agency").

The IEP Team must review each child's IEP at least annually to ensure that the child's annual goals are being achieved and to make revisions, as appropriate. 20 U.S.C. § 1414(d)(4)(A); 603 Code Mass. Regs. 28.04(3). "Additionally, every three years, or sooner if necessary, the school district shall, with parental consent, conduct a full three-year reevaluation consistent with the requirements of federal law." 603 Code Mass. Regs. 28.04(3); *see* 20 U.S.C. § 1414(a)(2)(B). At annual review meetings, each child's IEP Team convenes to review the student's progress toward their annual goals and develop new goals and objectives. ECF 97-14, at 32; ECF 97-3, ¶¶ 15-16. No significant adjustments to the IEP, such as new goals or service areas, are made at annual review meetings, as reevaluation is required for any changes that would add or remove goals or services entirely. ECF 97-3, ¶¶ 16-17. But the IEP Team does review the child's data to determine whether additional accommodations are necessary and whether services should be expanded, modified, or reduced. *Id.* ¶¶ 16-18. A child's final educational placement is not determined until after the entire IEP has been developed, *id.*, Ex. B, at 40, as "[t]he IEP forms the basis for the placement decision," *id.*, Ex. D, at 61.

The IDEA and Massachusetts law impose strict deadlines for the IEP process. *See, e.g.*, 20 U.S.C. § 1414; 603 Code Mass. Regs. 28.05(1), (7); ECF 97-3, ¶¶ 45-46. At Woburn Public Schools, special education teachers are responsible for submitting draft IEPs to their Team Chairs within three school days of an annual review meeting, to allow adequate time for edits from other

Team members and to ensure that the IEP is submitted within the timeline prescribed by the IDEA and Massachusetts law. ECF 97-3, ¶ 39.

## II.    <u>Factual Background.</u>

The following facts are either undisputed or recounted in the light most favorable to Connolly, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

Plaintiff Jessica Connolly is an employee of defendant Woburn Public Schools ("WPS"), where she has been a full-time special education teacher since September 2009. ECF 106, ¶ 1. WPS provides special education services to students with IEPs. *Id.* ¶ 5.

During the time period relevant to this case, defendant Matthew Crowley was Superintendent of WPS. *Id.* ¶ 2. Courtney Young was Assistant Superintendent of WPS for Curriculum and Instruction. ECF 97-28, at 90. From December 2021 to January 2022, defendant Michael Baldassarre was the Assistant Superintendent of Student Services for WPS. ECF 106, ¶ 3. Between July 2019 and May 2022, Maureen Ryan was the Director of Special Education for WPS. *Id.* ¶ 4. From August 2021 to August 2022, Renee Brissette was the Assistant Special Education Director for WPS. ECF 97-26, at 1, ¶ 1. Kenneth Kessaris was the Principal of the Goodyear Elementary School, a school in WPS, from May 2013 to July 2024. ECF 106, ¶ 13; *see* ECF 97-6, ¶ 1. Steve Gallo was the Assistant Principal at the Goodyear School. ECF 97-4, at 57. Jaimee Greitzer was a Team Chair in the special education department of WPS, responsible for reviewing Connolly's IEP drafts and consulting with students and families regarding their IEPs. ECF 106, ¶ 11.

At WPS, Team Chairs oversee the IEP process and are involved in reviewing, editing, finalizing, and submitting IEPs. *Id.* ¶ 9. As part of this responsibility, they monitor IEP paperwork

and the development of IEPs, working closely with special education teachers to ensure compliance with state and federal laws. *Id.* ¶ 10. Team Chairs are not considered administrators, however, nor are they direct administrative supervisors, even though they have supervisory responsibilities over the IEP process. *Id.* ¶¶ 12-13; ECF 97-28, at 141.

      A.    <u>The 2020-2021 School Year.</u>

The events relevant to this case began in late August 2020, when Connolly requested that she be permitted to work remotely for the school year because of her "severe asthma" and caretaking responsibilities for an immunocompromised family member. ECF 97-18, at 5-6 (WPS's accommodation form filled out by Connolly's doctor listing "Asthma (Severe)" as the justification (emphasis omitted)); *id.* at 7 (Connolly's note to Crowley explaining her "severe asthma" and her care for her family member); ECF 106, ¶ 15. At some point that month, she met with WPS administrators, including Crowley, Ryan, and Director of Human Relations Judi O'Neil, about this request. ECF 106, ¶¶ 14-15. At the meeting, Connolly explained that she had asthma and expressed that, because of COVID, she felt anxious about her role during upcoming school year. *Id.* ¶ 95.

WPS officially granted Connolly's request on September 10, 2020 and reassigned Connolly from her position as a special education teacher at the Goodyear School to WPS's Virtual Academy. ECF 106, ¶ 15; ECF 97-18, at 9. On September 14, 2020, Connolly emailed Ryan expressing concerns about this change. ECF 106, ¶ 16. Connolly opined that assigning a replacement teacher to the Goodyear School while Connolly was assigned to the Virtual Academy would "put a huge stressor on the social-emotional well-being of [her] caseload [at the Goodyear School] and create even more significant, unnecessary gaps in learning." *Id.*; ECF 122, at 2. In response, Ryan explained WPS's practice for "ensur[ing] consistency across the district with respect to leaves." ECF 122, at 2. She also explained certain logistics for the Virtual Academy, stating that she would

"do what [she] [could] to support [Connolly] in this role over the school year." *Id.* After Connolly explained that she had obtained a medical accommodation and was not taking leave, Ryan suggested that Connolly contact Baldassarre and O'Neil regarding her concerns. ECF 122, at 2; ECF 106, ¶¶ 15-16. Ultimately, Connolly remained in her newly assigned position as a Virtual Academy teacher. ECF 106, ¶ 17.

A few weeks later, on September 27, 2020, Connolly emailed Ryan to ask about the content of the programs she should be delivering in her position as a Virtual Academy teacher. *Id.*; ECF 122, at 4. Ryan suggested that she review her students' IEPs and asked what specific training Connolly required. ECF 106, ¶ 17; ECF 122, at 4. Connolly responded that she needed "[e]xact resources, names of programs and tools," "highly specific guidance and exact starting points in order to perform in an effective and systematic manner this school year, as opposed to last spring when we did our best to replicate teaching virtually." ECF 122, at 4; *see* ECF 106, ¶ 17. Ryan replied that she was "confused" and asked how Connolly had taught her caseload the previous spring. ECF 106, ¶ 19; ECF 122, at 5.  Connolly explained that in the spring, she "did [her] best" temporarily and that she was "under the impression that being a full time remote teacher . . . would entail training in some type of specialized virtual programming." ECF 122, at 5; *see* ECF 106, ¶ 19. She also informed Ryan that "[a]ll four of us [Virtual Academy] elementary [special education]/[special education] program teachers are struggling with the same thing - where exactly do you want us to find our teaching content?" ECF 106, ¶ 19; ECF 122, at 5.

Later that school year, Ryan relayed several concerns from parents to Connolly. First, on November 13, 2020, Ryan emailed Connolly regarding "further parent concerns expressed to [Ryan] regarding math support" and asked Connolly to "[p]lease be sure to provide services addressing the math goals." ECF 106, ¶ 20; ECF 122, at 6. Ryan explained that "one of the families

has legal representation and they are asking." ECF 106, ¶ 20; ECF 122, at 6. Second, on January 4, 2021, Ryan emailed Connolly regarding a parent's concerns about her child's progress, and she asked Connolly to keep track of data and share it regularly with the family. ECF 106, ¶ 21; ECF 122, at 7. In response, Connolly expressed her surprise that the parent felt that there was not enough data and attached the child's progress report, which "included very specific data taken over time." ECF 122, at 7. Connolly then sent a follow-up email, expressing her concerns that there was "an ongoing issue with [the parent] reporting her and untruths to higher authorities in the school system," that the parent "ha[d] accused [her] of not meeting time requirements," and that she felt "unprotected against [the parent's] claims." *Id.*; ECF 106, ¶ 21. Ryan explained that she was not doubting that Connolly was doing a great job with the child and that the best approach to such a situation was to "review the data together, more often." ECF 122, at 8; *see* ECF 106, ¶ 21. She also noted that she was unable to locate Connolly's current data log on the student when speaking with the parent and asked Connolly to share the file with her. ECF 106, ¶ 21; ECF 122, at 8.

B.    The 2021-2022 School Year.

The following school year, Connolly returned to in-person work at the Goodyear School. ECF 106, ¶ 26. A number of events occurred that school year that bear on her claims.

    1.    *Changes to WPS's Special Education Department.*

First, in response to an increase in students requiring special education services, WPS and the Woburn Teacher's Association union ("WTA") agreed that WPS would hire an additional special education teacher at each school to reduce caseloads, a change that lessened most special education teachers' service delivery obligations—including Connolly's—by about half. ECF 97-

3, ¶¶ 19, 22-24, 32; ECF 106, ¶ 22.[1] Connolly wrote to Ryan that she was "SO excited to be sharing the caseload" with Maria DiRienzo, the second special education teacher assigned to the Goodyear School. ECF 106, ¶ 23, ECF 122, at 15. On September 7, 2021, Connolly reached out to Kessaris, expressing her dissatisfaction with the caseload division and her desire "to take a more active role" in student assignments. ECF 122, at 167 (explaining that her suggested plan would "take into consideration past relationships" that she had built). The following day, Connolly also reached out to Ryan to express her sadness that she was not part of the decision-making process for student assignments, as she wished to work with students she had worked with before and believed the proposed caseload division to be "very inequitable." *Id.* at 175; *compare* ECF 97-3, ¶¶ 25-26 (Ryan's affidavit explaining that equitable division of caseloads must account for students' needs and cannot simply be divided numerically). That day, Connolly sent another email to Ryan and Kessaris asking why DiRienzo had permission to edit a document and had made changes to it, whereas Connolly did not have the same ability; Ryan responded that DiRienzo's access "may have been leftover access from when [Ryan] met with [DiRienzo] last spring in person and she was helping [Ryan] to spell students' names correctly." ECF 122, at 15-16; ECF 106, ¶ 26.

Second, as part of the agreement to hire additional teachers, WPS tasked special education teachers with leading and serving as local educational agency ("LEA") representatives at students' annual IEP review meetings, a responsibility that had formerly been assigned to Team Chairs. ECF 97-3, ¶¶ 22, 33; *see id.* ¶ 36 (Ryan's averment that she authorized special education teachers to serve as LEA representatives for purposes of conducting annual review meetings). Team Chairs continued to lead all substantive evaluation and re-evaluation meetings. *Id.* ¶ 33; ECF 106, ¶¶ 22,

---

[1] That year, the Goodyear School had fewer special education cases than other schools in the district. ECF 97-3, ¶ 31.

24. Team Chairs also continued to lead annual review meetings that were deemed contentious, that an advocate was expected to attend, or that would likely necessitate adding or removing service categories from the student's IEP if the student had undergone additional testing during the review period that indicated such changes might be necessary. ECF 97-3, ¶ 33; ECF 106, ¶¶ 22, 24.

At the time, special education teachers were already running annual review meetings at the middle and high school levels in WPS, as well as in many of WPS's peer and surrounding school districts. ECF 97-3, ¶¶ 33, 37. Ryan believed that the WPS elementary school special education teachers could lead annual review meetings as well, because "special education teachers are qualified to provide and supervise the delivery of special education services delivered by paraprofessionals, receive training on the types of services and accommodations available within the District, are familiar with the resources available to students in their school buildings, and/or have a general understanding of and familiarity with District resources through communications from the WPS Special Education Department and required District-provided training." *Id.* ¶ 37.

In Connolly's opinion, this change dramatically increased her workload. ECF 97-27, at 9. She also worried that special education teachers could not legally serve as LEA representatives and raised this concern on several occasions throughout the school year. *Id.* at 53; ECF 97-1, at 3; ECF 97-2, at 55-56; ECF 97-3, ¶ 38; ECF 97-4, at 152-153. In particular, Connolly believed that she was not qualified to fill the position because she did not have sufficient knowledge of district resources. ECF 97-27, at 56-60. For example, on one occasion, Connolly believed that there was a social worker available at the Goodyear School for a student, but later found out that the social worker had been moved. ECF 97-27, at 56-57. Connolly also believed that the fact that she had to seek approval from Ryan for certain district resources disqualified her from acting as an LEA representative. ECF 97-27, at 57.

In response to Connolly's concerns, Ryan sought a legal opinion from WPS's counsel, which she received on February 2, 2022 and forwarded to WPS administrators to share with Connolly. ECF 106, ¶ 99; ECF 97-3, ¶ 38. The attorney opined that under the IDEA, "there are no legal barriers associated with the appointment of a special education teacher" to lead IEP annual meetings and that the person need not be an administrator in the district. ECF 97-3, Ex. C, at 45-46. Connolly nevertheless continued to raise concerns about the legality of this practice even after receiving this legal guidance. ECF 97-4, at 153.

At her deposition, Connolly remembered receiving the Special Education Department's Procedures Manual, an Annual Review Checklist, and a meeting summary form, and she "believe[d]" that she attended a formal training on how to lead annual review meetings. ECF 106, ¶ 25; ECF 97-27, 12-14. This recollection aligns with Ryan's averment that she "arranged for all special education teachers, including Ms. Connolly, to receive extensive specialized training on how to lead these meetings." ECF 97-3, ¶ 35. Kessaris also offered "Connolly suggestions for further additional training and resources to assist her and ensure that she was able to lead most IEP team meetings," and he answered questions about that responsibility as well. ECF 97-6, ¶ 15 (italics omitted).

### 2. Connolly's Over-Servicing of Students.

In November 2021, Kessaris had a meeting with Gallo, during which they discovered that Connolly had been overservicing certain students, in violation of the LRE mandate. ECF 97-4, at 106, 137-39. Upon comparing Connolly's schedule to several children's IEP service delivery grids, Kessaris realized that Connolly was pulling the children out of their general education classrooms for more time during a day or week than prescribed by their IEPs. *Id.* at 106, 138-39. Kessaris raised this concern with Connolly but could not recall her specific reaction. *Id.* at 106-07.

3. *Student 1's November 12, 2021 IEP Meeting.*

Throughout the 2021-2022 school year, WPS received a number of concerns from the parents of Student 1. First, on October 22, 2021, Student 1's parent emailed Greitzer, complaining that Student 1 was receiving fewer services than were required by her IEP. ECF 106, ¶ 27; ECF 122, at 176 (explaining that Student 1 was "com[ing] home increasingly frustrated and overwhelmed").

A few weeks later, on November 12, 2021, Connolly participated in an IEP meeting for Student 1, which, in Connolly's estimation, went "terribly." ECF 106, ¶¶ 27-28; ECF 97-27, at 157. Immediately after the IEP meeting, Ryan wrote to Connolly, copying Gallo, and asked that Connolly scan and send her Student 1's data from her reading goal for the school year as soon as possible. ECF 106, ¶ 31; ECF 122, at 17. At Ryan's request, Gallo then went to Connolly's classroom and asked her for the data. ECF 106, ¶ 32; ECF 97-3, ¶ 54; ECF 97-27, at 34-35 (recounting her interaction with Gallo). Connolly "protested in some way" and requested "time to compile it in a readable format," but Gallo refused. ECF 97-27, at 34-35, 83 (characterizing the notes as "personal notes" and averring that she "was willing to share them in a readable format but . . . was not given the time to do that"). Connolly then emailed Ryan, asking for the weekend "to populate all of the data into a table" because it was "currently in very raw form," but Ryan requested that Connolly scan what she had so that Ryan could "review the data that was reported on" in Student 1's IEP meeting. ECF 122, at 17; *see* ECF 106, ¶ 31. Connolly agreed to provide the data and gave the notes to Gallo. ECF 122, at 17; ECF 97-27, at 34.

Two days after the meeting, Student 1's parent emailed Ryan, stating that she was "extremely upset" about the IEP meeting, which she described as "the most unprofessional and poorly run meeting" she had ever attended. ECF 122, at 21-22; *see* ECF 106, ¶¶ 28-29. The parent

complained that "there was nothing reported" from Connolly and questioned how the IEP Team could make appropriate recommendations without the data, noting that as a result, the Team did not discuss how her child's "goals would be driven by the data, because no data was presented." ECF 122, at 21. The parent stated that when she pushed for her child to have more pullout reading services, Connolly informed her that she "[didn't] have time in [her] schedule for more" and Greitzer told her that even if they scheduled more sessions, her child would have to miss services on some days. *Id.* The parent reiterated her concerns from October that Connolly was giving Student 1 fewer service sessions than required by the child's IEP, and she questioned how she could "trust going forward" that her child would be receiving appropriate services when Connolly was already "out of compliance" with Student 1's IEP. *Id.*; ECF 106, ¶ 30. Finally, the parent informed Ryan that Greitzer began to end the meeting before the team had discussed or come to an agreement on Student 1's accommodations, supports for state testing, or the service delivery grid. ECF 122, at 22.

On November 17, 2021, Ryan met virtually with Connolly, Greitzer, Angela Mousseau (the school's contracted neuropsychologist, who had conducted an in-depth assessment of Student 1), Kessaris, and Gallo to discuss the concerns raised in the email from Student 1's parent. ECF 106, ¶ 34; ECF 97-3, ¶ 55. Ryan expressed concern that Connolly could not substantiate her recommendation to deny Student 1 the services recommended by Mousseau, that the parent had complained about the lack of data presented, and that the parent had threatened to take legal action. ECF 97-3, ¶ 55. At the meeting, Connolly acknowledged that she had not complied strictly with Student 1's IEP and argued that "services could be delivered in different frequencies and durations than the IEP prescribes." *Id.* ¶¶ 55, 62 (emphasis omitted); *see* ECF 106, ¶ 35. Ryan instructed the group to reconvene with appropriate data as soon as possible. ECF 106, ¶ 34. Ryan did not observe

Connolly to be crying during the meeting, but at least one person reported that Connolly was in tears. *Compare* ECF 97-3, ¶ 62, *with* ECF 97-28, at 48, 154-55.

Connolly was very upset after the meeting. ECF 97-27, at 163. The next day, Gallo approached her and encouraged her to share her feelings with Ryan. *Id.* at 163-64; *see* ECF 122, at 219 (Connolly's email thanking Gallo for speaking with her "from a caring and helpful place"). Later that night, Connolly sent an email to Ryan, Kessaris, and Gallo, thanking Gallo for "extending a helping hand and encouraging words" and "asking for help and ideas moving forward." ECF 122, at 9-10. Connolly shared that she had "a very large and needs-intense caseload" and that she was "stretched quite thin . . . while trying to learn the ins and outs of the added responsibilities formerly handled by the chairperson." ECF 122, at 9; *see* ECF 106, ¶ 37. She "admit[ted] to coming up far short" in "keep[ing] useful data" for some of her students and noted that "[t]he quality of the data for this group is severely lacking compared to the data" she had for her other groups, explaining that this was due to the size of the group and her "overwhelming workload." ECF 122, at 9. Sharing that her workload "[a]t times . . . felt punitive," she requested that Student 1 be reassigned to another special education teacher and suggested that her "testing and meeting duties . . . be lightened," which would benefit her students. *Id.* at 10. In Connolly's opinion, "[t]he disparity in caseloads and the acute needs of the school's special ed population [were] putting these students at an even greater disadvantage." *Id.* Connolly also expressed that she was "finding it difficult to meet the inclusion obligations of students with paraprofessional support" and felt "as if [she] [could not] recommend as many in-class supports as [she] once could for fear of non-compliance." *Id.* Ryan thanked her for her email and requested Connolly's caseload and schedule, reiterating the expectation that "data is collected on every

student for each session," and emphasizing that "[s]pecial instruction is only effective when the programs are delivered with fidelity and accurate data is kept." ECF 122, at 23; *see* ECF 106, ¶ 38.

### 4. *Student 1's December 2, 2021 IEP Meeting.*

The meeting to reconvene Student 1's IEP team was scheduled for December 2, 2021. ECF 106, ¶ 39. At 11:01 p.m. the night before, Connolly entered a personal day into the WPS staff absence reporting system, in violation of WPS's policy requiring that staff give three days' notice and obtain preapproval for personal days. *Id.* ¶ 40. At her deposition years later, Connolly testified that she called out of work because she had a "migraine" from a "stressor" and her "mental health was at risk." ECF 106, ¶ 41; ECF 97-27, at 66-67. Connolly did not notify Student 1's IEP team that she would be absent. ECF 97-3, ¶ 63. The next day, the meeting was rescheduled because of Connolly's unanticipated absence. *Id.* ¶ 65; *see* ECF 97-4, at 87.

Ryan emailed Connolly the following day to advise her that Student 1's parent had complained that Student 1, whose IEP prescribed direct instruction, was instead receiving services through a computer-based program. ECF 106, ¶ 44; ECF 122, at 24.

### 5. *The Letter of Expectation.*

On the afternoon of December 2, 2021, Kessaris emailed Connolly and requested a disciplinary meeting to discuss her personal day request. ECF 106, ¶ 43; ECF 122, at 170.

The next day, Connolly, accompanied by Barbara Locke, the President of the WTA, met with Kessaris and Human Resources Director Marisa Boyajian for a disciplinary meeting regarding Connolly's use of the personal day. ECF 122, at 171. Connolly characterized Boyajian as "eager to punish" her at the meeting but was unable to remember her "exact words." ECF 97-27, at 73. Three days later, on December 6, 2021, Kessaris issued her a letter of expectation summarizing the meeting. ECF 106, ¶ 45; *see* ECF 122, at 171. That letter set forth the procedure

for requesting personal days and stated that "the expectation is that you will be more cognizant of when and how you are reporting absences moving forward and by bringing this matter to your attention, you will reflect on this experience and be more prepared to respond appropriately in the future." ECF 122, at 171. The letter did not place Connolly on suspension or carry with it any particular punishment. *See id.* At his deposition, Kessaris explained that he stood by his decision to issue the letter because the rescheduling necessitated by Connolly's absence impacted the school, the child's family, members of the special education team, and the school schedule that day, as "there were a lot of things that needed to be rescheduled . . . to make that meeting happen and to begin repairing that relationship and build that trust." ECF 97-4, at 86-87.

### 6. *The Whiteboard Meeting.*

At some point during the year, before the issuance of the letter of expectation, Crowley, Ryan, Young, and Baldassarre met to discuss Connolly's performance. ECF 97-28, at 165. At his deposition, Baldassarre testified that at the meeting, Crowley and Ryan "[drew] on a white board the way that they were going to go after" Connolly, and that Crowley would "orchestrate and direct people to do different things to different people so that it didn't look like it was one person [targeting] a person." *Id.* at 21, 29. Baldassarre also testified that the letter of expectation was written as part of this scheme, though he could not remember whether the personal day issue was diagrammed on the whiteboard. *Id.* at 21, 165. Baldassare understood that the whiteboard meeting reflected Crowley's "way of addressing what he thought was an underperforming employee," noting that Crowley "wasn't saying let's harass her," but was "strategizing how they would approach . . . whatever they perceived her conduct issues to be." *Id.* at 165, 229.

7. *Student 1's December 10, 2021 IEP Meeting.*

The reconvening of Student 1's IEP team was rescheduled for December 10, 2021. ECF 106, ¶ 46. The day before the meeting, Gallo approached Connolly, who was alone in her classroom, and asked her if she was planning to attend the meeting. *Id.* ¶ 47. At her deposition, Connolly stated that Gallo "yell[ed]" at her, "said something about being combative and disrespectful," and was "overly hostile." *Id.* ¶ 48; ECF 97-27, at 84-85. Though she did not believe that Gallo made any physical gestures suggesting that he was going to hurt her, she "felt unsafe physically and mentally" and told him so; in response, "his conversation turned to getting [her] to attend [the] meeting the following day and how he could ensure that that [would] happen." ECF 97-27, at 86; *see* ECF 106, ¶ 49.

Also on December 9, Ryan arranged for someone else to lead the December 10 meeting in case Connolly called out of work unexpectedly the next day. ECF 106, ¶ 50; ECF 97-3, ¶ 65. In her affidavit, Ryan averred that she did so because of Connolly's misuse of the personal day before the December 2, 2021 meeting, because she still had not received data on Student 1 that she had requested from Connolly, and because she believed that another cancellation would make the parent furious, delay the determination and delivery of appropriate special education services to Student 1, and expose the district to liability for the delay. ECF 106, ¶¶ 50-51; ECF 97-3, ¶ 65.

The next day, Connolly called in sick and did not attend Student 1's IEP meeting. ECF 106, ¶ 52; ECF 97-3, ¶ 66. Immediately after the meeting, a member of the IEP team informed Ryan that the file where Student 1's data had previously been stored was no longer accessible to the IEP Team and appeared to have been deleted. ECF 106, ¶ 53; ECF 97-3, ¶ 66.

At her deposition, Connolly admitted that she altered access to Student 1's data on or around December 7, 2021 and that she deleted a file with the child's data on December 9, 2021.

ECF 106, ¶¶ 55-56; ECF 97-27, at 125-27; *see also* ECF 97-15 (Connolly's activity on WPS's Google Drive). Connolly explained that she made one of the documents, which had been shared externally, private because Ryan and Boyajian "accused [her] of fabricating data to the WTA president," and "if they were evaluating [her] personal notes and saying [she] fabricated them, [she] wouldn't want them to have access to it." ECF 97-27, at 125. Connolly said that when she shared the data externally, she believed that she had shared it with her personal e-mail address because she was experimenting with privacy settings. *Id.* at 125-26.

After hearing that Student 1's data appeared to have been deleted, Ryan emailed Connolly to request a disciplinary meeting on December 13, 2021 regarding Student 1's IEP meeting. ECF 106, ¶ 54; ECF 122, at 172. Connolly declined to attend. ECF 106, ¶ 54. Ryan then sent a second request on December 14, requesting a meeting later in the morning and advising Connolly that she could bring a WTA representative, as disciplinary action might be imposed. *Id.*; ECF 122, at 172. Connolly stated that she needed additional time to secure representation and coordinate availability. ECF 122, at 172. Ryan then sent another request for a meeting on December 15, which Connolly said she would not attend, explaining that her representation was not available and there were "extenuating circumstances." *Id.* at 173.

Student 1's parents emailed at least two more times that school year with concerns about their child's IEP and the services she was receiving. On January 3, 2022, Student 1's parents emailed her IEP team to request status updates regarding items raised at the December 10, 2021 meeting. *Id.* at 213. They noted that, despite what had been promised at the meeting, the family had not yet received a proposed IEP, Student 1's proposed schedule, or her complete scores, which made it "challenging to make appropriate determinations regarding what really is appropriate for services and accommodations for" their child. *Id.* About a week later, Student 1's parent emailed

Kessaris and Ryan, complaining that Student 1 had relayed that Connolly was providing her with services that were inconsistent with the child's IEP and expressing frustration that the situation was "not appropriate or acceptable." *Id.* at 25; ECF 106, ¶ 60.

        8. *Baldassarre's Internal Investigation.*

On December 13, 2021, Connolly submitted an informal written complaint accusing Ryan, Greitzer, Gallo, Boyajian, and Kessaris of harassment. ECF 106, ¶ 57; *see* ECF 122, at 182-83, 191. Baldassarre confirmed receipt on December 15. ECF 122, at 191. Noting that the allegations appeared to be directed toward Ryan but also discussed involvement by Kessaris, Gallo, and Boyajian, Baldassarre asked to meet with Connolly the following day to discuss what supportive measures would be appropriate, and he informed her that he had asked those implicated by the complaint to direct any communications to Connolly through him. *Id.*; *see* ECF 106, ¶ 58; ECF 97-2, at 14 (WPS sometimes puts interim measures in place while an investigation is pending, typically at the discretion of the investigators); ECF 97-28, at 185-86; ECF 97-24, at 5 (WPS civil rights grievance procedure).

After Baldassarre's December 15 letter, Ryan had no further direct contact with Connolly, and Brissette became Connolly's primary administrative contact at the central office. ECF 106, ¶ 59. Ryan did, however, write that day to Locke requesting a meeting with Connolly regarding Student 1's December 10 IEP meeting, explaining that she "need[ed] to provide the parents with information tomorrow," and that she had "tried multiple times to have this meeting and need[ed] [Locke's] help arranging WTA representation for Ms. Connolly." ECF 107-5, at 6. Locke responded that "we have been directed not to have any contact/communication until further investigation has occurred"; in response, Ryan stressed that the meeting concerned "a rather serious work issue that need[ed] to be addressed ASAP as it impact[ed] a student and her

programming," and that they "need[ed] to move forward [with the meeting] either today or tomorrow regardless of the complaint." *Id.* at 6-10.

On December 17, Baldassarre sent Connolly a letter outlining the supportive measures to be instituted: Kessaris and Gallo were permitted to communicate with Connolly on work matters unrelated to her complaint, and Ryan, Boyajian, and Greitzer were to have no direct contact with Connolly and were required to pass all necessary communications to her through Baldassarre. ECF 122, at 188. The same day, Baldassarre wrote to Ryan asking her to "not have any communication with Mrs. Connolly either in person or in writing, or through any intermediary," and to direct "any administrative communications" through him. *Id.* at 193. After Baldassarre clarified the parameters of the supportive measures, Ryan did not further contact Connolly. ECF 106, ¶ 59.

On December 23, 2021, Connolly filed an official complaint with Baldassarre, alleging "ongoing harassment and bullying" perpetrated by Ryan, Boyajian, Kessaris, and Gallo, and claiming that "Greitzer's conduct and ongoing unprofessionalism have also severely compromised the integrity and lawfulness of the workplace." ECF 122, at 190; *see* ECF 106, ¶ 57.

At his deposition, Baldassarre testified that Crowley was "dismissive" of Connolly's allegations. ECF 97-28, at 19. The morning after he received Connolly's first complaint, Baldassarre spoke with Crowley about the allegations. *Id.* During the conversation, Crowley stated that Connolly was "crazy" and "a nut," "indicat[ed] that he was wanting [Baldassarre] to dispose of [the complaint] . . . [by] go[ing] through an informal process" to "make it go away," and "was disrespectful to her in every way, shape or form." *Id.* at 19-20. Nonetheless, Baldassarre did not allow Crowley's statements to impact his investigative findings. *Id.* at 152. Baldassarre also testified that when he told Crowley that he "felt that there was a significant problem" with Ryan and thought "the complaint had legs," Crowley replaced Baldassarre's original co-investigator,

Kevin Battle, with Robert Alconada, though Baldassarre acknowledged that he did not know why Crowley made that decision. *Id.* at 41-42, 139. In Baldassarre's opinion, Alconada "obstructed every step of the way," described "Connolly as a nut, crazy," "almost wouldn't allow [Baldassarre] to follow the process that [he] had set out," and was not a neutral party because he supervised Boyajian, who was named in the complaint. *Id.* at 42-43. Baldassarre filed a number of complaints about this and Crowley, none of which were sustained. *Id.* at 43, 152-53. Crowley, for his part, believed that Alconada better fit the "positional authority" to conduct the investigation. ECF 97-2, at 115.

Ultimately, Baldassarre found that no harassment had occurred by Boyajian, Kessaris, Greitzer, Gallo, or Ryan. ECF 106, ¶ 64; ECF 122, at 186. In his investigative report, dated January 28, 2022, he found that although Ryan's criticism "was not kind" and her response to Connolly's November 18, 2021 email "seemed to lack empathy and/or any understanding of the points that Ms. Connolly attempted to make," neither constituted harassment or bullying. ECF 122, at 186. Baldassarre determined that the letter of expectation had been "written in accordance with the contract between the WTA and the Woburn School Committee" and thus did not constitute an act of harassment or bullying. *Id.* Baldassarre also found that because Connolly had "willingly provided" Gallo data regarding Student 1 and had "agreed to provide this information when it was requested by Ms. Ryan," Gallo had not seized Connolly's personal property. *Id.* Baldassarre closed with four recommendations: (1) WPS should seek a legal opinion regarding the legality of Connolly leading IEP team meetings; (2) unequal caseload complaints should be referred through the WTA per the WTA contract; (3) WPS should offer opportunities for mediation between the parties; and (4) Kessaris should review the report and consider removing the letter of expectation. *Id.* at 186-87. Though Kessaris declined to remove the letter of expectation from Connolly's

personnel file, Crowley did so following a March 7, 2022 WTA grievance, which argued that Connolly was not given an opportunity to sign and respond to the letter of expectation before it was placed in her file. ECF 106, ¶ 66; ECF 97-2, at 42-43; ECF 122, at 211, 215-17.

Connolly asked to appeal Baldassarre's report. ECF 106, ¶ 65; ECF 97-2, at 38. On March 2, 2022, Crowley informed her that WPS would hire outside counsel Regina Ryan to conduct the appeal at the district's expense. ECF 106, ¶ 65; ECF 97-2, at 38-40; ECF 107-8, at 1. Connolly withdrew her appeal, however, feeling that the investigator was not impartial because of her "history of working with different municipalities around here to rid them of any wrongdoing." ECF 97-27, at 93-94. On March 11, Connolly requested that she be provided a choice between three potential investigators, but Crowley refused this request. ECF 97-2, at 40-42. In her interrogatory responses, Connolly stated that her request was "met with hostility and rage" and that Crowley threw his glasses on the table and yelled that he did not have time for this. ECF 97-1, at 4. At his deposition, Crowley denied that he had lost his temper, thrown his glasses down, or yelled at Connolly, but admitted that he probably "paraphrased something" to the effect that he did not have time and was running a school district, explaining that Connolly had raised this issue as an "add-on item" at the end of a meeting regarding her letter of expectation grievance. ECF 97-2, at 40-42.

### 9. *The January 27, 2022 Union Complaint.*

On January 27, 2022, Connolly emailed WTA union representative James Byington, outlining a number of recent events at the Goodyear School. ECF 107-19, at 1. Among other concerns, she raised that: (1) Brissette had told her to "initial the team attendance sheet [herself] for the parents," which she did not think seemed ethical; (2) Brissette had sent her a "long and unreasonable list of critiques that are WAY outside the scope of [her] job"; (3) no administrator

came to an annual IEP meeting and Connolly ran the meeting herself, though she admitted that it might have been "of [her] own doing," as she did not follow Young's direction to invite another special education teacher to lead her meetings; (4) serving as the lead in IEP meetings was "uncomfortable and cumbersome" and she "still [did] not hold any power to 'allocate district resources'"; and (5) Kessaris had overridden Connolly's and a classroom teacher's opinion on a child's services, which was a "Civil Rights nightmare" and led to the child "missing vital school core subjects to restart and repeat a program" that Connolly was already providing. *Id.* The email did not copy anyone from WPS, nor has Connolly pointed to any indication in the record that it was forwarded or shared with anyone from WPS. *See id.*

### 10. Brissette's and Kessaris' Meetings with Connolly.

Over the course of the 2021-2022 school year, Brissette received complaints from Connolly's colleagues and students' parents and became aware that Connolly was "having difficulty fulfilling the duties of her role." ECF 97-26, at 2, ¶ 13. In January, after becoming Connolly's primary contact, Brissette reviewed Connolly's IEPs that were currently due and those that were upcoming. *Id.* at 3, ¶ 15. Brissette averred that "it became clear to [her] that Ms. Connolly's administrative failings were causing an unnecessary backlog in IEP paperwork, which resulted in unnecessary strain on the department, as a whole, due to the need for IEP Teams to rush aspects of the process in an effort to correct these failings." *Id.* at 3, ¶ 16; *see also id.* at 7, ¶ 8 (Connolly's late submissions "caused a disruption to the Special Education Department's processes and caused the District to be out of compliance with several students' IEPs"). Upon reviewing parents' complaints regarding delays in the special education department and Connolly's noncompliance with their children's IEPs, Brissette "developed serious concerns about Ms.

Connolly's ability to fulfill the responsibilities of her role and, as a result, the ability of the district to adhere to federal and state laws." *Id.* at 3, ¶¶ 17-19.

Kessaris likewise believed that Connolly's "failure to meet strictly-prescribed IEP timelines led to frustration among students' caregivers, students' IEP Teams . . . , and the special education department as a whole." ECF 97-6, ¶ 9. After discussing their concerns with each other, Brissette and Kessaris decided that they should meet with Connolly to identify how WPS could best support her. ECF 97-26, at 3, ¶ 21; ECF 97-6, ¶ 12. Those meetings took place on March 15, May 25, and June 7, 2022. ECF 97-26, at 3, ¶ 22; *see* ECF 122, at 45-46 (Kessaris and Brissette emails following Connolly's meeting with Brissette on March 15). During the meetings, Brissette and Kessaris "reviewed the district's special education procedures with" Connolly, highlighted her strengths, "identified areas of weakness/potential improvement, tried to help her better-understand the IEP process, and tried to help her devise a system that would enable her to stay on top of her obligations to her students with special needs." ECF 97-26, at 4, ¶ 24. Brissette and Kessaris also answered Connolly's questions regarding the IEP process and district policies, and Brissette offered to walk Connolly "through all aspects of the IEP, from start to finish," but Connolly declined. *Id.* at 4, ¶ 26.

Brissette memorialized the content of their meetings in an email sent June 13, 2022, providing a "recap of [their] discussions" and "expectations moving forward." *Id.* at 4, ¶ 31; ECF 122, at 96. She also attached resources for Connolly to consult for further support. ECF 122, at 96.

### 11. IEP Edits.

Email correspondence regarding IEP preparation, sent over the course of the second half of the 2021-2022 school year, also bears on Connolly's claims.

On January 5, 2022, Brissette emailed Connolly regarding her new role as Connolly's primary contact, stating that she "underst[oo]d that [Connolly had] been informed that for the next few weeks [she would] be supporting [Connolly] regarding all matters that relate to special education." *Id.* at 98. She invited Connolly to contact her regarding any issue that Connolly "would typically utilize [her] chairperson for." *Id.* Brissette also noted that Connolly had referenced "IDEA #4" in an email to Kessaris, which appears to relate to Connolly's concern that annual review meetings did not have an LEA representative present. *Id.* Brissette clarified that in annual review meetings, Connolly "represent[ed] the individual from the public agency" as the student's liaison and that these meetings "continue[d] to be [Connolly's] responsibility to schedule and facilitate." *Id.*

On Thursday, January 27, Brissette emailed Connolly with a list of IEP corrections. ECF 106, ¶ 61; ECF 122, at 26. Brissette offered to meet to talk through the edits but otherwise asked Connolly to "please submit these updates at the end of the day on Friday." ECF 122, at 26; *see* ECF 106, ¶ 61. Four days later, Brissette followed up with Connolly, asking for a status update "so that [she could] take next steps on [the students'] behalf." ECF 122, at 27; *see* ECF 106, ¶ 62. Brissette then emailed a third time on February 7, expressing her "concer[n] that [she] [hadn't] received a reply and [it had] been over a week." ECF 122, at 28; *see* ECF 106, ¶ 62. Stressing that the IEPs "need[ed] to be sent to families," she asked that Connolly reach out to her if she needed assistance and that Connolly to send her the documents in two days. ECF 122, at 28; *see* ECF 106, ¶ 62. Connolly replied that day, stating that "[e]verything that ha[d] fallen under [her] historical purview for IEP writing" for the two students had been completed the day after their meetings and that she was "both puzzled and frustrated by the list of edits." ECF 122, at 30; *see* ECF 106, ¶ 63. Connolly listed questions she had about the corrections and stated that she had "absolutely no

training on almost all of those items" and that the documents she had "absolutely fail[ed] to outline how to do them." ECF 122, at 30. Arguing that "[r]elying on the know-how or some sort of informal, non-existent 'training' from a chairperson along with a how-to document less than a page long is not at all adequate," she also claimed that her responsibility to run annual meetings "pu[t] so many countless other duties, stresses, and concerning legal items on the table." *Id.*

On February 16, Greitzer sent Connolly an email requesting documents and followed up the next day, stating that she was "still waiting for [Connolly's] response." ECF 106, ¶ 67; ECF 122, at 31. Connolly replied that she "was told a master schedule was provided" and asked Greitzer to "[p]lease stop copying others on communication with me." ECF 106, ¶ 67; ECF 122, at 31. Greitzer explained that she still needed other information requested in the first email to determine if the child was being over-serviced and that Brissette would "continue to be copied on [their] communication until [they could] have consistent, positive interactions." ECF 106, ¶ 67; ECF 122, at 31. Eleven days later, on February 28, Greitzer followed up, stating that they "[had] not been able to provide the parent with the requested information" and were "waiting for [Connolly] to tell [them] which benchmarks" she was working on with the student. ECF 106, ¶ 67; ECF 122, at 31. She also noted that "[t]he Woburn expectation of responding to a parent is 24 hours and she [had] been waiting weeks," and she asked Connolly to "[p]lease respond to this email." ECF 106, ¶ 67; ECF 122, at 31.

On February 24, Brissette emailed Connolly, noting that a student's IEP was two weeks overdue and inquiring whether another child's IEP meeting had been rescheduled. ECF 122, at 35. Connolly replied four days later with a request that Brissette send her "further guiding documents" for a number of IEP topics and confirmed that the second child's IEP had been rescheduled. *Id.* Brissette thanked Connolly for the request, deferring to Greitzer as she "believe[d] some, if not

all, guiding docs [had] been provided," and noting that a child's parents had reached out for their IEP. *Id.* On March 2, in response to Connolly's request for clarification on several topics, Greitzer answered her questions and noted that they had previously gone over those items at a meeting with Brissette; that Connolly had previously filled out IEPs with the information she was asking about; and that the answers were in a resource folder shared with her. ECF 106, ¶ 69; ECF 122, at 36. The following day, Connolly informed Brissette that an email from Greitzer had been "improper, insufficient, and not at all in the spirit of collaboration," and Connolly claimed that she had been "[r]eprimand[ed] . . . for not knowing unwritten procedures in which [she was] never trained" and "shamed." ECF 106, ¶ 70; ECF 122, at 39. Brissette told Connolly that she "hear[d] [her] frustration and aim[ed] to provide [her] with the resources [she] need[ed] to feel successful." ECF 122, at 39. Brissette proposed providing Connolly with direct guidance on drafting IEPs and walking her through two IEPs from start to finish. ECF 106, ¶ 70; ECF 122, at 39.

On March 7, Greitzer informed Connolly that she was "trying to finish writing this IEP for" Connolly and requesting that Connolly send her the meeting invitation and attendance sheet, which Greitzer did not have, "as soon as [Connolly could] as this IEP [was] already out of compliance." ECF 106, ¶ 71; ECF 122, at 41. On March 14, in response to Connolly's request for more guiding documents, including on LEA provisioning, Brissette reminded Connolly that Greitzer had created a folder of resources in September 2021 and asked that Connolly provide her with a response to an earlier email regarding the status of her IEPs and specific questions. ECF 106, ¶ 73; ECF 122, at 43. Brissette and Greitzer exchanged emails separately on March 16, with Greitzer noting that she had not received any response from Connolly in weeks and that there had been no progress on any outstanding IEPs. ECF 122, at 210.

On March 30, after Greitzer sent an email notifying Connolly, Brissette, and Kessaris that an IEP was "out of compliance," Connolly wrote to Brissette and Kessaris. ECF 122, at 48. Connolly stated that she had already provided all supporting documents and meeting notes; "wonder[ed] if correspondence of this nature (and copied to superiors) gives an appearance of being misleading, hostile, or intimidating"; and complained about "unsustainable workload expectations." *Id.*; *see* ECF 106, ¶¶ 75-76. She also noted that she had not received the district's LEA provisions yet. ECF 122, at 48.

On June 1, Greitzer sent Connolly edits for an IEP and reminded her, in light of Connolly's removal of a student's math goal, that they "cannot remove goals without evaluating." ECF 106, ¶ 78; ECF 122, at 51. The student's parent had reached out to Connolly and another teacher in late May requesting the IEP, noting that she had not received her child's IEP from March. ECF 122, at 52. Greitzer reiterated this in another email that day, expressing her concern that "the executive functioning/writing goal was removed without a formal assessment" and that Connolly had "all but removed [her] involvement with the IEP with the exception of a consult." ECF 122, at 86.

The following day, Brissette responded to an email from Connolly concerning Greitzer's decision to copy Brissette, possibly Kessaris, and a child's parent on an email to Connolly. ECF 122, at 32. Brissette explained that "[b]eing cc'd keeps [Kessaris] and [her] updated should [Connolly or Greitzer] require support and/or feedback," but said she would "speak with Greitzer about a parent being cc'd on an email of this nature." *Id.* Connolly thanked Brissette and Kessaris for their "offer of support" and asked whether this practice was being applied to all special education teachers in the district. *Id.*

At her deposition, Connolly claimed that Greitzer "held onto IEPs that [Connolly] had written" and did not send them to parents on time to "put the blame on [Connolly]" and "retaliate"

against her for making a complaint against Greitzer. ECF 97-27, at 72, 118. Connolly further stated that "there was no way an IEP could be late" because it was a shared document, and Connolly's portions were complete. ECF 97-10, at 97.

### 12. Connolly's First MCAD Complaint.

On April 10, 2022, Connolly filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"). ECF 107-14, ¶ 2. That complaint is not part of the summary judgment record.

### 13. Connolly's Transfer Application to the Linscott School.

That same year, Connolly applied for a transfer to the Linscott School. Connolly testified that Ernest Wells, the former Principal of the Linscott, "verbally insinuated that the job at the Linscott was [hers]." ECF 97-27, at 170. Ultimately, however, her transfer was denied. Judy Merra, the new Principal of the Linscott School, explained that Connolly "wasn't a fit for the culture of the school," though she told Connolly that she felt that Connolly was "qualified for the position." *Id.* at 170, 180.

At the time, Kessaris was aware of Connolly's application and "would have supported the transfer, if that's what she had wanted." ECF 97-4, at 114-15. He also spoke to Wells after Wells gave Kessaris a courtesy call to let him know that Connolly had applied for the position, but Kessaris could not recall if Wells said anything about whether the transfer would occur. *Id.* at 115-16. Kessaris did not disparage Connolly to Merra with regard to her transfer, though he could not remember if he communicated with her regarding the transfer at all. *Id.* at 116.

*14. The May 2022 Disciplinary Hearing.*

On May 5, 2022, Connolly received an email from Brissette requesting a meeting on May 9 "to discuss details related to an IEP [Connolly] recently worked on" and advising her that she had "the right to representation as it may result in disciplinary action." ECF 107-9, at 1.

On May 6, Connolly withdrew her pending MCAD charge so that she could file suit for injunctive relief in federal court. ECF 107-13; ECF 107-14. She filed her complaint in this case two days later and, the next day, a motion for a preliminary injunction and temporary restraining order to prohibit the defendants from holding the disciplinary hearing that day. ECF 107-13, ECF 107-14; ECF 1; ECF 3. After a hearing, those motions were denied on May 13. ECF 14.

On May 9, in response to Connolly's request for additional time to coordinate the availability of her counsel, Brissette informed her that she had the right to bring her union representative but not an attorney, as it was "a routine meeting to discuss a student's IEP." ECF 107-9, at 1.

The following day, Connolly emailed Kessaris and Brissette regarding an unintentional "minor error" that she made in a student's IEP and asked for the proper procedure for returning the corrected document to the student's parent. ECF 122, at 199-200. Brissette then emailed Kessaris and Young separately, noting that she had been corresponding with Connolly about this IEP—that is, the one that Brissette had emailed Connolly about beginning on January 27, 2022—after "noticing the inconsistencies in her documentation, notes that didn't match Esped docs etc." *Id.* at 200; ECF 106, ¶ 61; ECF 122, at 26. Brissette flagged that the IEP had not gone out through the special education office (so there was no record of it being returned to the parents), that it was not signed by a chairperson, and that she "sent a number of subsequent emails indicating it needed to be submitted to [her] by Feb 7 (?)." ECF 122, at 200. Brissette then emailed Connolly on May 11,

informing her that the meeting she was seeking concerned this IEP and asking for an update on when Connolly could meet. *Id.*

On May 16, Connolly requested her lawyer's presence at the meeting and asked if she could "help to expedite this IEP in question," claiming that Greitzer "has now held onto the completed IEP for four months." ECF 122, at 201. Brissette told her that she could bring a union representative, but not an attorney, because the "purpose of the meeting [was] to discuss [Connolly's] actions with regard to this student's IEP and to give [her] an opportunity to provide information about the circumstances." *Id.*

### 15. *Connolly's Interactions with Shannon McDonough.*

During the 2021-2022 school year, Connolly also had a number of negative interactions with fellow teacher Shannon McDonough. First, on April 12, 2022, after asking whether an IEP meeting that week could go forward without Connolly present, McDonough emailed Connolly to express her concerns. ECF 106, ¶ 77; ECF 122, at 49-50. McDonough stated that she did not understand "why [Connolly] would call a meeting knowing [she could not] be there" and asked how they would explain it to the child's mother and advocate. ECF 122, at 49; *see* ECF 106, ¶ 77. "[H]ow can this do anything but build distrust?" McDonough asked. ECF 122, at 49. Connolly informed McDonough that she had been "given the exact directive to reschedule" for that week and that Greitzer or Kessaris were supposed to fill in for her. *Id.* The meeting was ultimately canceled, which McDonough described as "very uncomfortable and embarrassing, and completely unnecessary." *Id.*; *see* ECF 106, ¶ 77.

Second, on May 16, McDonough and another teacher, Susan Krevat, had an interaction with Connolly that led Connolly to file an internal complaint about McDonough. ECF 106, ¶ 79. On June 23, Kessaris informed Connolly that he had addressed the issue with McDonough and

"consider[ed] the issue resolved." ECF 122, at 206; *see* ECF 106, ¶ 79. Connolly then reached out to Boyajian to ask whether Kessaris had complied with WPS's civil rights procedures; Boyajian responded that Kessaris was "fully compliant," met with McDonough on clear expectations moving forward, and considered the issue resolved. ECF 122, at 209; *see* ECF 106, ¶ 79. Boyajian also offered Connolly an opportunity to pursue mediation, which Connolly declined. ECF 122, at 209; *see* ECF 106, ¶ 79.

### 16. Connolly's Formative Performance Evaluation.

On June 30, 2022, Kessaris submitted Connolly's formative performance evaluation. ECF 106, ¶ 92. Based on his personal observations of Connolly's interpersonal interactions and his concerns about Connolly's performance, Kessaris indicated that Connolly "needs improvement" in three areas, but he did not leave comments corresponding to those ratings. ECF 106, ¶ 92; ECF 97-4, at 92; ECF 97-6, ¶¶ 7-16; ECF 107-11 (formative evaluation report). At his deposition, Kessaris explained that he left the individual boxes blank because he put his comments regarding Connolly's communication issues, need for support regarding special education department procedures, and violations of students' IEPs in the overall performance rating box instead. ECF 97-4, at 91-92; ECF 107-11, at 2. The WTA filed a grievance; in response, Kessaris agreed that he had not timely submitted the evaluation or provided enough information for his "needs improvement" ratings. ECF 106, ¶ 93; ECF 122, at 224. Agreeing with the WTA's proposed remedy to change Connolly's rating to proficient, Kessaris provided additional rationale and offered to meet with Connolly. ECF 122, at 224; ECF 97-4, at 98-109; *see* ECF 107-12 (updated formative evaluation report). In response to a follow-up to the grievance, he later removed that added rationale but kept the "proficient" ratings and self-directed plan type in place. ECF 122, at 223; ECF 106, ¶ 93. At her deposition, Connolly claimed that the evaluation was "completely

fabricated" and "based off of no direct observations" of Connolly's teaching, though she admitted that Kessaris had been copied on e-mails between Connolly and other WPS staff members. ECF 97-10, at 94-95.

### 17. Connolly's Transfer to the Reeves School.

On June 23, 2022, Greitzer emailed Connolly and other special educators and staff to advise them that she had been reassigned from the Goodyear School to three other schools, including the Reeves School. ECF 106, ¶ 80. In August 2022, Connolly was granted a transfer to the Reeves School, which she had requested in the summer of 2020. *Id.* ¶ 81. Before accepting her position, Connolly was informed that Greitzer had already been reassigned to Reeves and would be working there. *Id.*

### 18. Locke's Letter to the Woburn School Committee.

On July 14, 2022, Locke wrote a letter to the Woburn School Committee on behalf of the WTA regarding "major deficiencies in both internal investigations and in teacher evaluations." ECF 107-15, at 1. Locke stated that Connolly "repeatedly spoke out and was retaliated against for alerting administrators to highly illegal special education meetings," where Connolly "was expected to disguise herself as fiscally able to commit resources and parents were led to believe she was a legal representative who could make on the spot fiscal decisions." *Id.* "In those meetings," Locke claimed, "the child could not get to a program they immediately needed or obtain assistive technology devices to be purchased." *Id.* Locke also stated that "only the 'privileged' with advocates and those families labeled 'contentious', were provided a true fiscal representative." *Id.*

Citing Connolly's May 2022 disciplinary meeting and formative evaluation report, Locke expressed concern about WPS's evaluation processes and disciplinary meetings. *Id.* at 2-3. And Locke stated that Connolly had been subject to retaliation, referencing Gallo's interactions with

her, as well as the fact that Connolly's formative evaluation report was published shortly after Connolly's interview for a transfer to the Linscott School, which she was ultimately denied. *Id.* at 3-4.

C.    The 2022-2023 School Year.

1.  *Connolly's Fall 2022 Experience.*

Connolly and Greitzer's strained relationship continued into the next school year at the Reeves School. Elizabeth Jolly, the principal of the Reeves School, recalled that Connolly and Greitzer "did not get along" and found it difficult to work with one another. ECF 106, ¶ 96. As in the previous school year, their conflict concerned Greitzer's attendance at annual review meetings, Greitzer's practice of copying others on her emails to Connolly, edits to IEPs, and the timeliness of those edits. Jolly, too, became aware in "the fall and winter of 2022" that "several IEPs for which Ms. Connolly was responsible were not delivered on time." ECF 97-13, ¶ 17.

On September 12, 2022, in response to Connolly's request that Greitzer attend an annual review meeting, Greitzer informed Connolly that she would not attend unless there was an advocate involved. ECF 122, at 12. After Connolly told Greitzer that this violated policy, as Greitzer was required to attend contentious meetings, Greitzer explained that the meeting was not contentious and directed Connolly to a script and manual, reiterating that she was only chairing annual review meetings with advocates. *Id.* at 13.

The next day, Connolly emailed Elementary Coordinator of Student Services Erin Ficociello regarding the process for requesting a chairperson to run a meeting and asked whether chairs were permitted to refuse to attend meetings. *Id.* at 14; ECF 97-13, ¶ 3. Ficociello explained WPS's policy of having special education teachers run annual review meetings except under particular circumstances, and she offered to speak with Connolly by phone if she had another

question. ECF 122, at 14. In response, Connolly asked Ficociello for her advice on what she should do if a chairperson refused to attend the meeting under the described exceptions and stated that they would only come when an advocate was present. *Id.*

Also on September 13, Connolly wrote an email to Locke regarding her frustration with the special education department. ECF 107-7. Connolly stated that she had been "handed 2/3 of the job of what was the previous full time chairperson with no additional time to do this" and listed a number of the new responsibilities she had been allocated. *Id.* Connolly complained that "[w]hen our principals don't show up to meetings, they are being illegally us [sic] and we are forced to keep quiet and break the law," and that she did not receive her IEP-mandated consultation time with general education teachers. *Id.*

A few weeks later, on September 28, Connolly emailed Ficociello again to ask whether it was "typical protocol" for Greitzer to copy Ficociello and Jolly on correspondence to Connolly, as Connolly had been told that Greitzer was not following this practice with other colleagues. ECF 106, ¶ 82; ECF 122, at 33. Ficociello explained that "this varies" and that she and "principals" are "cc:d on emails from team chairs from time to time." ECF 106, ¶ 82; ECF 122, at 33. She also noted that it was "helpful" as she was "learning about staff structures and department procedures." ECF 106, ¶ 82; ECF 122, at 33.

On October 3, Ficociello responded to an email from Connolly, which is not in the record, confirming that special education teachers are "LEA representatives" because they "have an understanding of the district resources." ECF 107-21. Ficociello also stated that she believed Greitzer was "asking for clarification around a special access accommodation (calculator) to be sure there is appropriate qualification," and explained that WPS was "obliged to ensure that only students who meet [certain] criteria are provided with the accommodation." *Id.* Summarizing the

student's data, she informed Connolly that the child did not qualify for a calculator accommodation. *Id.* In response, Connolly stated that she "respectfully disagree[d] and advocate[d] for this child to get this accommodation as the team [had] decided and confirmed at her meeting." *Id.* She asked whether the team would reconvene to discuss with the child's parents and stated that if she was "truly tasked with being the legal LEA representative, and then [her] expertise is questioned or overridden after the fact, [she was] not sure why" she was assigned the role. *Id.*

On October 5, Connolly asked Greitzer, "in the spirit of helping [their] teams' students," to make edits that it appears Greitzer had asked Connolly to make. ECF 106, ¶ 83; ECF 122, at 162. In response, Greitzer stated that she understood that Connolly was out that day but requested Connolly "make sure the edited [IEP] packets get to the special education office by Tuesday as they [were] out of compliance." ECF 122, at 162; *see* ECF 106, ¶ 83. Connolly then told Greitzer that they needed a meeting "immediately" because the packets had already been sent earlier that week. ECF 106, ¶ 83; ECF 122, at 163.

On October 7, Greitzer emailed Connolly, thanking her for sending two IEP packets and asking her to review them "with the lens of now being shown and receiving written documentation on how to write an IEP," because they did not conform to the checklist provided to Connolly. ECF 106, ¶ 84; ECF 122, at 134. Greitzer requested that Connolly send her the edited documents by the end of the day so that the IEPs could remain in compliance; twelve days later, she followed up, noting that she had not heard back from Connolly regarding whether the documents were ready for her review. ECF 106, ¶ 84; ECF 122, at 134.

On October 13, Greitzer emailed Connolly requesting that she review an IEP packet against a compliance checklist and fix a number of errors. ECF 106, ¶ 85; ECF 122, at 68. Four days later,

Connolly responded that she would forward the comments to another person and asked Greitzer to stop copying her supervisor on correspondence. ECF 106, ¶ 86; ECF 122, at 68-69. Greitzer replied that Connolly was responsible for making the corrections, as Connolly had submitted the packet, which was for her student, and the other person had covered Connolly's meeting because Connolly had been absent. ECF 122, at 68. Connolly responded that she had not submitted the IEP and that both she and the other person had been assigned to the student, again reiterating her request that Greitzer stop copying her supervisor. *Id.* at 69. Greitzer wrote separately to Ficociello and Jolly, requesting guidance on how to respond, as she had confirmed that Connolly had created the meeting invitation and attendance sheet, was the creator of the event on Google Calendar, and had made edits to the child's IEP. *Id.* Ficociello then responded to Connolly explaining that Greitzer had been directed to copy Ficociello on their correspondence so that Ficociello could "be sure to be supportive of [them] both should questions arise about any communication concerns." ECF 106, ¶ 86; ECF 122, at 69.

On October 24, Greitzer emailed Connolly with specific, substantive feedback regarding an IEP and asked that Connolly return the edits to her as soon as possible given the timeline. ECF 106, ¶ 87; ECF 122, at 70. In particular, Greitzer expressed concerns about the "drastic grid reduction"; in response, Connolly told Greitzer that she had completed the IEP with the assistance of Special Education Compliance Manager Katie Wholey and did not think there had been such a "drastic" reduction. ECF 106, ¶ 87; ECF 122, at 70-71. Greitzer replied that she had checked in with Wholey and that "it was [Wholey's] understanding that [Connolly], too, [was] concerned about this drastic reduction," and that Connolly was "going to reach out to [Greitzer] or [Ficociello] for guidance." ECF 106, ¶ 87; ECF 122, at 71.

On October 26, Greitzer emailed Connolly about an IEP she had not yet received and asked if it was on its way, as it was "Day 4" since the student's annual review meeting. ECF 106, ¶ 88; ECF 122, at 72. After Connolly told Greitzer that the child had not had an annual review, Greitzer responded: "Amendment then, please. Same timeline." ECF 106, ¶ 88; ECF 122, at 72. Connolly then asked Greitzer whether the 14-day mandate had changed; Greitzer responded that amendments followed the same schedule as IEPs and reiterated the schedule laid out in the manual. ECF 106, ¶ 88; ECF 122, at 72-73.

In an October 27 email, Greitzer thanked Connolly for giving her a student's amendment packet and noted that it was missing meeting notes. ECF 122, at 94. Greitzer also stated that she was going to print the notes for Connolly but that she could not find them in the child's virtual folder, and she asked Connolly to "remember to order the documents the cover sheet requests." *Id.*

### 2. *Connolly's Second MCAD Charge.*

On October 20, 2022, Connolly filed a second MCAD charge. ECF 97-23. Naming the City of Woburn, WPS, Kessaris, Brissette, Young, Ryan, and Greitzer as respondents, she alleged "clear retaliation" and hostile work environment, which followed from her first MCAD charge. *Id.* ¶ 9.

### 3. *Connolly's Internal Harassment Complaint.*

In October or November 2022, Connolly reached out to Boyajian and asked not to work with Greitzer. ECF 97-27, at 116. Connolly then went on medical leave. *Id.*

On January 20, 2023, while on medical leave, Connolly wrote to Boyajian in her capacity as Civil Rights Coordinator to complain that she "continue[d] to be harassed by Jaimee Greitzer." ECF 106, ¶ 89; ECF 122, at 74. Connolly noted that Boyajian had denied her protective measures on October 21, as it had been deemed a "'building based issue,'" and stated that the problem was

not building-based, as Connolly was not present in the building and was still facing harassment. ECF 106, ¶ 89; ECF 122, at 74. Connolly noted that Baldassarre had granted similar protective measures in December 2021 when she made an identical report under the same Civil Rights Policy. ECF 122, at 74. About two weeks later, Connolly followed up, noting that she had not heard back; in response, Boyajian offered to meet with Connolly upon her return to work the following week. ECF 106, ¶ 89; ECF 122, at 74. Connolly then met with Boyajian and Jolly, who recommended to Crowley that Connolly and Greitzer should not work together based on Connolly's allegations of harassment and retaliation. ECF 97-27, at 117; ECF 97-16, at 142.

On March 27, 2023, Crowley emailed Connolly, stating that he had arranged for an external investigator to look into Connolly's allegations of a hostile work environment and requesting that Connolly provide him a written report regarding the alleged harassment should she decide not to be interviewed. ECF 106, ¶ 90; ECF 122, at 66. Connolly initially agreed, though later refused, to meet with the investigator, whom Crowley confirmed was not a WPS employee or involved in any matter involving Connolly's employment at Woburn. ECF 122, at 66; ECF 97-2, at 78. The investigator worked at a firm that had represented the Woburn School Committee in suing the WTA, but Crowley believed he could be impartial because the lawsuit against the WTA had been resolved at the time. ECF 97-2, at 70-72. Greitzer was placed on administrative leave pending the investigation. ECF 106, ¶ 90; ECF 97-27, at 117.

### 4. *Connolly's Unauthorized Testing.*

On March 20, 2023, Ficociello told Connolly that she had informed a student's parents that testing in the area of reading had been done without their consent. ECF 122, at 77. Ficociello expressed concern that the testing had occurred and offered to speak about the process with Connolly and Jolly. *Id.*; ECF 106, ¶ 91. Connolly forwarded this email to Locke, stating that

Ficociello was "reprimanding [her] for something done routinely by [special education] teachers for 14 years and is copying it to [her] principal." ECF 122, at 77; *see* ECF 106, ¶ 91. Connolly also noted that Ficociello had shown up with Jolly to observe her the other week and that Ficociello was not her supervisor. ECF 122, at 77. In fact, Ficociello and Jolly were both Connolly's supervisors. ECF 97-13, ¶ 3. In response to Ficociello, Connolly wrote that "[t]his was the protocol followed for many years under the former [special education] Director," and that she would not have conducted the testing had she thought it was outside protocol. ECF 122, at 78.

### 5. *The Results of the Internal Harassment Complaint.*

On June 8, 2023, Connolly was informed of the independent investigator's determination that Greitzer had not harassed her. ECF 122, at 63. She received a written summary of the findings on September 6, 2023. *Id.* The summary stated that the investigation did not support Connolly's allegation that Greitzer used "belittling language" against Connolly and that, to the contrary, Greitzer's emails revealed that she "generally used polite and professional language" with Connolly. *Id.*; *see* ECF 106, ¶ 90. Moreover, other staff confirmed that Greitzer did not treat Connolly differently from her coworkers and did not use belittling language with anyone, but that Connolly "struggle[d] with constructive feedback, which may have contributed to [her] feeling of being belittled from Greitzer, whose job duties included providing constructive feedback on [her] IEPs." ECF 122, at 63-64. Nor did the investigation support Connolly's allegation that Greitzer followed her to the Reeves School to harass her; rather, Connolly followed Greitzer and accepted the position after Greitzer and Jolly informed her personally that Greitzer had transferred. *Id.* at 64. The investigator also found that Greitzer's emails regarding IEP corrections were reasonable and part of Greitzer's job; he did not find that they were harassing or intended to embarrass Connolly. *Id.* As to Connolly's allegation that Greitzer "engaged in a coordinated campaign to

harass [Connolly] with Young, Brissette, and Ryan" and "shared a fabricated list of criticism" with Brissette, the investigator also uncovered no corroboration for Connolly's claims. *Id.* And the investigator also determined that Greitzer did not wrongfully attempt to force Connolly to lead contentious IEP meetings; rather, "[w]itnesses consistently and credibly confirmed that [Connolly] improperly attempt[ed] to shirk work responsibilities, which included attempts to avoid leading IEP meetings by arguing the meetings were contentious when they were not." *Id.* at 65. The investigator also found that Greitzer's practice of copying Jolly and Ficociello on her emails to Connolly was not harassing; Jolly and Ficociello supported this practice and found it beneficial. *Id.* Finally, the investigator concluded that Greitzer had not asked Connolly to do something illegal by asking her to remove calculator accommodations from a student, as that request was "consistent with [Department of Elementary and Secondary Education] guidance," which "does not permit schools to allow students who are proficient in addition to use a calculator." *Id.*

### 6. *Connolly's Disclosure to Jolly That She Suffers from Anxiety.*

Connolly told Jolly that she suffers from anxiety at some point at the end of the 2022-2023 school year. ECF 106, ¶ 94. Jolly empathized, and the two "commiserated" about the condition. *Id.*

## III.    **Procedural Background.**

Connolly filed this suit in May 2022, asserting several claims: discrimination and retaliation under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, for discriminating against her based on her asthma and anxiety and retaliating against her based on these disabilities and her advocacy for disabled students (Count 1); discrimination and retaliation under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, for discriminating against her based on her asthma and anxiety and retaliating against her based on these disabilities and her

advocacy for disabled students (Count 2); claims under M.G.L. c. 151B based on her asthma, anxiety, and advocacy for disabled students (Count 3); a violation of the Massachusetts Whistleblower Statute, M.G.L. c. 149, § 185, by retaliating against her for disclosing to a supervisor activities and practices that she reasonably believed violated the law (Count 4); intentional infliction of emotional distress (Count 5); and claims under 42 U.S.C. § 1983 for actions taken under color of state law that intentionally and illegally caused Connolly physical, emotional, and reputational damages (Count 6). ECF 1. Counts 1, 2, and 4 were asserted against Woburn Public Schools and the City of Woburn; Count 5 against Crowley and Baldassarre; and Counts 3 and 6 against all of the defendants. *Id.*

The defendants moved to dismiss all six counts, ECF 21, 22, and Connolly subsequently voluntarily dismissed Counts 4 and 6, ECF 26. In July 2023, the Court granted in part and denied in part the motion to dismiss, dismissing Counts 1 through 3 insofar as they related to Connolly's asthma as time-barred; Count 3 insofar as it related to Connolly's advocacy for disabled students, as waived by Connolly's filing of a claim under M.G.L. c. 149, § 185; Count 5 in its entirety; and all claims against Baldassarre. ECF 32.

Three motions are now pending before this Court: the defendants' motion for summary judgment on all claims, ECF 97; Connolly's motion to exclude the expert testimony of Dr. Marlene Moskowitz Dodyk, ECF 105; and the defendants' motion to strike some of the evidence cited in Connolly's opposition to the motion for summary judgment, ECF 110. After holding a hearing, the Court took the motions under advisement. ECF 119. In considering the defendants' motion for summary judgment, the Court does not consult or rely on the expert report of Dr. Dodyk. Because, as will be explained, the defendants' motion for summary judgment will be granted, the Court will deny as moot Connolly's motion to strike Dr. Dodyk's expert testimony.

## DISCUSSION

### I.    <u>Motion to Strike.</u>

"When adjudicating a motion for summary judgment, a district court customarily may consider only evidence that would be admissible at trial." *Klauber v. VMware, Inc.*, 80 F.4th 1, 7 (1st Cir. 2023). A party seeking or opposing summary judgment may therefore object to evidence if it would be inadmissible under the Federal Rules of Evidence. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Pursuant to Federal Rule of Civil Procedure 56(c)(2), the defendants move to strike the following categories of evidence: (1) Baldassarre's testimony regarding the whiteboard meeting he attended with Crowley, Ryan, and Young, at some point in the fall of 2021, before Connolly's December 2, 2021 personal day and the subsequent December 6, 2021 letter of expectation; (2) Baldassarre's testimony that Connolly followed her students' IEPs; (3) Baldassarre's testimony regarding the December 6 letter of expectation; (4) testimony by Connolly and Baldassarre that Ryan violated the interim measures that Baldassarre put in place while investigating Connolly's December 13, 2021 claim of harassment; and (5) Connolly's testimony that Greitzer intentionally withheld documents to make it appear as though Connolly was missing deadlines. The Court will address each in turn.

The defendants first seek to strike Baldassarre's deposition testimony regarding the whiteboard meeting in which Crowley, Baldassarre, Young, and Ryan addressed Connolly's performance as a special education teacher. At this meeting, Baldassarre testified, Crowley and Ryan discussed "ways of trying to get [Connolly] to quit," and Crowley used a whiteboard to diagram his plan to "orchestrate and direct people to do different things to different people so that it didn't look like it was one person harassing a person." ECF 97-28, at 21.  The defendants object

to Baldassarre's testimony to the extent he used the word "harass" to describe Crowley's and Ryan's objective, because later in the deposition, Baldassarre retracted his use of the word "harassed." ECF 97-28, at 165, 229-30. Specifically, he testified, "I re[tr]acted the word harassed. I took it back. If I said it I took it back." *Id.* In response, Connolly contends that Baldassarre had first-hand knowledge of what occurred in the hearing, but she does not specifically object to striking his use of the words "harass," "harassed," or "harassing," in light of his retraction of that characterization. Accordingly, to the extent Baldassarre characterized Crowley's and Ryan's objective as seeking to "harass" Connolly, that testimony will be stricken. Otherwise, Baldassarre's testimony about the whiteboard meeting—including his perception of Crowley's and Ryan's objective in that meeting—is admissible, because he had personal knowledge of the meeting. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Second, the defendants argue that the Court should strike Baldassarre's deposition testimony that he "thought that [Connolly] knew her job very well," that she "followed the educational plans of the kids to the letter of the plans," and that "in the four years that [he] was [at WPS he] never had an issue with her ever." ECF 97-28, at 17. Citing Federal Rule of Evidence 602, the defendants argue that these statements are conclusory and lack a foundation. Under Rule 602, witnesses can only testify to matters of which they have "personal knowledge," and their "own testimony" can constitute "[e]vidence to prove personal knowledge." Fed. R. Evid. 602. The defendants argue that Baldassarre lacks personal knowledge of Connolly's compliance with IEPs because he (1) did not directly supervise Connolly and only filled in for Kessaris, who was her direct supervisor, for five to ten days; (2) saw Connolly only a couple of times per month; (3) was not involved in the meetings for Student 1; and (4) did not review the communications related to

Student 1. The Court disagrees. Baldassarre did have some personal knowledge of Connolly's tenure at the Goodyear School, as he had monthly interactions with Connolly and filled in as her direct supervisor for a short period of time. The fact that he could remember only one IEP meeting he attended with Connolly does not mean that he did not observe her adhering to IEPs at other points. Because "[t]he *extent* of a witness' knowledge of matters about which he offers to testify goes to the weight rather than the admissibility of the testimony," the testimony will not be stricken. *Hallquist v. Loc. 276, Plumbers & Pipefitters Union, AFL-CIO*, 843 F.2d 18, 24 (1st Cir. 1988).

Third, the defendants object to Baldassarre's deposition testimony that "no person in the Woburn Public Schools ever received" a disciplinary letter like Connolly's letter of expectation for violating WPS's personal day policy. ECF 97-28, at 51. When Baldassarre was asked about that testimony later in his deposition, this exchange occurred:

> Q. You testified that no person ever received a letter at Woburn Public Schools for violation of a personal day policy. Would you have been privy to all of the letters related to any staff member at Woburn Public Schools?
>
> A. Would I have been privy to them? Could I see them yes but the reason I know that is because Barbara said after that no person has ever received that.
>
> Q. Barbare Locke, the union representative for the teachers union?
>
> A. President, yes.

ECF 97-28, at 186. The defendants contend that, based on this testimony, Baldassarre's claim that no WPS employee had ever received a disciplinary letter for violating the personal day policy is premised on hearsay and not within Baldassarre's personal knowledge. In response, Connolly contends that Baldassarre had personal knowledge of the circumstances surrounding her letter of expectation, but she does not dispute that Baldassarre's testimony was based on inadmissible hearsay, nor does she contend that any exceptions set forth in Federal Rule of Evidence 803 to the rule against hearsay apply. Accordingly, Baldassarre's testimony that "no person in the Woburn

Public Schools ever received" a disciplinary letter like Connolly's letter of expectation for violating the personal day policy will be stricken. ECF 97-28, at 51:4-6. To the extent the defendants also seek to exclude Baldassarre's other testimony concerning Connolly's December 6, 2021 letter of expectation, including why the letter was written, the motion is denied. Baldassarre's deposition testimony lays an adequate foundation for his personal knowledge of that letter and the circumstances surrounding its development. *See* ECF 97-28, at 51-52, 167-68, 187-89.

Fourth, the defendants object to Baldassarre's testimony that, after he put interim measures in place barring communication between Connolly and those accused in her December 2021 harassment complaint, Ryan violated those interim measures by emailing Connolly. ECF 97-28, at 30-33. The defendants contend that Baldassarre only learned of this alleged violation from reading emails months later, not from his own personal experience. This mischaracterizes Baldassarre's testimony. Baldassarre testified, among other things, that he personally sent an email to Ryan about her violation of the interim measures he put in place. *Id.* at 32. That recollection is sufficient, under Rule 602, to demonstrate his personal knowledge of Ryan's conduct. The request to strike his testimony on this topic is denied.

Finally, the defendants seek to strike Connolly's testimony that Greitzer "held onto IEPs that [Connolly] had written" to "put the blame on" Connolly for their untimeliness and "retaliate" against her for making a complaint against Greitzer. ECF 97-27, at 72, 118. This testimony should be stricken, the defendants contend, because Connolly did not provide specific examples of this behavior or elaborate on how she formed this belief. Rule 602 does not require so much. Under that rule, "[p]ersonal knowledge can include inferences and opinions, so long as they are grounded in personal observations and experience." *United States v. Rodriguez*, 162 F.3d 135, 144 (1st Cir.

1998) (quotation marks omitted). Connolly interacted extensively with Greitzer throughout the 2021-2022 and 2022-2023 school years, and she had personal knowledge of Greitzer's behavior in the context of those interactions. Because Connolly's testimony about Greitzer's conduct is grounded in Connolly's personal observations and experience, the request to strike it is denied.

## II.    **Motion for Summary Judgment.**

The defendants move for summary judgment on each of Connolly's remaining claims. Those include claims against WPS, the City of Woburn, and Crowley (1) under the Rehabilitation Act, the ADA,[2] and Chapter 151B for discriminating against her on the basis of her disability—namely, anxiety, and (2) under the Rehabilitation Act, the ADA, and Chapter 151B for retaliating against her based on her filing of disability-related complaints against WPS and WPS officials and based on her advocacy for students with disabilities.[3]

### A.    Standard of Review.

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)

---

[2] Count Two of Connolly's complaint invokes only Title II of the ADA, not Title I. *See* ECF 1, ¶¶ 99-104 (citing 42 U.S.C. § 12131 *et seq.*). Although the First Circuit has not yet determined whether a public employee may bring employment discrimination claims under Title II, "most circuits have held that employment claims against public entities must be brought under Title I." *Logie v. Massachusetts Bay Transp. Auth.*, 323 F. Supp. 3d 164, 168 (D. Mass. 2018) (collecting cases). Nevertheless, because the parties have argued Connolly's disability discrimination and retaliation claims based on Title I precedent, the Court will construe her ADA claims as arising under Title I.

[3] Insofar as Connolly bases her Chapter 151B retaliation claim on advocacy for students with disabilities, that theory has been dismissed. ECF 32, at 23-24.

(citation omitted). To prevail, the moving party must show that "there is no factual determination which a rational factfinder could make as to the existence or nonexistence of a fact that has the potential to change the outcome of the suit." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quotation marks omitted). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but they "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility P.R., Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

B.    <u>Administrative Exhaustion.</u>

While claims brought pursuant to the Rehabilitation Act do not require administrative exhaustion, a plaintiff bringing employment discrimination claims under Title I of the ADA and Chapter 151B must first file an administrative charge before filing suit in court. *Rae v. Woburn Public Schs.*, 113 F.4th 86, 99 n.2 (1st Cir. 2024); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999). A court may, however, "consider events that 'occurred after the plaintiff's filing of her MCAD complaint' in the interest of judicial efficiency." *Rae*, 113 F.4th at 99 (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 529 n.8 (2001), which rejected "the defendant's assertion that [an incident] must be excluded from evidence because it occurred after the plaintiff's filing of her MCAD complaint, and, because the plaintiff did not subsequently amend her complaint to include the incident, she had failed to exhaust her administrative remedies")). To further the efficient resolution of the matters raised in this case, the Court will consider all of the facts in the record and the parties' statements of material fact, even though they

extend through September 2023, well after the April 10 and October 20, 2022 filings of Connolly's

MCAD complaints and the May 8, 2022 filing of her complaint in this case.

    C.    <u>Disability Discrimination Claims.</u>

Connolly's disability discrimination claims under the Rehabilitation Act, the ADA, and

Chapter 151B advance two theories: first, that the defendants subjected her to improper

disciplinary actions because of her anxiety, and second, that the defendants created a hostile work

environment because of her anxiety.

    *1. Adverse Employment Actions.*

Connolly's first theory of liability is that the defendants took the following adverse

employment actions against her because of her disability: (1) issuing a sham letter of expectation

to harm her, (2) conducting a biased investigation of her December 2021 harassment complaint,

(3) giving her an unjustified negative performance evaluation in June 2022, (4) refusing her request

to transfer to the Linscott School in the spring of 2022, (5) trying to pressure Jolly into giving her

a negative review, (6) scheduling unjustified disciplinary meetings (for the personal day in

December 2021 and the IEP issue in May 2022), and (7) shaming her into withdrawing her request

for accommodations during COVID-19.

Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the

United States . . . shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance." 29 U.S.C. § 794.[4] The ADA likewise prohibits

discrimination "against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job

---

[4] The parties do not dispute that WPS receives federal financial assistance.

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). And

under chapter 151B, it is unlawful for an employer "to dismiss from employment or refuse to hire,

rehire or advance in employment or otherwise discriminate against, because of [her] handicap, any

person alleging to be a qualified handicapped person, capable of performing the essential functions

of the position involved with reasonable accommodation, unless the employer can demonstrate

that the accommodation required to be made to the physical or mental limitations of the person

would impose an undue hardship to the employer's business." M.G.L. c. 151B, § 4(16). Where, as

here, any differences between the analysis of the three statutes are not material, the claims may be

considered together. *See Brader v. Biogen Inc.*, 983 F.3d 39, 54 (1st Cir. 2020); *Wheatley v.

American Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994) ("It is our practice to apply Federal case law

construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B."); *see* 29 U.S.C.

§ 794 (applying ADA Title I standards to Rehabilitation Act employment discrimination claims).

     In a case, such as this one, in which an employee has no direct evidence of animus based

on disability, the court applies the burden-shifting test articulated in *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792, 802-807 (1973). *See Brader*, 983 F.3d at 54-56; *Wheatley*, 418 Mass. at 397;

*Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004). First, the plaintiff must

make out a prima facie case of discrimination. *Brader*, 983 F.3d at 55. If she makes her prima facie

case, the burden shifts to the employer to "proffer a legitimate reason for terminating" the plaintiff.

*Id.* If the employer makes that showing, the burden shifts back to the plaintiff to "'show by a

preponderance of the evidence that [the employer's] proffered reason is pretextual and that the

actual reason for the adverse employment action is discriminatory.'" *Id.* (quoting *Johnson v. Univ. of Puerto Rico*, 714 F.3d 48, 54 (1st Cir. 2013)).[5]

The defendants contend that Connolly has failed, as a matter of law, to make a prima facie case of disability discrimination. To establish a prima facie case, a plaintiff must show that she "(1) has a disability within the meaning of the [statute]; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or in part on [her] protected disability." *Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 738 (1st Cir. 2025) (quotation marks omitted). The ADA, Rehabilitation Act, and Chapter 151B "provide three related but independent avenues for defining handicap or disability that fall within the respective terms' boundaries: (1) a physical or mental impairment which substantially limits one or more major life activities of a person; (2) a record of having such impairment; or (3) being regarded as having such impairment." *Moore v. Indus. Demolition LLC*, 138 F.4th 17, 30 & n.15 (1st Cir. 2025). The defendants maintain that because there is no evidence that they were aware of her anxiety or regarded her as disabled until the end of the 2022-2023 school year, Connolly has failed to demonstrate the requisite causal nexus between her disability and any adverse employment action.

Connolly disputes this premise, arguing that she first disclosed her disability to Crowley, Ryan, and O'Neil in 2020 when she told them, during the COVID-19 pandemic, that she was very anxious about the upcoming school year because she had an immunocompromised family member. This conversation occurred in the context of Connolly's request to teach virtually because of her asthma, not because of her anxiety. No reasonable jury could conclude that Connolly's expression

---

[5] For Chapter 151B claims, a plaintiff "need only present evidence from which a reasonable jury could infer" that the employer's justifications were pretextual. *Brader*, 983 F.3d at 59 (citing *Wheelock Coll. v. Mass. Comm'n Against Discrimination*, 371 Mass. 130, 139 (1976)).

of concern for her immunocompromised family member during the pandemic put the defendants on notice that she was disabled within the meaning of the disability antidiscrimination statutes. *See* 42 U.S.C. § 12102 (defining disability as "a physical or mental impairment that substantially limits one or more major life activities").

Connolly next contends that even if she did not disclose to the defendants that she suffered from anxiety, the defendants regarded her as disabled. To establish a "regarded as" claim under the ADA, a plaintiff need only establish that "she was regarded as having a physical or mental impairment," and need not demonstrate "that such impairment substantially limited one or more major life activities." *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016); *see also* 42 U.S.C. § 12102(3)(A). To support her argument that the defendants perceived her to be disabled, Connolly points to Baldassarre's descriptions of her as "sensitive," "fragile," and "an eggshell" (a characterization he later retracted) during his deposition. ECF 97-28, at 21-22, 96-97. He explained that Connolly was "fragile" because "it doesn't take much to upset, to have her feel not well," and because "she's somebody who could easily misconstrue a situation and feel bad." ECF 97-28, at 96. This perceived sensitivity and proclivity to easily misconstrue a situation does not, however, pertain to any mental impairment, and Baldassarre's descriptions do not suggest that the defendants understood Connolly to suffer from a mental impairment.

For similar reasons, Crowley's and Alconada's characterizations of Connolly in December 2021 as "crazy" and "a nut" cannot be reasonably interpreted as evidence that Connolly was regarded as disabled. Baldassarre testified that, at a meeting with Crowley shortly after Connolly filed her harassment complaint in December 2021, Crowley called Connolly "crazy" and "a nut" and was "disrespectful to her in every way, shape or form and that was a behavior that [he] had to deal with . . . him on a regular basis unfortunately." ECF 97-28, at 19-20; *see id.* at 152 (recalling

that Crowley stated that "some people are nuts and some are crazy"). Baldassarre also recalled that his co-investigator, Alconada, characterized Connolly as "a nut, crazy." *Id.* at 42. But there is no further evidence that, at the time they made these unprofessional statements, Crowley or Alconada believed that Connolly suffered from a "mental impairment," as required to establish a "regarded as" claim. Where courts have found a triable dispute over whether an employee is regarded as disabled, the record evinces more of a link between coworkers' derogatory comments and the employee's disability. *See, e.g.*, *Quiles-Quiles v. Henderson*, 439 F.3d 1, 6 (1st Cir. 2006) (a reasonable jury could find that the plaintiff was regarded as disabled where supervisors "stated 'on several occasions' that, because [the plaintiff] was under 'psychiatric treatment,' he was 'a risk to the security . . . of the Post Office'" and "that [the plaintiff] was 'a risk to the floor because [he] was under psychiatric treatment,'" and "called [the plaintiff] 'crazy' 'five, six, seven times a day' and told him that he 'should not be working at the post office'"). The words "crazy" and "nut" are the type of everyday insults that—though offensive and unkind—do not, standing alone, create a material dispute of fact over whether an employee was perceived as disabled. No reasonable jury could conclude that the insults directed at Connolly in December 2021 suggest that the defendants regarded her as disabled.

Much later, towards the end of the 2022-2023 school year, Connolly did disclose her anxiety to Reeves School Principal Jolly. ECF 106, ¶ 94. But because this disclosure came after all of the allegedly adverse employment actions that Connolly identifies, no causal connection can be drawn between these actions and the defendants' awareness of her anxiety. *See* ECF 106, ¶ 45 (letter of expectation issued December 6, 2021); *id.* ¶¶ 57, 64 (investigation of Connolly's first harassment complaint occurred between December 2021 and January 2022); ECF 122, at 223 (resolution of negative formative performance review disputes occurred August 24, 2022); ECF

97-23, at 6, 13-14 (refusal of Connolly's transfer request occurred during or shortly after the 2021-2022 school year); ECF 106, ¶¶ 53-54 (disciplinary meeting scheduled December 2021); ECF 107-9 (disciplinary meeting scheduled May 2022).[6] Connolly has, accordingly, failed to make out a prima facie case that the defendants discriminated against her on the basis of disability when they took these allegedly adverse employment actions against her.

### 2. *Hostile Work Environment.*

Connolly next argues that she was subjected to a hostile work environment because of her disability. A plaintiff may establish hostile work environment claims under the ADA and Rehabilitation Act by showing that "an employer required him or her to work in a hostile or abusive environment on account of their disability." *Brader*, 983 F.3d at 59; *Rivera-Velázquez v. Regan*, 102 F.4th 1, 9 (1st Cir. 2024). Following the First Circuit's lead, the Court assumes, without

---

[6]

deciding, that a hostile work environment claim based on disability discrimination is likewise actionable under Chapter 151B. *See Stratton v. Bentley Univ.*, 113 F.4th 25, 50 n.22 (1st Cir. 2024) ("'The SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16).'" (quoting *Barton v. Clancy*, 632 F.3d 9, 20 n.7 (1st Cir. 2011))); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 86 n.1 (1st Cir. 2016). To prevail on her hostile work environment claim, Connolly "must show that (1) . . . she was a qualified individual with a disabilit[y]; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [Connolly] in fact perceived it to be so; and (6) that some basis for employer liability has been established." *Stratton*, 113 F.4th at 50.

The defendants argue that Connolly's hostile work environment claims based on disability discrimination, like her discrimination claims premised on discrete adverse employment actions, fail because Connolly has not demonstrated that the defendants were aware of her disability or regarded her as disabled when she allegedly experienced a hostile work environment. The Court agrees. The allegations of harassment that Connolly sets forth all relate to events predating her disclosure of her anxiety toward the end of the 2022-2023 school year. Because all of the events giving rise to Connolly's hostile work environment claim occurred before Connolly disclosed to Jolly that she suffered from anxiety, the defendants are entitled to summary judgment on her hostile work environment claim as well.

D.    Retaliation Claims.

Connolly separately claims that after she engaged in protected conduct, the defendants retaliated against her by creating a hostile work environment and subjecting her to multiple adverse employment actions. The Rehabilitation Act, ADA, and Chapter 151B prohibit employers from taking an adverse employment action in response to an employee's protected conduct. *See* 42 U.S.C. § 12203; M.G.L. c. 151B, § 4(4); 29 U.S.C. § 794; 28 C.F.R. § 42.503(b)(1)(vii). "Retaliation claims under the ADA, Section 504, and Chapter 151B are analyzed under the same three-element framework: (1) the plaintiff engaged in protected conduct; (2) the plaintiff experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Rae*, 113 F.4th at 100 (citing cases).

    *1. Protected Conduct.*

Connolly contends that she engaged in two forms of protected conduct: (1) filing complaints about discriminatory behavior directed at her; and (2) advocating for disabled students. Filing a complaint qualifies as protected conduct under both federal and Massachusetts law. *See Rae*, 113 F.4th at 108-09 (filing a complaint with human resources and an MCAD charge qualify as protected activity). Here, Connolly filed a number of complaints: (1) her December 13, 2021 informal complaint, which turned into her December 23, 2021 complaint, to Baldassarre; (2) her April 10, 2022 MCAD complaint; (3) her May 8, 2022 complaint filed in this Court; (4) her October 20, 2022 MCAD complaint; (5) her harassment complaint against Greitzer in October or November 2022; and (6) her January 2023 complaint to Boyajian.[7]

---

[7] Connolly also lodged a number of complaints with the WTA regarding practices of the special education department. *See* ECF 107-19; ECF 107-7. Because there is no evidence that these complaints were communicated to the defendants, they cannot form the basis of a retaliation claim, and the Court does not consider them in this analysis.

Advocating on behalf of students with disabilities also qualifies as protected conduct. *Rae*, 113 F.4th at 100. The defendants argue, however, that the conduct Connolly characterizes as advocacy on behalf of students with disabilities instead consists of complaints about her own workload. The Court agrees. Connolly's complaints were largely concerned with her added responsibility of leading and serving as the LEA representative in non-contentious IEP annual review meetings, roles that were previously filled by Team Chairs. *See, e.g.*, ECF 107-21 (October 3, 2022 email confirming special education teachers may be LEA representatives); ECF 122, at 98. As Connolly saw it, serving as an LEA representative and leading annual review meetings was illegal and disserved her students because she did not have sufficient knowledge of district resources and had to seek approval from Ryan for certain district resources. ECF 97-27, at 56-60. Connolly also opined, on various occasions, that her students would benefit if she had a lighter workload. *See* ECF 122, at 10 (arguing that "[s]tudents' learning will always be compromised if their teachers feel overworked and under-appreciated" and suggesting that her "testing and meeting duties . . . be lightened" and that the "chairperson . . . pick some of the responsibility back up"); *id.* (stating that she felt "as if [she] can't recommend as many in-class supports as [she] once could for fear of non-compliance"); ECF 97-27, at 160 (arguing that her students were at a disadvantage because the other special education teacher had "much smaller less needs-intensive groups").

Connolly confuses the distinction between, on the one hand, advocating for herself and her desire for a lighter workload and, on the other, advocating for the right of students "to be free from disability-based discrimination." *Rae*, 113 F.4th at 100 (quotation marks omitted). While Connolly may have found it difficult to fulfill her responsibilities as a special education teacher, no reasonable jury could see these concerns as advocacy on her students' behalf. It is undisputed that special educators received specialized training on how to lead IEP Team meetings, that the practice

was widespread within and outside WPS, that Connolly received a legal opinion on the permissibility of her serving as an LEA representative, and that multiple WPS staff explained to her the process for leading the meetings and provided her with resources. To be sure, a person need not raise only meritorious concerns regarding discrimination against people with disabilities to be protected from retaliation. *See Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (to establish protected activity under Title VII, plaintiff need only show that she held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law" (quotation marks omitted)). But this theory cannot serve as a fig leaf for self-serving complaints about one's own responsibilities as a special education teacher. As for her complaints about her caseload, Connolly testified that she was able to provide her students with "compliant services according to their IEP." ECF 97-27, at 161; *see also* ECF 97-4, at 76-77 (Kessaris averring that he and Gallo determined that Connolly's and DiRienzo's caseloads were "in the same ballpark"); ECF 97-13, ¶¶ 15-16 (Jolly averring that "[a]t some point in late-fall or early winter, it became apparent to [her] that Ms. Connolly had a disproportionately small caseload as compared with her peers"). On this record, no reasonable jury could conclude that Connolly's complaints about her workload and her duty to lead certain annual review meetings amounted to advocacy for the right of students "to be free from disability-based discrimination." *Rae*, 113 F.4th at 100 (quotation marks omitted). Accordingly, the defendants are entitled to summary judgment to the extent that Connolly's retaliation claims are premised on her complaints about the permissibility of her leading annual review meetings and her caseload.[8]

---

[8] Connolly also argues that her January 27, 2022 complaint to Byington regarding WPS's practices constituted protected activity on behalf of her students with disabilities. *See* ECF 107-19. But because she does not offer any evidence that this complaint, made to the WTA, was communicated to anyone at WPS, it cannot serve as the basis for her retaliation claims.

The only arguable evidence of advocacy on behalf of a student with disabilities that Connolly points to comes from an October 3, 2022 email to Jolly and Ficociello. In that email, Connolly wrote that she was "advocat[ing]" for a child with an IEP "to get [an] accommodation"—namely, a calculator—that the IEP Team had decided was appropriate at the Team meeting. ECF 107-21. Ficociello had previously informed Connolly that "only students who meet the [state] criteria" can qualify for a calculator, and that this child did not meet the state criteria and was therefore ineligible for that accommodation. *Id.* The Court will assume, without deciding, that Connolly's email to Jolly and Ficociello qualifies as an instance of advocacy on behalf of the rights of a student with disabilities. It will therefore proceed to the next steps of the analysis—whether Connolly was subject to an adverse employment action, and if so, whether that action was causally related to her protected conduct—on the basis of the following protected conduct: Connolly's October 3, 2022 email advocating for a student with disabilities, and Connolly's filing of several complaints based on alleged harassment.

### 2.  *Adverse Employment Actions and Causal Nexus.*

Connolly contends that, in retaliation for her protected conduct, the defendants: (1) issued a sham letter of expectation on December 6, 2021, (2) conducted a biased investigation of her December 2021 harassment complaint, (3) gave her an unjustified negative performance evaluation in June 2022, (4) refused her request to transfer to the Linscott School in the spring of 2022, (5) tried to pressure Jolly into giving her a negative performance review, (6) scheduled unjustified disciplinary meetings on December 3, 2021 for the personal day and on May 9, 2022 for the IEP issue, and (7) shamed her into withdrawing her request for accommodations during COVID-19, and (8) subjected her to a hostile work environment.

For claims asserting retaliation in violation of the ADA, the Rehabilitation Act, and Chapter 151B, an "adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination." *Rae*, 113 F.4th at 101 (quotation marks omitted). Subject to the facts of the particular case, such actions may include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Id.* (quoting *Colón-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 37 (1st Cir. 2011)). A hostile work environment can also constitute a retaliatory adverse employment action, so long as it is "'sufficiently severe or pervasive.'" *Id.* (quoting *Noviello v. City of Boston*, 398 F.3d 76, 89 (1st Cir. 2005)). Once a plaintiff has demonstrated that she was subject to an adverse action, she must then demonstrate that her "protected activity was the but-for cause of the adverse action [she] suffered." *Id.*; *see Colón-Fontánez*, 660 F.3d at 37 ("For causality to be established, the plaintiff must show a nexus between the protected conduct and the alleged retaliatory act.").

The defendants contend that summary judgment is warranted on Connolly's retaliation claims because the employment events she identifies do not qualify as "adverse actions," or because a reasonable jury could not find that her protected conduct was a but-for cause of any adverse action. The Court agrees and will address each alleged adverse event in turn. First, Connolly's allegation that the defendants tried to pressure Jolly into giving her a negative performance review in the 2022-2023 school year is unsupported by record evidence. Connolly's brief cites only to nonexistent pages in the record. Absent an evidentiary basis, this assertion of an adverse employment action fails.

Second, several of the allegedly adverse actions that Connolly identifies—namely, the December 6, 2021 letter of expectation, disciplinary meeting on December 3, 2021, and alleged

shaming of Connolly into withdrawing requested accommodations during the COVID-19 pandemic—occurred before any of her protected conduct, the earliest of which was her December 13, 2021 internal complaint. Accordingly, even if these events were adverse employment actions, Connolly's protected conduct could not be a but-for cause of the event.

Third, several of the events are not adverse actions because they would not "dissuade a reasonable person from making or supporting a charge of discrimination." *Rae*, 113 F.4th at 101 (quotation marks omitted). Connolly contends that Baldassarre conducted a biased investigation of her December 2021 harassment complaint. She points to Baldassarre's testimony that Crowley wanted him to "dispose of" her complaint, and that Alconada "almost wouldn't allow [him] to follow the process that [he] had set out." ECF 97-28, at 19-20, 42-43. But it is undisputed that Baldassarre was the official who investigated Connolly's allegations of harassment, and that Baldassarre did not allow Crowley's statements or Alconada's actions to impact his investigative findings. *Id.* at 42, 152. Baldassarre's investigative report detailed the evidence he consulted, made extensive factual findings, and provided a thorough explanation for his conclusion that Connolly did not experience harassment or bullying. ECF 122, at 182-87. Other than pointing to the statements and behavior from Crowley and Alconada that did not influence Baldassarre's investigation, Connolly makes no further argument as to why Baldassarre's investigation was biased. The First Circuit recently concluded, in a similar case, that unsupported assertions that an investigation was a "sham" and "biased" were insufficient to establish an adverse employment action under the ADA, Rehabilitation Act, and Chapter 151B. *Rae*, 113 F.4th at 108. So too here.

Connolly points next to Kessaris' June 30, 2022 performance evaluation of her, which—based on a scale of unsatisfactory, needs improvement, proficient, and exemplary—indicated that she "need[ed] improvement" in three areas, including in her overall performance rating. ECF 107-

11. After a union grievance regarding the evaluation, Kessaris agreed on July 27, 2022 to change Connolly's rating to proficient throughout, provide her with more rationale for his assessment, and discuss the assessment with her. ECF 122, at 224. Connolly contends that, in light of Baldassarre's aforementioned praise of her performance as a special education teacher, Kessaris' initial evaluation of her was unwarranted. Setting that issue aside, Connolly makes no argument that a negative performance evaluation, changed one month later to a positive performance evaluation, would "dissuade a reasonable person from making or supporting a charge of discrimination." *Rae*, 113 F.4th at 101 (quotation marks omitted). Nor would such an argument be persuasive. While an unwarranted performance evaluation can, in some circumstances, constitute an adverse employment action, *see id.*, Connolly's evaluation was corrected in less than a month and did not remain on her record. On this set of facts, the short-lived evaluation from June 30, 2022 would not dissuade an objectively reasonable employee from making a charge of discrimination. Indeed, Connolly herself filed several subsequent complaints during the fall of 2022.

The same is true of the May 2022 disciplinary meeting. On May 5, 2022, Brissette requested a May 9 meeting with Connolly to discuss an IEP and noted that, as the meeting could result in disciplinary action, Connolly had the right to representation. ECF 107-9. After Connolly requested a delay, Brissette agreed to postpone the meeting, but noted that the meeting was a "routine meeting to discuss a student's IEP." *Id.* The meeting appears to have taken place on May 25, 2022. ECF 122, at 201-02. Connolly does not contend or offer evidence that any formal reprimand resulted from the meeting. Nor does she argue that a routine meeting that could have resulted in a disciplinary measure, but did not, might have dissuaded a reasonable employee from making or supporting a charge of discrimination. Such an argument would not pass muster.

Accordingly, the May 2022 meeting concerning the student's IEP did not constitute an adverse employment action.

Connolly next points to the denial of her request for a transfer to the Linscott School for the 2022-2023 school year. Assuming, without deciding, that this denial constituted an adverse employment action, Connolly has not introduced evidence to demonstrate a causal link between her protected conduct and that denial. Specifically, Connolly points to no evidence that Wells, the Linscott School principal who insinuated that Connolly had a job, or Merra, the successor Linscott School principal who declined to hire her, knew anything about Connolly's protected conduct. Merra explained that Connolly "wasn't a fit for the culture of the school," but she did not reference Connolly's complaints or conduct at the Goodyear School. ECF 97-27, at 170. Kessaris testified that he did not say anything negative about Connolly to Merra with regard to her transfer. ECF 97-4, at 116. And Crowley was not even aware that Connolly had applied for the position at the Linscott School. ECF 97-2, at 82. Absent evidence that Wells or Merra knew about her complaints before Merra decided not to hire her, Connolly cannot establish that her protected conduct was a but-for cause of the denial of her transfer request. *See Stratton*, 113 F.4th at 45-46 (Title VII retaliation claim failed where there was no evidence that the plaintiff's supervisors who took a purportedly adverse action knew about her complaints of discrimination); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) ("[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997))).

Finally, Connolly's claim that the defendants subjected her to a hostile work environment because of her protected conduct cannot survive summary judgment. The First Circuit has recognized, in the ADA context, that "'a hostile work environment, tolerated by the employer, is

cognizable as a retaliatory adverse employment action' if the harassment is 'sufficiently severe or pervasive.'" *Rae*, 113 F.4th at 101 (quoting *Noviello*, 398 F.3d at 89).[9] The question whether an employee's work environment is hostile or abusive "must be answered by reference to all the circumstances." *Colón-Fontanez*, 660 F.3d at 43 (citation and quotation marks omitted). Precedent "is clear that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)'" are not sufficient "to establish an objectively hostile or abusive work environment." *Colón-Fontánez*, 660 F.3d at 44 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Similarly, "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Noviello*, 398 F.3d at 92. Rather, the plaintiff "must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'" *Colón-Fontanez*, 660 F.3d at 43 (alterations modified) (quoting *Quiles-Quiles*, 439 F.3d at 7).[10]

---

[9] One week before *Rae* was decided, the First Circuit cautioned in *Stratton* that, in the Title VII context, a court assessing whether harassment constitutes a "materially adverse" employment action must analyze whether the harassment "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" 113 F.4th at 42 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). And it took "the opportunity . . . to say, definitively, that *Noviello*'s standard in the retaliation context is no longer appropriate." *Id.* at 43. Because *Rae* was decided after *Stratton*, the Court understands the First Circuit to have drawn a distinction between the standard applicable to retaliatory harassment claims in the Title VII and ADA contexts. But even under *Stratton*'s "might-have-dissuaded" standard, drawn from *Burlington Northern*, the totality of the harassing conduct that Connolly identifies would not have dissuaded a reasonable worker from making a charge of discrimination.

[10] The standard is similar under Massachusetts law. *See Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 296 (2016) (the conduct must be "both 'subjectively offensive' and 'sufficiently severe and pervasive to interfere with a reasonable person's work performance,'" and the environment must be "'pervaded by harassment or abuse,' resulting in 'intimidation, humiliation, and stigmatization' that poses a 'formidable barrier to the plaintiff's full participation in the workplace'" (quoting *Dahms v. Cognex Corp*. 455 Mass. 190, 205 (2009); *Pelletier v. Somerset*, 458 Mass. 504, 523-24 (2010))). Where the parties have not argued that the federal and state statutes create meaningfully different standards, the Court will assume the standards are

Drawing all factual inferences in Connolly's favor, the record does not demonstrate that she experienced severe or pervasive harassment objectively indicative of a hostile work environment.[11] In the time period after her earliest protected conduct—that is, her first claim of harassment on December 13, 2021—Connolly was asked to shoulder new work responsibilities, and she interacted with supervisors who were, at times, demanding and fastidious. After her initial harassment complaint in December 2021, Connolly had little contact with Ryan, Boyajian, Kessaris, Greitzer, and Gallo until Baldassarre's investigation determined that she had not experienced harassment. Later, in March 2022, Crowley grew angry with Connolly when she refused the district's appointed outside investigator for her appeal of Baldassarre's report and instead requested a choice of three different investigators. Throughout the winter and spring of 2022, Connolly also received frequent, and sometimes negative, feedback on her work performance from Kessaris, Brissette, and Greitzer. The communications from these individuals were polite but firm, and they often emphasized that Connolly needed to comply with state and federal requirements for IEPs and meet IEP deadlines. It was, of course, within the scope of these individuals' job responsibilities to correct Connolly's mistakes and provide her with feedback. Connolly was also called to attend one disciplinary hearing related to an overdue IEP. Most troubling, Connolly testified that Greitzer did not send IEPs Connolly had written to parents in a timely manner, which Connolly perceived as an attempt to retaliate against and place the blame on her. If true, this behavior would be highly unprofessional. But it does not, even considered with the other evidence from the 2021-2022 school year at the Goodyear School, rise to the level of a

---

interchangeable in resolving the motion for summary judgment. *See, e.g.*, *Brader*, 983 F.3d at 59-65; *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215-18, 215 n.9 (1st Cir. 2016); *Noviello*, 398 F.3d at 92-94.

[11] There is no dispute that Connolly subjectively felt harassed.

workplace "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive" to constitute a hostile work environment. *Colón-Fontanez*, 660 F.3d at 43 (alterations modified and quotation marks omitted).

The same holds true for the 2022-2023 school year, when Connolly worked at the Reeves School. Greitzer and Connolly continued to clash over the scope of their responsibilities regarding annual review meetings and IEP deadlines, and Greitzer continued to provide Connolly with specific, and firm, feedback on her handling of IEPs. Greitzer also copied Connolly's supervisors on emails, a practice that bothered Connolly. Connolly eventually filed another harassment complaint against Greitzer, at which point Greitzer was placed on administrative leave. In June 2023, the independent investigator concluded that Greitzer did not harass Connolly, and that Greitzer's emails to Connolly regarding IEP corrections were reasonable and part of her job.

In cases with similar fact patterns, the First Circuit has affirmed summary judgment for the employer. *See, e.g.*, *Brader*, 983 F.3d at 62-63 (critiques by a supervisor that the plaintiff found unduly harsh are insufficient to create a hostile work environment); *Murray*, 821 F.3d at 87 ("snide comments" are insufficient to create a hostile work environment); *Alvarado v. Donahoe*, 687 F.3d 453, 462-63 (1st Cir. 2012) (isolated incidents of derogatory language, even when fairly severe, are insufficient to create a hostile work environment); *Colón-Fontánez*, 660 F.3d at 43-45 (employee who was yelled at by supervisor in front of coworkers and who was accused of "faking it" and being a hypochondriac was not subject to a hostile work environment). And the facts here do not resemble cases in which the First Circuit has concluded that summary judgment was unwarranted. *See, e.g.*, *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 18 (1st Cir. 2013) (harassment included unwanted physical contact); *Tang*, 821 F.3d at 218 (plaintiff was subjected to frequent obscene and degrading, rather than simply rude, comments); *Quiles-Quiles*, 439 F.3d at 3-4, 7

(harassment occurred on a daily basis and included lewd comments, and coworker threateningly drove at the plaintiff with her truck); *Noviello*, 398 F.3d at 93-94 (plaintiff was subjected to false accusations of misconduct and continuing harassing insults, told by coworkers she had to take dinner breaks alone, left in the cold by coworkers, taunted on behalf of the employee she reported for sexual harassment, and put at risk of physical harm by a coworker who came close to striking her with a car). Viewed in the light most favorable to Connolly, the factual record does not portray an objectively hostile work environment.

The defendants are, accordingly, entitled to summary judgment on Connolly's claims of retaliation under the ADA, Rehabilitation Act, and Chapter 151B.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motion to strike, ECF 110, is GRANTED in part and DENIED in part; the defendants' motion for summary judgment, ECF 97, is GRANTED; and Connolly's motion to exclude expert testimony, ECF 105, is DENIED as moot.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2025